# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4515 | **DATE** | 3/3/2004 |
| **CASE TITLE** | Northern Contracting, Inc. vs. The State of Illinois, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 3/22/2004 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. The court grants Federal Defendants' motion for summary judgment (Doc. 88-1) is granted. The court denies Plaintiff's motion for summary judgment (Doc. No. 82-1), and denies State Defendants' motion for summary judgment (Doc. 87-1). Additionally, the court denies State Defendants' motion to strike improper factual averments in Plaintiff's statement of facts in support of summary judgment (Doc. 98-1) and grants State Defendants' motion to strike improper facts referenced for the first time in Plaintiff's reply brief (Doc. 121-1).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 4 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 0 4 2004 date docketed | 129 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 3/3/2004 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| ETV | courtroom deputy's initials | ETV mailing deputy initials | |
| | | Date/time received in central Clerk's Office | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORTHERN CONTRACTING, INC.,           )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )    No. 00 C 4515
                                       )
THE STATE OF ILLINOIS, ILLINOIS        )    Judge Rebecca R. Pallmeyer
DEPARTMENT OF TRANSPORTATION, KIRK     )
BROWN, as Illinois Secretary of        )
Transportation, GORDON SMITH, in his   )
capacity as Bureau Chief of the BUREAU OF )
SMALL BUSINESS ENTERPRISES, UNITED     )
STATES DEPARTMENT OF TRANSPORTATION, )
and NORMAN Y. MINETA, in his capacity as the )
United States Secretary of Transportation, )
                                       )
            Defendants.                )

DOCKETED

MAR 0 4 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Northern Contracting, Inc. ("Northern"), an Illinois highway contractor, challenges the constitutionality of provisions of federal and state laws designed to guarantee the award of a portion of highway subcontracts to disadvantaged business enterprises ("DBEs"). Northern brought this action against Defendants the State of Illinois, the Illinois Department of Transportation ("IDOT"), Kirk Brown (in his capacity as the Secretary of Transportation for the State of Illinois), Gordon Smith (in his capacity as Chief of IDOT's Bureau of Small Business Enterprises), the United States Department of Transportation ("USDOT"), and Norman Mineta (in his capacity as the United States Secretary of Transportation). Northern seeks a declaration that the federal statutory provisions, federal implementing regulations, and state statute authorizing the Illinois DBE program, as well as the Illinois program itself, are unlawful and unconstitutional. In addition, Northern asks the court to enjoin enforcement of the relevant statutory provisions and regulations and operation of the Illinois DBE program. Northern, which is 100 percent owned by a white male, specializes in fencing, guardrail, and handrail construction, and regularly bids on subcontracts for federal-aid

highway prime contracts awarded by IDOT. Northern claims that several contracts for which it submitted the lowest bid were awarded to subcontractors owned by racial minorities and/or women. After the court denied the Defendants' motion to dismiss, *Northern Contracting, Inc. v. Illinois*, No. 00 C 4515, 2001 WL 987730 (N.D. Ill. Aug. 28, 2001), the parties engaged in lengthy discovery. Now all parties seek summary judgment. For the reasons stated below, the Federal Defendants' motion for summary judgment is granted, the State Defendants' motion for summary judgment is denied, and the Plaintiff's motion for summary judgment is denied.

## FACTUAL BACKGROUND

### I.    Parties

Defendant IDOT is the Illinois state agency responsible for planning, construction, and maintenance of Illinois's extensive transportation network, including highways and bridges, airports, public transit, rail freight, and rail passenger systems. *See* http://www.dot.state.il.us/org.html. IDOT, which operates with an annual budget of approximately $5 billion, administers all state-funded and federal-aid highway construction contracts in the State of Illinois, subject to USDOT regulations and Act 575, Business Enterprise for Minorities, Females, and Persons with Disabilities Act, 30 ILCS 575/1, *et seq.* (West 1996) (hereinafter, the "Business Act"). (*Id.*; State Defendants' Statement of Material Facts (hereinafter, "State Defs.' 56.1") ¶ 1.)

Defendant Kirk Brown was Illinois Secretary of Transportation–the head of IDOT–until December 2002. (State Defs.' 56.1 ¶ 2.) Timothy Martin now holds that position. *See* http://www.dot.state.il.us/directory.html. Defendant Gordon Smith was Chief of the Bureau of Small Business Enterprises and the Liaison Officer for the IDOT DBE program from June 16, 2002 until April 30, 2003. (State Defs.' 56.1 ¶¶ 3, 52; Ex. 2 to State Defs.' 56.1.) In his official capacity, Smith was responsible for developing and implementing all aspects of IDOT's DBE program and for promoting the utilization of women and minorities consistent with federal regulations. (*Id.* ¶ 3.) The

position of Chief of the Bureau of Small Business Enterprises is currently vacant. *See* http://www.dot.state.il.us/directory.html. Defendant USDOT is a federal executive branch agency responsible for administering and enforcing statutes or portions of statutes relating to national transportation policy and programs. (Federal Defendants' Statement of Material Facts ("Fed. Defs.' 56.1") ¶ 1.) Norman Mineta, the current United States Secretary of Transportation, is the head of USDOT, and as such is responsible for the administration of USDOT's programs and the promulgation and enforcement of USDOT regulations. (*Id.* ¶ 2.)

In his deposition, Richard Roesch, Plaintiff's sole owner, testified that Plaintiff "does state, government and commercial work." (Deposition of Richard Roesch (hereinafter, "Roesch Dep."), Ex. 19 to Plaintiff's Statement of Material Facts (hereinafter, "Pl.'s 56.1"), at 22, 36). He stated that Plaintiff bids as a subcontractor on approximately 200 to 250 IDOT and county projects per year, but bids only five or six times per year as a prime contractor for IDOT work. (*Id.* at 36-37.)[1] According to Roesch, Northern competes for guardrail and fencing work against approximately seven other firms, three of which--Access Control Co., Inc., Clevenger Contractors, Inc., and Harris Fence--are DBEs. (*Id.* at 113-16.)[2] Roesch testified that "our biggest complaint is [that] we lose work in our immediate area to minority contractors. . . . It's more profitable . . . to be within our geographic vicinity closer to base than . . . getting jobs that are two hours away and having to send people and supplies to that location just to stay in business." (*Id.* at 118.) Plaintiff obtains approximately 35 percent of its revenues from federal-aid highway construction contracts administered by IDOT (hereinafter, "federal-aid IDOT contracts"), and the remainder from state,

---

[1] Plaintiff's complaint does not mention prime contracts for which it bid. The record does not indicate how many total bids--government and commercial--Plaintiff makes each year. Nor has any party stated the number of federal-aid projects administered by IDOT on which Plaintiff bids each year.

[2] Although it is clear from the record that Plaintiff has bid on guardrail and fencing subcontracts, it is not clear whether IDOT also awards prime contracts for guardrail and fencing work and, if so, whether Plaintiff has bid on such work.

local, and privately-funded contracts without federal funding. (State Defs.' 56.1 ¶ 119; Plaintiff's Response to Illinois State Defendants' Statement of Material Facts (hereinafter, "Pl.'s Resp. to State Defs.' 56.1") ¶ 121.) In 2002, Plaintiff was awarded more than 60 contracts, and its gross revenues were approximately $3 million. (State Defs.' 56.1 ¶ 121; Pl.'s Resp. to State Defs.' 56.1 ¶ 123; Roesch Dep., at 53.)[3] Plaintiff does not claim status as a DBE and has never applied for certification as a DBE. (State Defendants' Response to Plaintiff's Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment (hereinafter, "State Defs.' Resp. 56.1") ¶ 3.)

## II. Complaint

On February 14, 2003, Plaintiff filed its four-count Third Amended Complaint (hereinafter, "TAC"),[4] which challenges the constitutional validity of a federal statute, a state statute, and certain implementing regulations. Specifically, Plaintiff challenges (1) § 1101(b) of the Transportation Equity Act for the 21st Century, Pub. L. 105-178, 112 Stat. 107 (1998) (hereinafter, "TEA-21"), which was enacted on June 9, 1998; (2) 49 C.F.R. Part 26 (the "Regulations"), which became effective on March 4, 1999; (3) the Business Act, which became effective on September 6, 1984; and (4) IDOT's DBE Program, which was first submitted to USDOT for approval pursuant to the Regulations on September 1, 1999.

Plaintiff brings Counts I through III of the TAC only against USDOT and Mineta (collectively, the "Federal Defendants"). In Count I, Plaintiff claims that TEA-21 and the Regulations deprive Plaintiff of "an equal opportunity to compete for federal-aid highway contracts because of the race and gender of its owners and management" and therefore "violate Northern's rights under 42 U.S.C. § 2000(d) and the equal protection element of the Fifth Amendment to the United States Constitution." (TAC ¶¶ 76-78.) In Count II, Plaintiff claims that, to the extent TEA-21 and the

---

[3]    The record does not indicate whether this figure refers only to work Plaintiff performed for IDOT or if it includes local and private projects as well.

[4]    Plaintiff filed its original complaint in this case on July 26, 2000.

Regulations require IDOT "to utilize goals for the participation of DBEs selected on the basis of race and gender on federal-aid highway contracts, they invidiously discriminate against white male-owned and controlled contractors, such as Northern." (TAC ¶ 79-82.) In Count III, Plaintiff claims that "[t]he relevant provisions of TEA-21 exceed Congress's legislative powers under the United States Constitution." (TAC ¶ 83-86.)

In Count IV, which is brought only against IDOT, Brown and Smith (collectively, the "State Defendants"), Plaintiff claims that as a "direct and proximate result of the race and gender-conscious measures set forth in . . . State Defendants' DBE Program and the [Business] Act and as applied by . . . State Defendants, Northern has been, and will continue to be, denied an equal opportunity to compete for federal-aid and state highway contracts in Illinois." Accordingly, Plaintiff alleges, Illinois's DBE Program, the Business Act, and the acts of State Defendants "violate Northern's rights to equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution and Article 1 of the Illinois Constitution, and 42 U.S.C. §§ 1981, 1983 and 2000(d)." (TAC ¶¶ 87-89.)

## III.     Relevant Statutes

### A.     TEA-21 and Implementing Regulations

Since 1982, the federal highway statutes have required that recipients of federal highway funds set aside ten percent of federal highway construction funds for small businesses owned and controlled by "socially and economically disadvantaged individuals," as that term was defined in the Small Business Act.  *See* Surface Transportation Assistance Act of 1982, Pub. L. No. 97-424 § 105(f), 96 Stat. 2097, 2100.  On June 9, 1998, the President signed into law TEA-21, which authorized USDOT to expend funds for federal surface transportation programs for highways,

highway safety, and transit for fiscal years 1998-2003.[5] Under TEA-21, as under previous federal highway statutes, at least ten percent of federal highway construction funds must be paid to DBEs "except to the extent that the Secretary [of Transportation] determines otherwise." TEA-21 § 1101 (b)(1). The provisions of TEA-21 were set to expire on September 30, 2003; however, on the eve of TEA-21's expiration, the President signed into law the Surface Transportation Extension Act of 2003, Pub. L. 108-88, 117 Stat. 1110, which extended the provisions of TEA-21 for an additional five months, through February 29, 2004.

Effective March 4, 1999, USDOT issued the Regulations, which were titled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs." 64 Fed.Reg. 5096 (Feb. 2, 1999) (codified in 49 C.F.R. pt. 26). The Regulations define "recipient" as "any entity, public or private, to which DOT financial assistance is extended, whether directly or through another recipient, through the programs of the FAA, FHWA, or FTA, or who has applied for such assistance" (hereinafter, "Recipient"). 49 C.F.R. § 26.5.[6] The parties implicitly agree that Illinois and IDOT are Recipients as defined by the Regulations. The Regulations forbid a Recipient from discriminating against anyone "in connection with the award and performance of any contract covered by this part on the basis of race, color, sex, or national origin." 49 C.F.R. § 26.7(a). In administering its DBE program, a Recipient "must not, directly or through contractual or other arrangements, use criteria or methods of administration that have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, sex, or national origin." 49 C.F.R. § 26.7(b).

---

[5] For a detailed description of the relevant statutes and regulations preceding TEA-21, see *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1188-95 (10th Cir. 2000), *cert. granted then dismissed as improvidently granted*, 532 U.S. 941, 534 U.S. 103 (2001).

[6] The Regulations do not explain what private entities might receive DOT financial assistance, whether directly or through another recipient, and this court found no cases addressing the issue.

As a condition of receiving federal highway funds, a Recipient must have a DBE program, 49 C.F.R. § 26.21, must set an overall goal for DBE participation in USDOT-assisted contracts, 49 C.F.R. § 26.45(a), and, if it sets overall goals on a fiscal year basis, must submit them to USDOT for review and approval. 49 C.F.R. § 26.45(f)(1). If a Recipient determines that DBE firms are so "overconcentrated" in a particular occupational area as to "unduly burden" the opportunity of non-DBE firms to participate in that type of work, it must devise appropriate measures to address this overconcentration. 49 C.F.R. § 26.33. The provision in TEA-21 requiring that at least ten percent of federal highway construction funds be paid to DBEs "is an aspirational goal at the national level." 49 C.F.R. § 26.41(b). This national goal "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." 49 C.F.R. § 26.41(c). USDOT may grant an exemption or waiver from nearly all aspects of the program, including any provision relating to administrative requirements, overall goals, contract goals, and good faith efforts. 49 C.F.R. § 26.15(b).

## 1.    The Goal-Setting Process

The Regulations outline the process for setting the Recipient's overall DBE participation goal. As the Regulations explain, that goal "must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate" on its USDOT-assisted contracts (hereinafter, the "relative availability of DBEs"). 49 C.F.R. § 26.45(b). The goal must also reflect the Recipient's determination of the level of DBE participation it "would expect absent the effects of discrimination." *Id.*[7] Under the first of two steps mandated by the Regulations, the Recipient is directed to determine "a base figure for the relative

_____

[7]    The court notes that the Regulations do not specify whether the phrase "effects of discrimination" refers to discrimination by public or private actors, or both.

availability of DBEs." 49 C.F.R. § 26.45(c). Examples of approaches that the Recipient may employ in determining a base figure include: (1) use of DBE directories and Census Bureau data; (2) use of a bidders list; (3) use of data from a disparity study; (4) use of the goal of another Recipient in the same, or a substantially similar, market, adjusted for differences in the Recipient's local market and contracting program, as a base figure for the Recipient's goal; or (5) other methods to determine a base figure, as long as such methods are based on demonstrable evidence of local market conditions and are designed ultimately to attain a goal that is rationally related to the relative availability of DBEs in the relevant market. *Id.*

Once the Recipient has calculated its base figure, step two of the goal-setting process requires the Recipient to examine all evidence available in the jurisdiction and adjust the base figure accordingly to arrive at the overall goal. 49 C.F.R. § 26.45(d). The "many types of evidence that must be considered" when adjusting the base figure include (i) the current capacity of DBEs to perform work in the DOT-assisted contracting program, as measured by the volume of work DBEs have performed in recent years, and (ii) evidence from "disparity studies" conducted anywhere within the jurisdiction, to the extent such evidence is not already accounted for in the base figure. *Id.* If available, the Recipient must consider evidence from related fields that affect the opportunities for DBEs to form, grow and compete, including (i) statistical disparities in the ability of DBEs to obtain the financing, bonding, and insurance required to perform work in the program; and (ii) data on employment, self-employment, education, training, and union apprenticeship programs, to the extent they relate to the opportunities for DBEs to participate in the Recipient's program. *Id.* If the Recipient attempts to make an adjustment to the base figure "to account for the continuing effects of past discrimination (often called the 'but for factor') or the effects of an ongoing DBE program, the adjustment must be based on demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought." *Id.* In setting the

8

overall goal, the Recipient must provide for public participation, including consultation with minority, women's, and general contractor groups and community organizations which "could be expected to have information concerning the availability of disadvantaged and non-disadvantaged businesses, the effects of discrimination on opportunities for DBEs, and [the Recipient's] efforts to establish a level playing field for the participation of DBEs." 49 C.F.R. § 26.45(g)(1). If a Recipient does not have an approved DBE program or overall goal, or if it fails to implement its program in good faith, it is "in noncompliance with" the Regulations. 49 C.F.R. § 26.47(b). A Recipient cannot, however, be penalized, or treated by USDOT as being in noncompliance with the Regulations, because its DBE participation falls short of its overall goal, unless it has failed to administer its program in good faith. 49 C.F.R. § 26.47(a).

When submitting its DBE goal to USDOT, a Recipient must include a description of the methodology used to establish the goal, including the base figure and the evidence with which it was calculated, as well as the adjustments made to the base figure and the evidence relied on for such adjustments. 49 C.F.R. § 26.45(f)(3). The Recipient should also include a summary listing of the relevant available evidence in the jurisdiction and, where applicable, an explanation of why the Recipient did not use that evidence to adjust the base figure. *Id.* Further, the Recipient must include its projection of the portions of the overall goal it expects to meet through race-neutral and race-conscious measures, respectively. *Id.*; 49 C.F.R. § 26.51(c).

## 2. Preference for Race-Neutral Measures over Contract Goals

The Regulations direct a Recipient to meet the "maximum feasible portion" of its overall goal through race-neutral means.[8] 49 C.F.R. § 26.51(a). Race-neutral DBE participation includes a DBE's being awarded (1) a prime contract through customary competitive procurement procedures,

---

[8]     The terms "race-neutral" and "race-conscious" include gender-neutrality and gender-consciousness for purposes of 49 C.F.R. § 26.51. 64 Fed.Reg. at 5112.

(2) a subcontract on a prime contract that does not carry a DBE goal, and (3) a subcontract on a prime contract that does carry a DBE goal but where the prime contractor did not consider its DBE status in making the award (e.g., where a prime contractor uses a strict low bid system to award subcontracts). *Id.* Race-neutral means include providing assistance in overcoming limitations such as inability to obtain bonding or financing by simplifying the bonding process, reducing bonding requirements, eliminating the impact of surety costs from bids, and providing services to help DBEs and other small businesses obtain bonding and financing. 49 C.F.R. § 26.51(b). Contract goals are considered race-conscious measures. 64 Fed.Reg. at 5112.

If a Recipient projects it will not be able to meet its overall goal using only race-neutral means, it must establish contract goals to the extent that such goals will achieve the overall goal. 49 C.F.R. §§ 26.51(d), (f)(1). A Recipient may use contract goals only on those USDOT-assisted contracts that have subcontracting possibilities. 49 C.F.R. § 26.51(e)(1). Further, a Recipient must adjust its use of race-neutral and/or race-conscious measures if it determines during the course of the year that it will exceed or fall short of its overall goal. 49 C.F.R. § 26.51(f)(2). If the Recipient has succeeded in meeting or exceeding its overall goals through race-neutral means alone for two consecutive years, it need not make a projection of the amount of its goal it can meet using race-neutral means in the next year. 49 C.F.R. § 26.51(f)(3). If the Recipient obtains DBE participation that exceeds its overall goal in two consecutive years through the use of contract goals (i.e., not through the use of race-neutral means alone), it must reduce its use of contract goals proportionately in the following year. 49 C.F.R. § 26.51(f)(4).[9] The Regulations provide, further, that a Recipient may not use quotas for DBEs on USDOT-assisted contracts and may not set aside contracts for DBEs on USDOT-assisted contracts except in limited circumstances "when no other

---

[9] Presumably § 26.51(f)(4) would only apply to a Recipient that failed to determine that it would exceed its DBE goal pursuant to § 26.51(f)(2) during two consecutive years.

method could be reasonably expected to redress egregious instances of discrimination." 49 C.F.R. § 26.43.

Once it has set a DBE goal, a Recipient may only award a prime contract to a bidder/offeror that documents that it has either (1) obtained enough DBE participation to meet the goal, or (2) made adequate good faith efforts to meet that goal, even if it did not succeed in obtaining enough DBE participation to do so. 49 C.F.R. § 26.53(a). Examples of the types of actions a Recipient should consider as part of the bidder's good faith efforts to obtain DBE participation include soliciting interest of DBEs at pre-bid meetings; advertising and/or written notices; breaking out contract work items into economically feasible units to facilitate DBE participation, even when the prime contractor might otherwise prefer to perform these work items with its own forces; providing interested DBEs with adequate information about the plans, specifications, and requirements of the contract; negotiating in good faith with interested DBEs; not rejecting DBEs as being unqualified without sound reasons based on a thorough investigation of their capabilities; making efforts to assist interested DBEs in obtaining bonding, lines of credit, or insurance as required by the Recipient or contractor; making efforts to assist interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or services; and effectively using the services of available minority/women community organizations, contractors' groups, and government business assistance offices. 49 C.F.R. pt. 26, Appendix A § IV. A higher bid from a DBE than from a non-DBE is not a sufficient reason for a prime contractor's failure to meet the DBE goal on a contract, unless the difference is "excessive or unreasonable." 49 C.F.R. pt. 26, Appendix A § IV(D)(2). A Recipient must apply the requirements of this section to DBE bidders/offerors for prime contracts. 49 C.F.R. § 26.53(g). In determining whether a DBE bidder/offeror for a prime contract has met a contract goal, the Recipient is directed to count the work the DBE has committed to performing

with its own forces as well as the work that it has committed to be performed by DBE subcontractors and DBE suppliers. *Id.*

### 3. Qualifications for DBE Status

To qualify as a DBE, a contractor must be independently owned and operated, not dominant in its field of operation, and at least 51 percent owned–and controlled by–one or more socially and economically disadvantaged individuals. TEA-21 § 1101(b)(2); 15 U.S.C. §§ 632(a)(1), 637(a)(6)(A), 637(d).[10] Recipients "must rebuttably presume" that women and members of certain racial minority groups[11] are socially and economically disadvantaged individuals and must require each presumptively disadvantaged business owner to submit a signed, notarized certification that he or she is, in fact, socially and economically disadvantaged. 49 C.F.R. § 26.67(a)(1).[12] A firm does not qualify for DBE status, however, if its average annual gross receipts over the preceding three fiscal years exceed $16.6 million, as adjusted by USDOT for inflation. TEA-21 § 1101 (b)(2)(A). Further, any individual whose personal net worth exceeds $750,000 is not economically disadvantaged, 49 C.F.R. § 26.67(b)(1); on the other hand, a firm owned by an individual who is not presumptively disadvantaged may qualify as a DBE if it can demonstrate that "the individuals

---

[10] "Socially disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," 15 U.S.C. § 637(a)(5), and "economically disadvantaged individuals" are "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A), cited in TEA-21 § 1101(b)(2)(A).

[11] Specifically, "Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, or other minorities found to be disadvantaged by" the Small Business Administration. 49 C.F.R. § 26.67(a)(1).

[12] Specific guidance on which factors qualify an individual as socially and economically disadvantaged is provided in 49 C.F.R. Appendix E.

who own and control" the firm are in fact socially and economically disadvantaged. 49 C.F.R. § 26.67(d).

Recipients have the responsibility to ensure that DBEs attest to the accuracy of the information provided to the Recipient and continue to meet the requirements for that status. 49 C.F.R. § 26.83(c)(7)(ii), (j). Recipients must require each individual owner of a firm applying to participate as a DBE to certify that he or she has a personal net worth that does not exceed $750,000. 49 C.F.R. § 26.67(a)(2). Any person may file with the Recipient a written complaint alleging that a DBE-certified firm is ineligible for specific reasons. 49 C.F.R. § 26.87(a). When such a complaint is made, the Recipient must review all available information concerning the firm and, if it determines that there is reasonable cause to believe the firm is ineligible, provide written notice to that firm setting forth the reasons for the proposed determination and give the firm an opportunity for an informal hearing on the matter. 49 C.F.R. § 26.87(a), (d)-(k).

USDOT may refer to the Department of Justice for prosecution any person who makes a false or fraudulent statement in connection with participation of a DBE in any USDOT-assisted program. 49 C.F.R. § 26.107(e). On its web site, at the request of a number of Recipients, USDOT posted a document providing guidance beyond what is set forth in the Regulations on goal-setting and on how to determine what portion of goal should be race/gender-neutral and race/gender-conscious. *See* http://osdbuweb.dot.gov/business/dbe/tips.html.

**B.    Illinois Business Act**

The Business Act requires any Illinois state agency that administers a construction program governed by federal law or regulations relating to utilization of minority, disadvantaged, and female-owned businesses to implement a DBE program "using the federal standards and procedures for the establishment of goals and utilization procedures for the State-funded, as well as the federally assisted, portions of the program." 30 ILCS 575/6(d). The Business Act will be repealed by its own

13

terms on September 6, 2004. 30 ILCS 575/9. The court notes that Plaintiff has not offered any evidence to support its assertion that the Business Act is unconstitutional.

## IV.    Illinois DBE Program

IDOT operated a DBE program prior to implementation of the Regulations, although, except as discussed below, the record is devoid of information regarding this program. On a date not specified in the record, IDOT formed a committee to create the DBE program challenged in this suit, for the administration of federally-funded highway construction projects in Illinois. (State Defs.' 56.1 ¶ 48; Pl.'s Resp. to State Defs.' 56.1 ¶ 50.) The record indicates that six IDOT officials participated in the development of IDOT's FY 2000, FY 2002, and FY 2003 DBE goals: Rob Newbold ("Newbold"), then-Deputy Secretary of IDOT, (Deposition of Rob Newbold (hereinafter, "Newbold Dep."), Ex. 9 to State Defs.' 56.1, at 45-46); Edward Gower, then-Chief Counsel for IDOT, (Deposition of Edward Gower (hereinafter, "Gower Dep."), Ex. 7 to State Defs.' 56.1, at 5, 8, 10-11); Randy Vereen, then-Director of IDOT's Office of Finance and Administration, (Deposition of Randy Vereen (hereinafter, "Vereen Dep."), Ex. 6 to State Defs.' 56.1, at 8); Beverly Peters, who was until January 2000 Chief of the Bureau of Small Business Enterprises, (Deposition of Beverly Peters (hereinafter, "Peters Dep."), Ex. 11 to State Defs.' 56.1, at 8); Ana Velasco, who followed Peters as Chief of the Bureau of Small Business Enterprises, (Deposition of Ana Velasco (hereinafter, "Velasco Dep."), Ex. 10 to State Defs.' 56.1, at 21)[13]; and Gary Gould ("Gould"), former

---

[13]    On January 3, 2000, Peters became Deputy Director of Finance and Administration, and Velasco became Chief of the Bureau of Small Business Enterprises. (Peters Dep., at 8-9; Velasco Dep., at 20.) Velasco was not involved in creating the FY 2000 DBE program, but did participate in determining IDOT's FY 2002 goal (with Peters's assistance) as well as its FY 2003 goal. (Id.)

Chief of the Bureau of Construction in IDOT's Division of Highways.[14] (Deposition of Gary Gould (hereinafter, "Gould Dep."), Ex. 13 to State Defs.' 56.1, at 6-7.)

According to Gould, IDOT is required by law to award prime contracts to the lowest bidder, without regard to DBE status. (Gould Dep., at 35, 44, 74.) Although DBE status is purportedly irrelevant to the choice of prime contractors for Illinois highway projects, there is evidence that where IDOT does select a DBE prime contractor, IDOT accounts that project toward its DBE goal. (*See* Ex. 15 to State Defs.' 56.1 ¶¶ III, VII(A).) As discussed above, such accounting is permitted by the Regulations. For example, race-neutral DBE participation includes a DBE's being awarded a prime contract through customary competitive procurement procedures. 49 C.F.R. § 26.51(a). In determining whether a DBE bidder/offeror for a prime contract has met a contract goal, the Recipient is directed to count the work the DBE has committed to performing with its own forces. 49 C.F.R. § 26.53(g). Although the Regulations do not explicitly bar consideration of DBE status in the award of prime contracts, the Regulations do state that a Recipient may use contract goals only on those USDOT-assisted contracts that have subcontracting possibilities. 49 C.F.R. § 26.51 (e)(1). State Defendants have not addressed, and Gould did not identify, the statutory provision or regulation that imposes the requirement that prime contracts be awarded to the lowest bidder. The court therefore is puzzled by Gould's assertion that IDOT never considers–and indeed cannot consider–DBE status in awarding prime contracts. As discussed below, such information is significant in evaluating IDOT's DBE program.

## A.    Goal Development Process

IDOT officials held several public hearings in which both DBEs and prime contractors[15] discussed the needs and experiences of DBEs as well as barriers to their success, such as the fact

---

[14]    This title appears in an undated IDOT personnel directory. *See* http://www.dot.state.il.us/gif/directory.html.

[15]    Vereen did not indicate whether any of these prime contractors were also DBEs.

that many DBE owners "didn't grow up in the industry . . . [or] inherit the business from their parents." (Vereen Dep., at 133, 144.) Vereen testified that he personally met with owners of small businesses, DBEs, and prime contractors in the IDOT construction industry to discuss and identify barriers and discrimination that might be affecting participation levels of DBEs. (*Id.* at 15-17.) It is clear, however, that IDOT officials never attempted to determine whether the goal reflected IDOT's determination of the level of DBE participation it "would expect absent the effects of discrimination," as required by 49 C.F.R. § 26.45(b). (*See* Newbold Dep., at 35-38, 46-47; Vereen Dep., at 106-07, 113-14, 138-39, 146, 156, 167; Peters Dep., at 97-98, 101-02, 117; Gould Dep., at 49-51; Gower Dep., at 105.) Vereen stated that IDOT never performed "a numerical analysis of discrimination" because "[w]e did not have the time, and we moved forward to try to implement a program." (Vereen Dep., at 138-39.)

## B.    FY 2000 DBE Program

IDOT officials drafted and submitted IDOT's FY 2000 Program Document to USDOT on September 1, 1999. (Ex. 3 to State Defs.' 56.1, at 1.) The document stated that the Department's "overall goal was based on evidence of the availability of ready, willing, and able DBEs relative to all businesses ready, willing, and able to participate in DOT-assisted contracts." (*Id.* at 9.) To determine the number of "ready, willing, and able" DBEs, IDOT first calculated the number of DBE construction firms and engineering consulting firms—both prime contractors and subcontractors—to which it had awarded contracts as a percentage of total contracts awarded in FY 1997 and 1998, during the course of IDOT's pre-Regulations DBE program. It then calculated the value of contracts awarded to DBE construction firms and engineering consulting firms as a percentage of the total value of contracts awarded in FY 1997 and 1998. The average of these two percentages became the base figure for the FY 2000 program goal.

Although some 15.72 percent of the highway construction firms were DBEs, only 13.67 percent of the total dollar value of construction contracts had been awarded to DBEs over those years. The ratio for engineering consulting contracts was worse: although 17.09 percent of the active highway engineering consulting firms were DBEs, they accounted for only 9.2 percent of the contract dollars awarded for engineering consulting. Similarly, while the "weighted average" of the number of DBE construction and engineering consulting firms was 15.76 percent, DBEs garnered a weighted average of only 13.39 percent of total contract dollars. The average of these two figures, 14.6 percent, constituted the "base figure" for IDOT's FY 2000 program goal. (*Id.* at 10-16.)

IDOT then adjusted this base figure of 14.6 percent "to reflect changes in the regulation and other program dynamics." (*Id.*) Specifically, the Department removed the 16 former DBE firms rendered ineligible by the $750,000 personal net worth cap, removed DBE trucking firms, and reduced the percentage to account for the change in status of the three largest of the 16 former DBE firms, yielding a final DBE goal of 12.5 percent. (*Id.* at 13-15.)

The document stated that IDOT sought to "meet the maximum feasible portion" of this overall goal by using the following race-neutral means: (1) awarding a number of smaller projects—40 to 50 projects of $500,000 or less—in urban areas of the state to increase the opportunities for DBEs to function as prime contractors; (2) creating a more accessible website marketplace to help match DBE subcontractors with prime contractors on IDOT projects; and (3) providing an additional $500,000 to expand its contractor training programs in such areas as estimating, unit pricing, and work scheduling. (*Id.* at 15.) The document also stated that "IDOT evaluated current [race-neutral] accomplishments to determine what portion of the overall goal could be met through [race-neutral] means." (*Id.*) This evaluation was accomplished by comparing the volume of business awarded in FY 1997 and 1998 to DBE prime contractors and

subcontractors on non-set-aside highway construction contracts with total IDOT highway construction awards, during the course of IDOT's pre-Regulations DBE program. (*Id.*) After evaluating the race-neutral measures it had already implemented, IDOT anticipated meeting 3.5 percent of its DBE goal through race- and gender- neutral means, with the remaining nine percent presumably to be met through race- and gender-conscious contract goals. (*Id.* at 15-17.)

Under the FY 2000 program, consistent with the Regulations, a prime contractor could seek a waiver or modification of a highway construction project's DBE participation goal by documenting its good faith efforts to achieve the project goal. The program document refers the bidder to 49 C.F.R. Part 26 Appendix A for examples of good faith efforts. (*Id.* at 20-21.)

A document authored by IDOT titled "Special Provision for Disadvantaged Business Enterprise Participation"[16] states that "the fact that there may be some additional costs involved in finding and using DBE companies is not in itself sufficient reason for a bidder's failure to meet the contract DBE goal, as long as such costs are reasonable." (Ex. 15 to State Defs.' 56.1 ¶ VIII(A)(4)(b).) The document confirms, further, that prime contractors are not "required to accept higher quotes from DBE companies if the price difference is excessive or unreasonable." (*Id.*) Newbold, Gower, and Velasco all testified that a prime contractor was not expected to accept a DBE's bid that was more than five percent higher than the lowest responsible bid. (Newbold Dep., at 22; Gower Dep., at 62; Velasco Dep., at 53-54.) The "Special Provision" document, however, does not make reference to this "five percent" rule of thumb.[17] Velasco testified that it was her

---

[16]      The record does not indicate when, where, or to whom IDOT issued this document.

[17]      In an undated document titled "Good Faith Efforts," IDOT stated that "[a] DBE bid for a subcontract will normally be considered unreasonable if the bid exceeds by more than five percent the lowest responsible bidder." (Ex. A to State Defendants' Reply in Support of Their Motion for Summary Judgment, at 2.) State Defendants acknowledge that "IDOT inadvertently cited to the wrong exhibit in its Statement of Material Facts (¶ 61)" but note that Plaintiff's counsel received the document through discovery. (State Defendants' Reply in Support of Their Motion for
(continued...)

understanding that a prime contractor was also excused from accepting a DBE's bid if the prime contractor presented evidence, based on actual experience with the DBE, that there was a problem with the quality of the DBE's work or competency. (Velasco Dep., at 56-57.) The document merely states, "A bidder using good business judgment . . . would take a firm's price and capabilities as well as contract goals into consideration," and states that a prime contractor may not reject DBEs "as being unqualified without sound reasons based on a thorough investigation of their capabilities." (Ex. 15 to State Defs.' 56.1 ¶¶ VIII(A)(4)(b), (5).)

In his deposition, Robert Ashby, USDOT Deputy Assistant General Counsel for Regulations and Enforcement, testified that he and other USDOT officials reviewed the methodology employed by IDOT in setting its FY 2000 DBE program plan and overall goal. (Deposition of Robert Ashby, Ex. 12 to Federal Defendants' Renewed Motion for Summary Judgment (hereinafter, "Fed. Defs.' Motion"), at 38-39, 102-04, 182.) On May 1, 2000, USDOT approved IDOT's FY 2000 DBE plan based on the program's "compliance and consistency with" the Regulations. (Ex. 17 to State Defs.' 56.1, at 1.) USDOT found that IDOT's program was "similar to [USDOT's] Sample DBE Program," (*id.* at 8), and that IDOT'S certification process met the size, group, membership, ownership, and control standards set forth in the Regulations. (State Defs.' 56.1 ¶ 73; Pl.'s Resp. to State Defs.' 56.1 ¶ 75.) With the approval of USDOT, IDOT did not submit a proposed DBE goal to USDOT for FY 2001 but continued to use the FY 2000 goal and race-neutral component in FY 2001. (State Defs.' 56.1 ¶ 81; Pl.'s Resp. to State Defs.' 56.1 ¶ 83.)

C.    FY 2002 DBE Program

In its FY 2002 Program Document, which IDOT submitted to USDOT on August 1, 2001, the Department reiterated many of the same goals and information set forth in the FY 2000

---

[17](...continued)
Summary Judgment, at 10 n.9.) As this document does not indicate when, where, or to whom it was issued, however, the court declines to consider it.

Program Document. (Ex. 4 to State Defs.' 56.1, at 1-8.) IDOT officials held public meetings on June 28, 2001 and July 10, 2001 with representatives of highway construction industry associations and community organizations to discuss the Department's goal-setting methodology, including the availability of DBEs and non-DBEs, the effects of discrimination on opportunities for DBEs, and the Department's efforts to establish a level playing field for DBE participation. (Id. at 8.) The document stated that IDOT sought to "meet the maximum feasible portion" of its overall goal by using race-neutral means of achieving DBE participation, including awarding smaller contracts and providing training and internet services. (Ex. 4 to State Defs.' 56.1, at 9, 16.) It indicated that IDOT made several race-neutral efforts to increase DBE participation in the Department's highway construction program, including "an extensive outreach program," a technology assistance program that provided services in computerization and internet utilization, and development of a website that includes a "Contractor's Market Place" for prime contractors, subcontractors, and suppliers wishing to do business with IDOT. (Id. at 9.) Other race-neutral measures IDOT pointed to were the creation of the Small Business Advisory Committee ("SBAC") to advise the Department on DBE-related matters,[18] the establishment of networking sessions throughout Illinois, and the decision to "unbundle" between $20 and $25 million per year in contract expenditures in packages of $500,000 or less to provide opportunities for DBEs and other small businesses to bid as prime contractors. (Id.)

IDOT employed the same methodology it had used in setting its FY 2000 goal, but with FY 1997 through FY 2000 data, to arrive at a DBE goal of 12.29 percent participation in IDOT contracting. (Id. at 12-15.) After evaluating the race-neutral measures it had already implemented,

---

[18]     According to IDOT's FY 2003 DBE Program Document, the SBAC "serves in an advisory capacity to [IDOT] regarding matters relating to the DBE program. Industry associations representing prime contractors and DBE interests, from both geographic and special interest perspectives, serve on the SBAC." (Ex. 8 to State Defs.' 56.1, at 9.)

IDOT anticipated meeting 2.5 percent of this DBE goal through race- and gender-neutral means, leaving the remaining 9.79 percent to be met through race- and gender-conscious contract goals. (*Id.* at 16.) USDOT approved IDOT's FY 2002 Program Document on November 26, 2002. (Pl.'s 56.1 ¶ 40; State Defs.' Resp. 56.1 ¶ 40.) Prior to that date, IDOT continued to operate under its FY 2000 goal. (Vereen Dep., at 76-77.)

### D. FY 2003 DBE Program

USDOT approved IDOT's FY 2003 Program Document on November 26, 2002, the same day it had approved IDOT's FY 2002 Program Document. (Pl.'s 56.1 ¶ 41; State Defs.' Resp. 56.1 ¶ 41; Ex. 20 to State Defs.' 56.1, at 1.)[19] In a document prepared to describe the methodology used to establish the FY 2003 overall goal, IDOT stated that it had held two public meetings to solicit information from interested organizations or individuals. (Ex. 8 to State Defs.' 56.1, at 1.)[20] Employing the same methodology used for the FY 2000 and 2002 goals, but with data from FY 1997 through 2001, IDOT calculated a DBE goal of 12.14 percent. (*Id.* at 4-8.) The document reiterated race-neutral efforts the Department had implemented in FY 2002, discussed above, including "an extensive outreach program," networking sessions throughout Illinois, an expanded website that included the Contractor's Market Place, and the creation of the SBAC. (*Id.* at 9.) IDOT anticipated meeting 2.25 percent of its DBE goal through these race- and gender-neutral means, leaving the remaining 9.89 percent of its goal to be met through race- and gender-conscious contract goals. (*Id.* at 10.)

---

[19]     The record does not indicate when IDOT submitted its FY 2003 Program Document to USDOT.

[20]     For reasons that are unclear, State Defendants have chosen to attach this summary document rather than IDOT's FY 2003 DBE Program Document.

## E. IDOT "Zero-Goal" Program

At the request of non-DBE prime contractors, and as a response to suggestions by Plaintiff's counsel, "IDOT engaged in an experimental program whereby it set 0% participation goals on approximately 5% of IDOT's highway and aeronautic construction projects." (State Defs.' 56.1 ¶¶ 55, 75.) Although the record does not provide the dates during which IDOT conducted this program, Gould testified that the program took place for one year in either calendar year or fiscal year 2001. (Gould Dep., at 78.) The parties agree that prime contracts awarded to DBEs were excluded from the study. (State Defs.' 56.1 ¶ 76.) The Department's objective in undertaking this program was "to confirm the accuracy of its annual goal and its race-neutral efforts." (Id. ¶ 55.) DBE participation on these projects dropped to about 1.5 percent.[21] Gower testified that "we didn't get much participation, which suggested we could not replace contract goals with no goals and achieve our overall goal for DBE participation for a given year." (Gower Dep., at 105.) He acknowledged, however, that no one "examine[d] whether the reason that more DBE subcontractors were not selected was due to discriminatory reasons." (Id.)

## F. Effectiveness of Race-Neutral Measures

The parties dispute whether IDOT could have met its DBE goals using only race-neutral measures, i.e., without employing race-conscious contract goals. (State Defs.' 56.1 ¶¶ 54, 66, 67; Pl.'s Resp. to State Defs.' 56.1 ¶¶ 56, 68, 69.) According to State Defendants, IDOT had no evidence that it could meet its overall goals through exclusively race-neutral means. (State Defs.' 56.1 ¶ 54.) In Randy Vereen's words, a race-conscious goal was necessary "because we had no evidence that we would achieve the kinds of participation that the analysis suggested we should have without one based on prior history." (Vereen Dep., at 135-36.) State Defendants assert that

---

[21]     The record does not indicate what the DBE subcontractor participation rate was for non-DBE prime contractors before IDOT conducted the zero-goal program.

IDOT used "the best available data" both "to analyze its past and future race neutral achievements" and to identify "ready, willing and able" DBEs. (State Defs.' 56.1 ¶¶ 54, 66.) Traci Baker, a civil rights specialist with the Federal Highway Administration who reviewed the IDOT FY 2000 DBE program submission, testified that it was her understanding that IDOT did not possess information as to the availability of DBE subcontractors separate from the availability of DBE prime contractors and that IDOT "analyzed what information they had available to them to the best of their ability." (Deposition of Traci Baker (hereinafter, "Baker Dep."), Ex. 12 to State Defs.' 56.1, at 55-56, 59.) A USDOT document concluded that, "at the time IDOT submitted its program, this was the best data that IDOT possessed." (Ex. 16 to State Defs.' 56.1, at 13.)[22]

Plaintiff contends that IDOT ignored evidence that IDOT could have achieved its DBE goal solely through race-neutral means. (Pl.'s Resp. 56.1 ¶¶ 56, 68-69.) Plaintiff particularly emphasizes certain testimony of Gary Gould based on a number of IDOT records, many of which Gould saw for the first time during his deposition. Some of the documents were handwritten, and Gould stated that he could not confirm whether the figures in the documents were "final numbers." In fact, Gould believed the data consisted of "quick compilation[s]" that may have been based on incomplete data and incomplete reporting, or could have resulted from duplications of subcontractors in multiple districts. Gould acknowledged that, from these documents, it appeared that DBEs constituted between 21 and 22 percent of the subcontracting community in FY 1998, 1999, and 2000,[23] but received approximately 31 percent of total subcontracting dollars during the

---

[22]     State Defendants also assert that it was not possible for IDOT to determine with certainty the reason or basis for a prime contractor's selection of a subcontractor, although they offer no support for this assertion. (State Defs.' 56.1 ¶ 54.)

[23]     Specifically, 21.74 percent in FY 1998, 21.35 percent in FY 1999, and 21.2 percent in FY 2000.

periods July 1, 1998 through January 31, 1999, and July 1, 1999 through January 31, 2000.[24] Gould believed that IDOT possessed this data when it set its goals for FY 2000. (Gould Dep., at 86, 101-07, 119, 126-27.)

As noted earlier, to determine its DBE goals, IDOT first calculated the number of DBEs–both prime contractors and subcontractors–to which it had awarded contracts as a percentage of total contracts awarded in previous fiscal years, then calculated the value of contracts awarded to DBEs as a percentage of the total value of contracts awarded in those years, and averaged these two percentages to determine the "base figure." (*See, e.g.,* Ex. 3 to State Defs.' 56.1, at 10-16.) Plaintiff claims that State Defendants had available separate data for DBE prime contractors and subcontractors and non-DBE primes and subs; Defendants deny this assertion. (State Defs.' 56.1 ¶ 67; Pl.'s 56.1 ¶ 69.) Newbold and Gould testified that, for purposes of FY 2000 goal-setting, they thought IDOT "could have" determined the availability of, and volume of business obtained by, non-DBE subcontractors separately from DBE subcontractors, and subcontractors separately from prime contractors, on awarded contracts. (Newbold Dep., at 51-52, 107-08; Gould Dep., at 39-41.) Ana Velasco testified that, on a quarterly basis, the Department calculated separately the percentage of IDOT contract dollars that DBE subcontractors and non-DBE subcontractors obtained, although she did not state what this percentage was. (Velasco Dep., at 24.) Thus, it appears that IDOT may have had separate data regarding prime contractors and subcontractors.

### G. Evidence of Private Discrimination Against DBEs

#### 1. Oral Allegations of Discrimination

Randy Vereen testified that he was aware of numerous general and specific verbal allegations of discrimination against women and minority contractors. (Vereen Dep., at 27.)

---

[24] The court notes that Plaintiff has not submitted any of these documents into the record.

According to Vereen, in legislative hearings, discussions, and correspondence, both DBEs and small businesses generally had alleged "that prime contractors may have acted in ways that they thought were unfair." (*Id.* at 21-22.) From Vereen's perspective, there was "some reasonable evidence" suggesting that "access to credit does more negatively impact women and minority firms." (*Id.* at 23.) For example, he claimed that at least four or five times per year, he "heard allegations that prime contractors have not utilized minority or women-owned subcontractor firms on certain projects on account of the[] race and gender of the owners." (*Id.* at 24-25.) He also recalled hearing allegations that after selecting a DBE subcontractor, "primes would either change the scope of the work, or they would do something else that made it difficult for the DBE to participate." (*Id.*) According to Vereen, "Typically we will refer those back to the districts who handle those kinds of allegations." (*Id.* at 27.)[25] Vereen indicated that he had also received allegations by DBEs of difficulty in obtaining financing and bonding on projects. (*Id.* at 40.) He stated that, "in the deliberations, we came to a conclusion . . . that it was reasonable that [discrimination] may have occurred in some cases and that there was a reason for the program." (*Id.* at 147.)

Beverly Peters testified that, during her tenure, in each of the numerous meetings, forums, workshops, seminars, and informal meetings that her office held, "I could probably say that there was never a meeting where at least some form of discrimination wasn't expressed by a DBE . . . from financial situations to lack of contracts to all sorts of things." (Peters Dep., at 77.) According to Peters, DBEs alleged that financial institutions discriminated against them in denying their loan applications. (*Id.* at 79.) Peters recalled situations in which a DBE had put together a loan package in the manner that was required by the lending institution but was turned down for financing. (*Id.* at 81-82.) After the staff of the Supportive Services Unit of the Bureau of Small

---

[25] Vereen did not identify to whom the term "we" referred.

Business Enterprises ("Supportive Services"), which assists DBE prime contractors and subcontractors in obtaining bonding and financing, intervened on behalf of the DBE, changing "virtually nothing," the loan was approved. (*Id.*) The Bureau "never understood why . . . we had to intervene on their behalf to get it done." (*Id.*) To Peters, this initial refusal to provide financing, followed by quick approval after intervention by the Bureau, represented "real discrimination." (*Id.* at 82.) She acknowledged, however, that she could not recall any circumstance in which a DBE subcontractor alleged it was not awarded a subcontract even though it had submitted the lowest bid. (*Id.* at 92-93.)

Ana Velasco testified that IDOT became aware of barriers to participation by DBEs during meetings held in connection with goal-setting, in "regional meetings, quarterly meetings" with the SBAC, as well as "numerous organizational meetings" in which she gave presentations on the DBE program. (Velasco Dep., at 100-01.) Certain DBE groups alleged that they had experienced difficulties obtaining bonding, financing, and equipment. (*Id.* at 101-02.) According to Velasco, several DBEs in southern Illinois had been required to obtain bonding while non-DBEs were not subject to that requirement. (*Id.*) She added that she "continuously" heard from DBEs that they had problems obtaining bonding. (*Id.* at 104-05.)

Edward Gower also recalled receiving general allegations of discrimination during the goal-setting meetings and elsewhere. (Gower Dep., at 16.) For example, he recalled that a member of Black Contractors United had told him that one of the principal difficulties its members faced was that they were not quoted the same supply terms and prices as white contractors. (*Id.* at 88.) He also recalled attending a meeting at the Chicago Urban League in which there were "any number of allegations" of discrimination in the contracting community, specifically, that there were white contractors who would not do business with African-American contractors or subcontractors and who would not hire African-American truckers or workers. (*Id.* at 90-92.) He also recalled a goal-

setting meeting at which the vice president of Black Contractors United made "generalized allegations about white primes not utilizing black subs." (*Id.* at 92.)

Rob Newbold testified that two or three subcontractors had come to him at public meetings and alleged that they were unable to obtain "supplies at a reasonable cost because of their lack of financial capability; that financial capability is likely because of their race or gender." (Newbold Dep., at 28.) Newbold added that three or four DBEs had complained of difficulty obtaining bonding because of their financial situation. (*Id.* at 32-33.) Newbold's impression was that "past discrimination is documented through numerous items, through regulations, anecdotes, whatever, and that th[e] DBE program is intended as some remedy to those past discriminations." (*Id.* at 45.)

Gary Gould could only recall hearing "a couple" of unsubstantiated complaints that DBEs had experienced "problems getting jobs . . . getting bonded . . . and getting loans" and claimed that most of these complainants "fail[ed] to follow through." (Gould Dep., at 18-19, 21-22.) He also testified that he had received "no more than half a dozen" allegations of discrimination regarding attempts to secure capital. (*Id.* at 24.)

It appears that IDOT investigated few, if any, of these oral allegations of discrimination. Vereen acknowledged that IDOT did not investigate most of the oral allegations officials heard to determine the veracity or bases for these claims. (Vereen Dep., at 27.) He testified further that IDOT did not attempt to determine whether or not prime contractors declined to award contracts to newly-formed DBEs because they preferred to work with firms they had worked with in the past. (Velasco Dep., at 165.) Gower agreed that no one within IDOT or the Attorney General's office conducted an investigation to assess the veracity or frequency of the general allegations of discrimination he heard in goal-setting meeting and elsewhere. (Gower Dep., at 88-89.) Gower himself "never reported an allegation of discrimination involving IDOT contracting issues to an outside entity, nor [did he] ever recall investigating allegations of discrimination in the context of the

27

DBE program and contracting." (*Id.* at 89.) Gould claimed that IDOT did not investigate any of the "half a dozen" allegations of discrimination he received regarding attempts to secure capital. (Gould Dep., at 24.)

## 2. Written Complaints of Discrimination

The record indicates that DBEs filed relatively few formal, written complaints of discrimination with IDOT. Vereen and Velasco could not recall any formal, written complaints of discrimination brought by DBEs. (Vereen Dep., at 175; Velasco Dep., at 104.) In response to a General Accounting Office survey, IDOT stated that no formal written discrimination complaints were filed by DBE firms in Illinois in FY 1999 and FY 2000. (Ex. 15 to Pl.'s 56.1, at 17.) Gower could recall only one formal complaint, from a southern Illinois DBE subcontractor or contractor who felt that IDOT (rather than a prime contractor) was discriminating against his company in a claims process. IDOT had investigated the allegation, but Gower could not recall the result of the investigation. (Gower Dep., at 16-17.) According to Peters, a written complaint was required to trigger a "really thorough investigation." (Peters Dep., at 78.) Peters, Newbold, Vereen, Velasco, and Gould agreed that DBEs and other small businesses often do not file written complaints of discrimination for fear of being "black-balled" in the industry. (*Id.* at 54-55, 58-60, 77-78; Newbold Dep., at 101-02; Vereen Dep., at 21-22, 25-26; Velasco Dep., at 104; Gould Dep., at 19.) Velasco acknowledged that, without written allegations, "it is difficult for a government agency to move on that with any specifics. Most of what I can tell you as far as barriers is anecdotal." (Velasco Dep., at 104.)

## 3. Evidence Regarding DBE Participation in Pre-Regulations Program

According to Beverly Peters, in the years before USDOT issued the Regulations challenged here, the IDOT DBE program determined DBE status based on "the dollar volume averaged over three years . . . . their three year receipts." (Peters Dep., at 162.) After a DBE firm had

28

"graduated" from the program because it had exceeded this three-year "dollar volume" receipts

limit, she stated, the firm could "come back in," presumably if its three-year receipts again fell below

the threshold amount. (*Id.*) After a firm graduated from the program, "[q]uite often we want[ed] to

know what ha[d] happened because at the time they left they were viewed as very successful, very

active, reliable and good firms." (*Id.* at 163.) Often, she stated, "we were told that after they exited

the program they were no longer used." (*Id.*) According to Peters, revenues for some DBEs fell

sharply after they graduated from the program, some were "no longer used," and some could not

"sustain as viable DBEs." (*Id.*)[26]

---

[26]    Ms. Peters testified at some length regarding this matter:

Prior to CFR 26 existing, the program was based on the number – the dollar volume averaged over three years. So we've had a number of firms that have gone out in that – after they graduated averaging their three year receipts and then having come back in.

...

Quite often we want to know what has happened because at the time they left they were viewed as very successful, very active, reliable and good firms. And many times we were told that after they exited the program they were no longer used.

We have, in fact, seen some as early as the very next time that you could average that three years, and we have others that have been out two years or three years. But when they get their average for whatever the assigned standard was at the time didn't meet it, and in some instances quite a significant reduction in terms of diminishing of the firms in terms of dollar volume. And one could advance that to discrimination.

Here's a firm that's been in the program almost from the existence of the program that's done very well, has performed, their ratings have been good, their performance has been without criticism, but after exiting the program they can't sustain as viable DBEs.

...

One of the firms that came to mind because I think he actually went out on two occasions and came back was Steve's Equipment.

...

We've had a firm that went out, Benchmark, formed another company, Reliable [Contracting, Inc.], and then was still not able to get it. And I think he just finally gave up. He said I can't deal with it, I can't make any money and when I do I graduate and I'm not used, and so he left.

But he came in I believe a couple of times and then after seven years came back in as another company and he's out and he was very vocal about that.

(continued...)

29

### 4.    Evidence of the Effect of Discrimination on DBE Participation

The record indicates that none of the complaints of discrimination that IDOT did investigate was directly substantiated.  Beverly Peters acknowledged that in many instances of alleged discrimination by financial institutions against DBEs, the problem was an incomplete loan package, lack of proper documentation, or lack of a "payback system" (she did not define the term), rather than identifiable discrimination. (Peters Dep., at 79.) For example, in one instance, a DBE claimed that a financial institution had discriminated against it by denying it financing, but an IDOT investigation revealed that the reason for the denial was the DBE's failure to complete a required form. (*Id.* at 81.)

Velasco noted that prime contractors stated a preference for working with firms with which they had worked in the past, so they tended not to subcontract to new firms, including new DBEs. (Velasco Dep., at 165.)  She added that, to her knowledge, no one at IDOT followed up to determine whether prime contractors tended not to subcontract to new firms in general, or with new DBEs in particular. (*Id.*)  Velasco testified that she directed John Gust, Supportive Services Unit Manager, to review data concerning DBE participation for FY 1997 through 2000, gathered in the course of IDOT's pre-Regulations DBE program. (*Id.* at 136-37.)  In reporting the results of his examination, Gust stated his opinion that the volume of contract dollars awarded to DBEs was decreasing.  He wrote that "[t]he shortfall appears to be the result of the awarded projects that do not support the level of DBE participation anticipated in the goal-setting process."[27]  Gust went on to state that "[t]he Department is awarding a considerable amount of asphalt resurfacing contracts on projects involving bridge rehabilitation.  These contracts do not afford many subcontracting

---

[26](...continued)
(*Id.* at 162-63.)  Ms. Peters did not provide any further details regarding the methods IDOT employed to determine DBE eligibility before the Regulations were issued.

[27]    The record does not elaborate on what Gust meant by this statement.

opportunities, and the opportunities that are available are pavement, striping, and some miscellaneous contract work. This work does not yield high levels of DBE participation." (*Id.* at 139-40.)

Newbold testified that he was not aware of any evidence that would indicate that the level of DBE prime contractor, subcontractor, or consultant participation had been less than what he would have expected because of the effects of past discrimination. (Newbold Dep., at 42-43, 104.) When asked, "What is the basis of your knowledge . . . as to what factors may be limiting the ability of DBEs to obtain IDOT construction contracts, be they prime or sub?" Gower responded, "I don't know. I have struggled with why it is that we have been unable to secure greater DBE participation in our program." (Gower Dep., at 18-19.)[28] Gower testified that he had asked a number of prime contractors why IDOT was not able to achieve greater DBE participation. (*Id.* at 20.) In response, Gower "heard complaints about the work ethic of DBE contractors . . . about the fact that there's a perception they aren't forced to compete like others are." (*Id.* at 20-21.)

Velasco testified that "every time a firm gets a contract, [information concerning] that contract and those dollar amounts are given to Supportive Services"; that if a DBE requests assistance with IDOT contracts, including problems obtaining bonding or financing, the DBE is assigned to a Supportive Services consultant; and that the Bureau of Small Business Enterprises within IDOT handled complaints or allegations by DBE subcontractors or suppliers that they had suffered discrimination. (Velasco Dep., at 93, 95, 103, 112, 114, 116.) Newbold testified that if a DBE prime contractor or subcontractor had a problem, such as obtaining financing or bonding, the Supportive Services staff would work with the DBE to overcome the problem. (Newbold Dep., at

---

[28]     The court notes that Gower's statement seems at odds with the statistics Plaintiff's attorney attempted to present in Gould's deposition, which suggested that DBEs had in fact secured greater participation than their share of the subcontracting community would suggest.

34-35.) Neither Velasco nor Peters was aware of any DBE bonding or financing problems that were not resolved satisfactorily. (Velasco Dep., at 117; Peters Dep., at 21.)

Peters testified that she attended most of the meetings of the Illinois Business Enterprise Council for Minorities, Females, and Persons with Disabilities ("BEC")[29] on behalf of IDOT during her tenure. (Peters Dep., at 104-05, 111.) The BEC established a Vendor Complaint Review Committee to receive complaints, including allegations of discrimination, and to report those complaints to the BEC, which theoretically would include a summary of the complaints in the meeting minutes. (*Id.* at 112-117.)[30] Peters testified that she did not know whether IDOT had ever considered the BEC meeting minutes as a potential source of information on discrimination complaints. (*Id.* at 117.) Plaintiff's counsel assertedly examined and summarized all of the BEC meeting minutes for the period 1993 through 2002 and found no mention of any complaints of discrimination brought before the Vendor Complaint Review Committee. (Ex. 3 to Pl.'s 56.1.) State Defendants do not address the BEC meeting minutes or the analysis conducted by Plaintiff's counsel.

---

[29]     The BEC was established by section 5 of the Business Act, 30 ILCS 575/5, which provides, in relevant part:

(1) To help implement, monitor and enforce the goals of this Act, there is created the Business Enterprise Council for Minorities, Females, and Persons with Disabilities, hereinafter referred to as the Council, composed of the Secretary of Human Services and the Directors of the Department of Human Rights, the Department of Commerce and Community Affairs, the Department of Central Management Services, the Department of Transportation and the Capital Development Board, or their duly appointed representatives. Ten individuals representing businesses that are minority or female owned or owned by persons with disabilities, 2 individuals representing the business community, and a representative of public universities shall be appointed by the Governor. These members shall serve 2 year terms and shall be eligible for reappointment.

[30]     These minutes have not been entered into the record. Plaintiff has offered to provide "copies of all the meeting minutes if the Court wants to independently review them (they comprise approximately 4000 pages)." (Pl.'s Mem., at 29.)

## V.    Relevant Subcontracts

In the TAC, Plaintiff claims it was the lowest bidder on six subcontracts which prime contractors nevertheless awarded to DBEs. (TAC ¶¶ 48-65.) As discussed below, however, Plaintiff can claim plausible injury as a result of only three of these contracts.

### A.    Backbone Road Project

On January 21, 2000, IDOT awarded prime contract number 85224 for federal-aid highway construction work on Backbone Road in Bureau County ("Backbone Road Project") to Ladd Construction Company ("Ladd"). (Pl.'s 56.1 ¶¶ 51, 53; State Defs.' Resp. 56.1 ¶¶ 51, 53; State Defs.' 56.1 ¶ 97; Pl.'s Resp. to State Defs.' 56.1 ¶ 99.) The project had a four percent DBE goal. (Pl.'s 56.1 ¶ 52; State Defs.' Resp. 56.1 ¶ 52; State Defs.' 56.1 ¶ 97; Pl.'s Resp. to State Defs.' 56.1 ¶ 99.) In his deposition, James Walsh ("Walsh"), who was Ladd's only full-time employee, testified that Ladd solicited bids for three guardrail items. (Deposition of James Walsh (hereinafter, "Walsh Dep."), Ex. 21 to Pl.'s 56.1, at 55.) Walsh stated that Plaintiff submitted a total bid of $9,300, which included $4,700 for the three guardrail items plus $4,600 for bridge rail work. (Id. at 55-56, 88-89.) Ladd deleted the bridge rail line item from Plaintiff's bid submission because "we [gave] that to somebody else." (Id. at 55-56.) Plaintiff's $4,700 bid for the three guardrail items constituted the lowest bid, while Access Control Co., Inc. ("Access Control"), a certified DBE owned by a female, submitted a bid of $6,900 for the guardrail items. (Id. at 57, 62; Ex. 8 to Walsh Dep.)

Walsh testified that Ladd had worked with Access Control in the past, and he believed that Ladd had been "generally satisfied" with Access Control's work product. (Walsh Dep., at 37.) Nevertheless, he asserted that Ladd awarded the work to Access Control solely because it was a DBE. (Id. at 67.) He added that, based on Ladd's past experience with Plaintiff and because Plaintiff had submitted the lowest bid, Ladd would have selected Plaintiff had there been no DBE requirement. (Id.) Walsh explained that Ladd did not seek a waiver from the DBE requirement

even though Access Control's bid was 47 percent higher than Plaintiff's because he believed that IDOT was not issuing many waivers in January 2000, when Ladd won the IDOT contract. (*Id.* at 66, 79, 91.) Since that time, Walsh believes, IDOT has "loosened up" in terms of granting waiver requests; and Walsh acknowledged that IDOT has granted Ladd at least one of its waiver requests, although he could not remember specific details. (*Id.* at 40-42, 92.) Walsh acknowledged that Ladd has contributed either $500 or $1,000 toward the prosecution of Plaintiff's lawsuit. (*Id.* at 70.) He also stated that Ladd itself was formerly a certified DBE and that Ladd's receipts have "probably suffered a little bit" since it left the DBE program. (*Id.* at 31.) In his deposition, Roesch, Plaintiff's owner, estimated that Plaintiff's lost expected profit on this project was $400. (Roesch Dep., at 153.)

### B. Hennepin Bikeway Project

On March 10, 2000, IDOT awarded prime contract number 44692 for federal-aid highway construction work on the Hennepin Bikeway in Henry and Bureau Counties ("Hennepin Bikeway Project") to Central Illinois Contracting Corp. ("Central Illinois"). (Pl.'s 56.1 ¶¶ 45, 47; State Defs.' Resp. 56.1 ¶¶ 45, 47; State Defs.' 56.1 ¶ 89; Pl.'s Resp. to State Defs.' 56.1 ¶ 91.) The project had a six percent DBE goal. (Pl.'s 56.1 ¶ 46; State Defs.' Resp. 56.1 ¶ 46; State Defs.' 56.1 ¶ 89; Pl.'s Resp. to State Defs.' 56.1 ¶ 91.) Plaintiff submitted the lowest bid of $202,151.76 to Central Illinois for the bicycle railing and guardrail work on this project, but Central Illinois awarded the work to National Improvement, a DBE firm owned by an African-American male, which submitted a bid of $202,405.21, $253.45 more than Plaintiff's bid, for the same work. (Pl.'s 56.1 ¶¶ 48-49; State Defs.' Resp. 56.1 ¶ 48-49.)

In his deposition, Len Trovero, owner of Central Illinois, testified that although he awarded National Improvement the contract "with the knowledge that it would help us gain our goals for minorities," he did not necessarily award the contract to National Improvement because it would

help him meet the DBE goal. (Deposition of Len Trovero ("Trovero Dep."), Ex. 20 to Pl.'s 56.1, at 45-49.) Trovero noted that the difference between the two bids was insignificant, that he had subcontracted with National Improvement on a previous job and had been equally satisfied with the work that National Improvement and Plaintiff had performed in the past, and that National Improvement's place of business was located closer to the project than Plaintiff's. (Id.) Trovero believes there is a "strong possibility" that he would have selected National Improvement even if the project had not contained a DBE goal. (Id.) He also testified that he was unable to meet the DBE goal on at least one past project but that IDOT waived the goal requirement in that instance. (Id. at 32-33.)

### C.    Riley Creek Project

On March 8, 2002, IDOT awarded prime contract number 60431 for federal-aid highway construction work for removal and replacement of a box culvert on Illinois Route 23 over Riley Creek in McHenry County ("Riley Creek Project") to Belvidere Construction Co. ("Belvidere"). (Pl.'s 56.1 ¶¶ 57, 59; State Defs.' Resp. 56.1 ¶¶ 57, 59; State Defs.' 56.1 ¶ 105; Pl.'s Resp. to State Defs.' 56.1 ¶ 107.) The project had a four percent DBE goal. (Pl.'s 56.1 ¶ 58; State Defs.' Resp. 56.1 ¶ 58; State Defs.' 56.1 ¶ 105; Pl.'s Resp. to State Defs.' 56.1 ¶ 107.) Plaintiff submitted the low bid of $15,060.55 to Belvidere for the guardrail work on the project, but Belvidere awarded the work to Access Control, which submitted a bid of $20,377.00, 35.3 percent higher than Plaintiff's bid. (Pl.'s 56.1 ¶¶ 60-61; State Defs.' Resp. 56.1 ¶¶ 60-61.) In his deposition, Larry Kuehne, Project Manager for Belvidere, testified that he had been satisfied with Access Control's work in the past. (Deposition of Larry Kuehne (hereinafter, "Kuehne Dep."), Ex. 22 to Pl.'s 56.1, at 66.) He claimed, however, that Belvidere would have used Plaintiff had there been no DBE goal because Plaintiff's bid was "considerably lower," but that Belvidere could not meet the DBE goal without awarding the subcontracting work to Access Control. (Id. at 87-88.) According to Kuehne,

Belvidere "would not have been awarded the job had we not met . . . DBE participation goals." (*Id.* at 114.) Kuehne acknowledged that Belvidere could have sought a waiver, but claimed the company did not have adequate staff to provide the "substantial documentation" that must accompany a request for waiver. (*Id.* at 98, 115.) Kuehne added that he did not know whether IDOT requires a firm to subcontract to a DBE where, as here, the DBE submitted a bid that was 35 percent greater than the lowest bid. (*Id.* at 115.)[31]

### D.    Other Contracts

The TAC also alleges that Plaintiff lost contract number 44693 "on the basis of the race or gender of its owner to a higher bidding DBE." (TAC ¶¶ 48-50.) Plaintiff omitted this contract from its 56.1 Statement of Facts, however, and it is undisputed that Plaintiff in fact did not submit the lowest bid on this project. (State Defs.' 56.1 ¶¶ 94-96; Pl.'s Resp. to State Defs.' 56.1 ¶ 96-97; Fed. Defs.' 56.1 ¶ 55.) This contract is, therefore, not relevant to the court's consideration of Plaintiff's injuries, if any, resulting from the federal and state DBE programs at issue.

Plaintiff claims, in addition, that it lost two contracts (contract numbers DKB-2978 and 3-17-0139-B30) because Plaintiff is owned by a white male. (TAC ¶¶ 60-65.) Neither contract, however, used federal-aid highway funds authorized under TEA-21 or the Regulations. (Fed. Defs.' 56.1 ¶ 72; Declaration of Norm Stoner, Ex. 6 to Fed. Defs.' Motion ¶¶ 4-5; Declaration of Richard A. Pur,

---

[31]      Kuehne stated, "I don't know if they require that or not or if there's a documentation that says that, if it's exorbitant amounts of money that you don't have to award it to them." (Kuehne Dep., at 115.) After he made this statement, counsel for Federal Defendants showed Kuehne an IDOT document titled "Special Provision for Disadvantaged Business Enterprise Participation." (*Id.* at 116.) Counsel referred to this document as "[t]he fourth one," but did not identify when, why, or for whom the document was written. Counsel asked Kuehne to read the following sentence found within the "Pre-award Good Faith Efforts" section into the record: "A DBE bid for a subcontract will normally be considered unreasonable if the bid exceeds by more than 5 percent the lowest responsible bidder." (*Id.*) When asked if he was aware of this IDOT rule, Kuehne replied, "No. I like it." (*Id.* at 117.) As noted earlier, however, this "five percent" rule does not appear in the document titled "Special Provision for Disadvantaged Business Enterprise Participation" that is part of the record. (*See* Ex. 15 to Pl.'s 56.1.)

Ex. 7 to Fed. Defs.' Motion ¶¶ 4-7; Long Dep., at 95.) Therefore, neither contract is relevant to the court's analysis of the constitutionality of Defendants' DBE programs. Because Plaintiff was the lowest bidder that lost to a higher-bidding DBE pursuant to TEA-21 and the Regulations only on the Backbone Road, Hennepin Bikeway, and Riley Creek Projects, they constitute the only relevant contracts in this litigation.

Plaintiff and State Defendants agree that IDOT will continue to award federal-aid and state highway contracts in Illinois, that at least some of those contracts will contain DBE participation goals, and that Plaintiff will continue to bid on federal-aid and state highway contracts in the future. (Pl.'s 56.1 ¶¶ 75, 81-83; State Defs.' Resp. 56.1 ¶¶ 75, 81-83.) State Defendants "deny that the record, in undisputed fashion, supports plaintiff's prospective claims about its future competition" against DBEs in bidding for federal-aid highway work, but offer no evidence to support this assertion. (State Defs.' Resp. 56.1 ¶ 75.)

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). This will be true whenever the nonmoving party fails to make a sufficient showing on an essential element for which he has the burden of proof, because "a complete failure of proof concerning an essential element of his case necessarily renders all other facts immaterial." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 759 (7th Cir. 2003).

As explained below, the court concludes that Plaintiff has standing to challenge the constitutionality of the federal and Illinois DBE programs; that Federal Defendants have identified

a compelling governmental interest for enacting TEA-21 and the implementing Regulations; that the statute and Regulations are narrowly tailored to further that interest; and that State Defendants need not establish a distinct compelling interest for implementing the federal DBE program. The court finds, however, that there are material issues of fact regarding whether the Illinois DBE program is narrowly tailored to achieve the federal government's compelling interest, as the parties have not proffered sufficient evidence–or established the absence of evidence–regarding (1) whether IDOT employs race- and gender-conscious goals in awarding prime contracts; (2) IDOT's zero-goal experimental program–specifically, the relative number and dollar amount of subcontracts awarded to DBEs in the program compared to the relative number and dollar amount of subcontracts awarded to DBEs outside of the program during the same period; (3) the relative number and dollar amounts of subcontracts awarded to DBEs in each fiscal year for which IDOT has such data; and (4) the number, type, investigation, and resolution of oral and written complaints of discrimination.

## II.    Standing

State Defendants assert that Plaintiff lacks standing to challenge the constitutionality of the federal and Illinois DBE programs.[32] (Memorandum of Law in Support of State Defendants' Motion for Summary (hereinafter, "State Defs.' Mem."), at 32-35.) The Supreme Court has set forth three requirements that constitute the "irreducible constitutional minimum" of standing. *McConnell v. Fed. Election Comm'n*, — U.S. —, —, 124 S.Ct. 619, 707 (2003). First, a plaintiff must demonstrate an "injury in fact" that is "concrete," "distinct and palpable," and "actual or imminent." *Id.* Second, a plaintiff must establish causation–a "fairly traceable" connection between the alleged injury in fact and the alleged conduct of the defendant. *Id.* Third, a plaintiff must show redressability, that is, a "substantial likelihood that the requested relief will remedy the alleged injury

---

[32]    Federal Defendants do not challenge Plaintiff's standing to sue.

in fact." *Id.* "Typically, redressability and traceability are two sides of a causation coin." *Dynalantic Corp. v. Department of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).

Two Supreme Court cases have recognized the standing of non-minority contractors to challenge laws designed to promote minority participation in public construction projects. First, in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), plaintiff, an association of individuals and firms in the construction industry, challenged a city ordinance that accorded preferential treatment to certain minority-owned businesses in the award of all city contracts. The Court concluded that plaintiff had standing to challenge the ordinance:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. . . . [I]n the context of a challenge to a set-aside program, the "injury in fact" is the inability to compete on an equal footing in the bidding process, not the loss of a contract. . . . To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.

*Id.* at 666 (citation omitted). The Court added, "It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury." *Id.* at 666 n.5. The Court concluded that, because plaintiff association had alleged that its members regularly bid on construction contracts awarded by the local government, and that they would have bid on contracts set aside pursuant to the city's ordinance were they able, plaintiff had standing. *Id.* at 668-69.

Two years later, in *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) ("*Adarand III*"), plaintiff, a non-minority highway construction company specializing in guardrail work, was the lowest bidder for a subcontracting job on a federal highway project in Colorado. The prime

contractor awarded the job to a minority-owned firm because the federal statute that preceded TEA-21 effectively granted financial incentives to general contractors that hired minority subcontractors. *Id.* at 211. In addressing plaintiff's standing to seek declaratory and injunctive relief against such financial incentives, the Court noted that the injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Id.* at 210, quoting *Northeastern Fla.*, 508 U.S. at 667. The aggrieved party, the Court added, "need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.*, quoting *Northeastern Fla.*, 508 U.S. at 666. Instead, the plaintiff must demonstrate "that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Id.* at 211. The Court concluded that plaintiff did have standing because the evidence indicated that the state was likely to award contracts involving guardrail work pursuant to the federal DBE program at issue at least once per year in the state, that plaintiff was very likely to bid on each such contract, and that plaintiff often had to compete for such contracts against small disadvantaged businesses. *Id.* at 212.

More recently, the Eighth Circuit considered the standing question where two non-minority contractors that provided landscaping services to prime contractors on federally-assisted highway projects filed separate actions challenging TEA-21 and the Regulations as implemented in Minnesota and Nebraska. In *Sherbrooke Turf, Inc. v. Minnesota Department of Transportation*, 345 F.3d 964 (8th Cir. 2003), plaintiffs sued the Minnesota Department of Transportation ("MnDOT") and its Commissioner, and the Nebraska Department of Roads and its Director, respectively, to enjoin them from enforcing the requirement that ten percent of federal highway construction funds be paid to DBEs. *Id.* at 967. The court concluded that plaintiffs had standing to assert their constitutional claims because the stipulated facts demonstrated that plaintiffs had bid on federally-

assisted highway projects in the past, would continue to do so in the future, and suffered "competitive harm" when contracts were awarded to others under USDOT's DBE program. *Id.* at 967-68, citing *Adarand III*, 515 U.S. at 211-12.

State Defendants here argue that Plaintiff has not shown that it sustained an injury in fact. (State Defs.' Mem., at 33.) They characterize Plaintiff's alleged injury as "either non-existent, completely speculative in terms of any lost profit or not due to the DBE program." (*Id.*) State Defendants also claim that Plaintiff's injury is not traceable to the allegedly unconstitutional preferences, and that the relief Plaintiff seeks—an injunction against continued operation of the federal and state DBE programs—would not redress Plaintiff's grievances. (*Id.* at 33-35.) State Defendants cite three cases to support this proposition.

In *Cache Valley Electric Co. v. Utah Department of Transportation*, 149 F.3d 1119 (10th Cir. 1998), a non-DBE electrical subcontractor sought to enjoin implementation of the predecessor to the current federal DBE program. Plaintiff claimed an "inability to compete for government subsidized contracts on an equal footing with businesses classified as DBEs"; offered evidence of contracts that it lost as a result of the DBE program; and represented that it would continue to apply for USDOT electrical subcontracts in the "relatively near future." *Id.* at 1122. The court found that plaintiff had established an injury in fact and assumed, *arguendo*, that plaintiff had demonstrated causation as well. *Id.* at 1123.

The court nevertheless sustained defendant's objection to standing on the ground that plaintiff could not demonstrate redressability. *Id. Adarand III* was not controlling on that issue, as the *Adarand III* Court had limited its standing analysis "to a detailed discussion of how to demonstrate an injury of sufficient imminence to satisfy standing requirements for forward-looking relief" and offered no analysis on redressability. *Id.* The *Cache Valley* court concluded that "it would be pure speculation to conclude that invalidating the allegedly unconstitutional preferences

would ameliorate plaintiff's ability to compete in any way" for two reasons. *Id.* First, the disputed preferences were severable from the rest of the DBE program and thus, the court found, the program would remain viable even absent those preferences because the legislative intent was to foster development of small businesses which have faced social and economic hardship regardless of their minority status. *Id.* at 1123-24. Second, the court explained, plaintiff had not established that eliminating the preferences would reduce the number of qualifying DBEs. *Id.* The court noted that the statute permitted a small business entity to qualify as "socially and economically disadvantaged" either by relying on the race- or gender-based presumption of such disadvantage, or by satisfying race- and gender-neutral criteria. *Id.* at 1123. There was therefore "no truth" to plaintiff's claim that socially and economically disadvantaged individuals were necessarily minorities. *Id.* Based on this statutory framework, the court found, "the legislative intent to foster development in small businesses whose owners have had to overcome social and economic hardship would remain even in the absence of the challenged presumption." *Id.* at 1123-24. As the DBE program would continue even absent the disputed presumption, the court stated, "small businesses whose owners could prove they were disadvantaged—and thereby qualify as DBEs—would continue to have an advantage over businesses like [plaintiff] that are too large to qualify as DBEs." *Id.* at 1124. Therefore, in order for plaintiff to demonstrate that a favorable judicial determination would "likely" improve the terms of competition it faces, the court stated, plaintiff had to show "at a bare minimum that the practical effect of eliminating the presumption would be some meaningful reduction in the number of DBEs against which it would be forced to compete." *Id.* Because plaintiff had failed to proffer any evidence on this issue, the court affirmed summary judgment against plaintiff on standing grounds. *Id.*

Two district court cases relied on *Cache Valley* in finding that plaintiffs could not demonstrate causation or redressability with regard to alleged injuries resulting from TEA-21 and

implementation of the Regulations. In *Klaver Construction Co. v. Kansas Department of Transp.*, 211 F. Supp. 2d 1296 (D. Kan. 2002), the court concluded that an unsuccessful bidder for federally-funded highway construction subcontracts that failed to qualify as a DBE lacked standing to challenge the constitutionality of the Regulations' race- and gender-conscious elements because the challenged elements did not cause, and favorable judgment would not redress, the bidder's injury. In *Interstate Traffic Control v. Beverage*, 101 F. Supp. 2d 445 (S.D. W. Va. 2000), the court determined that a highway construction firm that was unable to qualify for DBE status lacked standing to challenge the federal DBE program because the firm had failed to show that the presumption of disadvantage enjoyed by certain minorities under the DBE program was causally related to its alleged injury in fact. *Id.* at 453. Further, the court concluded, the firm had not demonstrated that removal of the presumption would redress that injury–the inability to compete on an equal footing for all federally-assisted state highway construction traffic control subcontract work. *Id.*

Plaintiff insists that it has standing because, in the future, IDOT will continue to award federal-aid IDOT highway contracts containing DBE goals, Plaintiff will bid on such contracts, and Plaintiff "will be denied an equal opportunity to compete" for such contracts because of DBE participation requirements. (Plaintiff's Memorandum in Response to Federal and State Defendants' Motions for Summary Judgment (hereinafter, "Pl.'s Resp. Mem."), at 2.) In Plaintiff's view, the Tenth Circuit's approach in *Central Valley* imposes standing requirements that exceed what is required by the Supreme Court. (*Id.* at 1.) To support this contention, Plaintiff cites opinions from two other Courts of Appeals.

In *Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia*, 6 F.3d 990 (3d Cir. 1993), citing *Northeastern Florida*, the Third Circuit held that "construction contractors have standing to challenge a minority preference ordinance upon a showing they are able and ready to

43

bid on contracts subject to the ordinance and that a discriminatory policy prevents them from doing so on an equal basis." *Id.* at 995, citing *Northeastern Fla.*, 508 U.S. at 666. In *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997), the Ninth Circuit held that a general contractor owned by a white male who was the lowest bidder for a state construction project had standing to challenge a state statute that required general contractors to subcontract certain percentages of work to "designated classes"–minority, women, and disabled veteran owned subcontractors. Although the defendants did not argue absence of redressability, the court implicitly addressed the issue, observing that, "[b]ut for the minority and women enterprise goals and 'good faith' requirements, [plaintiff] would have won the contract." *Id.*

This court recognizes that no uniform picture emerges from the case law regarding standing doctrine in cases involving governmental race- or gender-based set-aside programs. The *Adarand III* Court cited *Northeastern Florida*, although it did not explicitly address the causation or redressability requirements of standing. Neither *Sherbrooke Turf* nor *Contractors Association* addressed causation or redressability. The *Cache Valley* court–which required a showing of severability and a "meaningful reduction in the number of DBEs"–never addressed the fact that under the *Northeastern Florida* Court's definition of injury in fact in cases involving a challenge to a set-aside program–"the inability to compete on an equal footing in the bidding process"–the plaintiff in *Northeastern Florida* had "sufficiently alleged" the redressability and causation standing requirements as well. *See* 508 U.S. at 666 & n.5. In addition, the court notes that, in *Tarpley v. Jeffers*, 96 F.3d 921, 923-24 (7th Cir. 1996), our Court of Appeals remanded a case that did not involve a government set-aside program to determine whether the *Northeastern Florida* standing test had been met, but did not address causation or redressability.[33]

---

[33]     Nor has this court found any cases in which our Court of Appeals has applied a severability test in determining standing.

44

Despite some inconsistencies in these authorities, the court concludes that Plaintiff here has demonstrated an injury in fact. Plaintiff bid on federal-aid IDOT highway contracts in the past, will continue to bid on such projects in the future, and suffered competitive harm (however minimal) when three subcontracts in the past three years for which Plaintiff submitted the lowest bid were nevertheless awarded to DBEs pursuant to the federal and state DBE programs. *Cf. Adarand III*, 515 U.S. at 211-12; *Sherbrooke Turf*, 345 F.3d at 967-68; *Contractors Association*, 6 F.3d at 995-96. Further, the court concludes that the facts of the injury in this case satisfy the redressability and causation requirements of standing, as the evidence suggests that Plaintiff would have won at least two of the three contracts (Backbone Road and Riley Creek) but for the DBE goals. *See Monterey Mechanical*, 125 F.3d at 708; *cf. Northeastern Fla.*, 508 U.S. at 666 n.5. Plaintiff, thus, has standing to bring this constitutional challenge to the federal and Illinois DBE programs.

## III.     Constitutionality of TEA-21 and Implementing Regulations

Plaintiff contends that the federal highway DBE program, on its face and as applied in Illinois, violates 42 U.S.C. § 2000(d) and the equal protection element of the Fifth Amendment's Due Process Clause. *Adarand III* established that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand III*, 515 U.S. at 224. Even though the DBE program confers benefits on "socially and economically disadvantaged individuals," a term that is facially race-neutral, Defendants concede that the program is subject to strict judicial scrutiny.[34] (State Defendants' Motion for Summary Judgment

---

[34]     State Defendants assert that the gender-conscious provisions are subject to intermediate scrutiny and thus need only be substantially related to the achievement of an important governmental objective, (State Defendants' Motion for Summary Judgment ¶ 6), an argument that Plaintiff does not address. Our Court of Appeals has questioned the wisdom of applying a more permissive standard to preferential treatment on the basis of sex than to race or ethnicity but has not resolved the issue. *See Builders Ass'n of Greater Chicago v. County of Cook*, (continued...)

(hereinafter, "State Defs.' Motion") ¶ 5; Memorandum of Law in Support of Federal Defendants' Renewed Motion for Summary Judgment (hereinafter, "Fed. Defs.' Mem."), at 5.) TEA-21 employs a race-based rebuttable presumption to define the class of beneficiaries and authorizes the use of race-conscious remedial measures. Accordingly, the statute's race-based measures "are constitutional only if they are narrowly tailored to further compelling governmental interests." *Sherbrooke Turf*, 345 F.3d at 969, quoting *Grutter v. Bollinger*, 539 U.S. 306, 123 S. Ct. 2325, 2337-38 (2003). The Supreme Court has cautioned that strict scrutiny is rigorous but is not always "fatal in fact." *Adarand III*, 515 U.S. at 237. Whether there is evidence sufficient to support a finding that a race-conscious governmental action is supported by a compelling interest and is narrowly tailored is a question of law. *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000).

State Defendants urge that *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000) ("*Adarand VII*"), *cert. granted then dismissed as improvidently granted*, 532 U.S. 941, 534 U.S. 103 (2001), "is dispositive of the issue of whether the State Defendants' DBE program is constitutional." (State Defs.' Motion ¶ 5.) Plaintiff responds that the *Adarand VII* decision is limited to its facts. (Plaintiff's Memorandum of Law in Support of Its Motion for Summary Judgment (hereinafter, "Pl.'s Mem."), at 5 n.1.) Both parties miss the mark. In *Adarand VII*, the court concluded that the DBE provisions of TEA-21 and the Regulations survive constitutional challenge

---

[34](...continued)
256 F.3d 642, 644-45 (7th Cir. 2001). Nevertheless, because the court concludes that the race-conscious provisions of the federal and state DBE programs survive strict scrutiny, it follows that the program's gender-conscious provisions survive the lesser "intermediate scrutiny" standard. *Cf. Concrete Works of Colo., Inc. v. City & County of Denver*, 321 F.3d 950, 959-60 (10th Cir. 2003) ("To meet its burden of demonstrating an important governmental interest" relative to "the gender-based measures in the ordinances[,] . . . the evidentiary basis may be something less than the 'strong basis in evidence' required to justify race-based remedial measures") (internal citations omitted). For the remainder of this opinion, references to the race-based portions of TEA-21, the Regulations, and the federal and Illinois DBE programs will implicitly include the gender-conscious provisions as well.

because they are narrowly tailored to serve a compelling governmental interest. 228 F.3d at 1155. Although the court did not limit its decision to the facts of the case, the court did leave open the possibility that a future plaintiff could offer additional evidence sufficient to raise a genuine issue of material fact as to whether the government has met its evidentiary burden. *Id.* at 1176. Plaintiff points out, correctly, that the *Adarand VII* court did not evaluate the state's DBE program. *Id.* at 1187-88 ("We do not have before us a sufficient record to enable us to evaluate the separate question of [the Colorado Department of Transportation's] implementation of race-conscious policies"). *Adarand VII* thus provides an appropriate guidepost for analyzing TEA-21 and the Regulations but not the IDOT program. The Eighth Circuit's recent *Sherbrooke Turf* decision is even more relevant to the task before this court because that court addressed two states' implementation of TEA-21 and the Regulations.[35]

Recognizing that it need not give courts from other circuits "automatic deference," *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987), nevertheless, where possible, this court will adhere to the rationale employed by these two Courts of Appeals. *See Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("We do not create conflicts among the circuits without strong cause"); *Colby*, 811 F.2d at 1123 ("Bearing in mind the interest in maintaining a reasonable uniformity of federal law and in sparing the Supreme Court the burden of taking cases merely to resolve conflicts between circuits," district courts should "give most respectful consideration to the decisions of the other courts of appeals and follow them whenever [they] can").

### A.    Compelling Interest

To satisfy the compelling interest requirement of strict scrutiny, the government must meet two conditions:

---

[35]    *Sherbrooke Turf* was decided after the parties submitted their final briefs in this case.

> First, the discrimination must be "identified discrimination." While the States and their subdivisions may take remedial action when they possess evidence of past or present discrimination, they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief. A generalized assertion of past discrimination in a particular industry or region is not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy. Accordingly, an effort to alleviate the effects of societal discrimination is not a compelling interest. Second, the institution that makes the racial distinction must have had a strong basis in evidence to conclude that remedial action was necessary, *before* it embarks on an affirmative-action program.

*Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (emphasis original) (internal citations omitted); *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989) (plurality opinion) ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice") (citation omitted); *Majeske*, 218 F.3d at 820 ("[T]he government must show real evidence of past discrimination and cannot rely on conjecture"); *Contractors Ass'n*, 6 F.3d at 1008 ("[P]lausible hypotheses are not enough to satisfy strict scrutiny, even at the summary judgment stage").

If the government makes such a showing, the party challenging the affirmative action plan bears the "ultimate burden" to demonstrate the unconstitutionality of that program. *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277-78 (1986) (plurality opinion); *cf. Majeske*, 218 F.3d at 820 ("Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional"). Government at all levels "has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *Croson*, 488 U.S. at 492 (plurality opinion).

Our own Court of Appeals has summarized the strict scrutiny test for race-conscious governmental programs in this manner:

> A law that grants preferential treatment on the basis of race or ethnicity does not deny the equal protection of the laws if it is (1) a remedy for (2) intentional

discrimination committed by (3) the public entity that is according the preferential treatment (unless . . . the entity has been given responsibility by the state for enforcing state or local laws against private discrimination)[36] and (4) discriminates no more than is necessary to accomplish the remedial purpose.

*Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 643-44 (7th Cir. 2001) (internal citations omitted).[37] Although the court did not explicitly so state, it is clear that the first three parts of the test summarize the compelling interest inquiry, while the fourth prong states the test for narrow tailoring.

### 1. Analysis of *Adarand VII* and *Sherbrooke Turf*

In reviewing a challenge to TEA-21 and the Regulations, *inter alia*, the *Adarand VII* court established the following standard for assessing a government's claimed "compelling interest":

> First, we must determine whether the government's articulated goal in enacting the race-based measures at issue in this case is appropriately considered a "compelling interest" under the governing case law; if so, we must then set forth the standards under which to evaluate the government's evidence of compelling interest; third, we

---

[36] Although neither party has addressed the issue, the court notes that USDOT has indeed been given responsibility for enforcing the provisions of TEA-21 that act against private discrimination. *See* TEA-21 § 1101(b)(1) ("*Except to the extent that the Secretary [of Transportation] determines otherwise*, not less than 10 percent of the amounts made available for any program under . . . this Act shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals") (emphasis added); *see also* 49 C.F.R. § 26.7(a) (Recipients may not discriminate against anyone "in connection with the award and performance of any contract covered by this part on the basis of race, color, sex, or national origin"); 49 C.F.R. § 26.7(b) (in administering DBE program, a Recipient "must not, directly or through contractual or other arrangements, use criteria or methods of administration that have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, sex, or national origin").

[37] Plaintiff attempts to analogize the facts of this case to those of *Builders Association*. (Plaintiff's Memorandum In Response to Federal and State Defendants' Motions for Summary Judgment, at 8-9, 15-16.) In *Builders Association*, the district court found unconstitutional a Cook County ordinance requiring allotment of certain percentages of the dollar value of each county construction contract to minority- and women-owned businesses; the Court of Appeals affirmed. *Builders Ass'n of Greater Chicago v. County of Cook*, 123 F. Supp. 2d 1087, 1117 (N.D. Ill. 2000), *aff'd*, 256 F.3d 642 (7th Cir. 2001). Because *Builders Association* involved quotas based solely on race and gender, however, it is readily distinguishable from the federal and state DBE programs, which prohibit the use of quotas.

must decide whether the evidence presented by the government is sufficiently strong to meet its initial burden of demonstrating the compelling interest it has articulated; and finally, we must examine whether the challenging party has met its ultimate burden of rebutting the government's evidence such that the granting of summary judgment to either party is proper.

228 F.3d at 1164. The court "readily conclude[d] that the federal government has a compelling interest in not perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination in the government contracting markets created by its disbursements." *Id.* at 1165. The court then conducted a lengthy analysis of the government defendants' proffered evidence, both statistical and anecdotal, which included numerous congressional investigations and hearings identifying private contracting firms, unions, banks, business networks, suppliers, and bonding companies as sources of discrimination; statements of legislators during debate on TEA-21; local disparity studies of minority subcontracting; and studies of local subcontracting markets after the removal of affirmative action programs. 228 F.3d at 1167-76. This evidence, the court concluded, demonstrated "the existence of two kinds of discriminatory barriers" to competition by minority subcontractors for publicly-funded contracts, "both of which show a strong link between racial disparities in the federal government's disbursements of public funds for construction contracts and the channeling of those funds due to private discrimination." *Id.* at 1167-68.

The first discriminatory barriers, the court explained, "are to the formation of qualified minority subcontracting enterprises due to private discrimination, precluding from the outset competition for public construction contracts by minority enterprises." *Id.* at 1168. The government's evidence on this point consisted of numerous congressional investigations and hearings as well as outside studies of statistical and anecdotal evidence, cited in DEPARTMENT OF JUSTICE, PROPOSED REFORMS TO AFFIRMATIVE ACTION IN FEDERAL PROCUREMENT, APPENDIX--THE COMPELLING INTEREST FOR AFFIRMATIVE ACTION IN FEDERAL PROCUREMENT, (hereinafter, "The

Compelling Interest"), 61 Fed. Reg. 26042, 26,050-63 (1996), a Department of Justice summary of more than fifty documents and thirty congressional hearings on minority-owned businesses prepared in response to the *Adarand III* decision. *Id.* This evidence satisfied the *Adarand VII* court that "discrimination by prime contractors, unions, and lenders has woefully impeded the formation of qualified minority business enterprises in the subcontracting market nationwide." *Id.*

The second discriminatory barriers "are to fair competition between minority and non-minority subcontracting enterprises, again due to private discrimination, precluding existing minority firms from effectively competing for public construction contracts." *Id.* The court found that the government had presented "powerful evidence" that tended to show that private discrimination–by prime contractors, private sector customers, business networks, suppliers, and bonding companies–created "a decidedly uneven playing field" for minority subcontractors competing for work on federally-funded construction projects. *Id.* at 1170.

The court noted that the government had also presented local disparity studies of minority subcontracting and studies of local subcontracting markets after the termination of affirmative action programs. *Id.* at 1168. The government's review of those studies revealed that "although such disparity was least glaring in the category of construction subcontracting, even in that area 'minority firms still receive only 87 cents for every dollar they would be expected to receive' based on their availability." *Id.* at 1173, citing The Compelling Interest, 61 Fed. Reg. at 26,062. The court also noted that there was "ample evidence" that when race-conscious public contracting programs were struck down or discontinued, minority business participation in the relevant market dropped sharply or even disappeared. *Id.* at 1174, citing 144 Cong. Rec. S1421 (March 5, 1998) (statement of Sen. Moseley-Braun) (citing statistics); The Compelling Interest, 61 Fed. Reg. at 26,062 & nn.130-134 (citing studies). Although this evidence standing alone was not dispositive, it was, in the court's estimation, strong support for the claim that discrimination restricts minority firms

51

competing for federal subcontracting money. *Id.* "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." *Id.*, quoting *Croson*, 488 U.S. at 509 (Op. of O'Connor, J.) (citations omitted). The court also found that extensive Congressional debates on whether to renew the DBE program in 1998, *id.* at 1180, citing 144 CONG. REC. S1481-06, S1481-96 (March 6, 1998); *id.* at S1395-01, S1395-434 (March 5, 1998); *id.* at H1885-04, H2000-11 (Apr. 1, 1998), "indicate that the race-conscious programs at issue are 'appropriately limited' to last no longer than 'the discriminatory effects [they are] designed to eliminate.'" *Id.*, citing *Adarand III*, 515 U.S. at 238.[38]

The court considered and rejected plaintiff's characterization of numerous congressional reports and findings as conclusory, as well as plaintiff's "highly general criticism of the methodology of numerous 'disparity studies' cited by the government and its amicus curiae," and concluded that plaintiff had not met the burden of offering specific evidence to rebut the government's showing of a compelling interest in remedying discrimination in the market for federally-funded construction subcontracts. *Id.* at 1175. The court concluded that the evidence cited by the government and its amici, particularly that contained in "The Compelling Interest," more than satisfied the government's burden of production regarding the compelling interest for a race-conscious remedy. *Id.* at 1176.

Similarly, the *Sherbrooke Turf* court rejected plaintiffs' argument that, in enacting TEA-21, Congress lacked any "hard evidence" of widespread intentional race discrimination in the contracting industry. *Sherbrooke Turf*, 345 F.3d at 969-70. Plaintiffs had pointed to Government reports and their own expert's report questioning the persistence of racial discrimination in highway construction. *Id.* at 970. After taking "a hard look," the court concluded that Congress had a strong

---

[38]      As noted earlier, the provisions of TEA-21 were set to expire on September 30, 2003, but a recently-enacted statute extended the Act's provisions through February 29, 2004.

basis in the evidence to support its conclusion that race-based measures were necessary for the reasons stated by the *Adarand VII* court. *Id.* The court agreed with the *Adarand VII* court that Congress had "spent decades compiling evidence of race discrimination in government highway contracting, of barriers to the formation of minority-owned construction businesses, and of barriers to entry." *Id.* The court concluded that plaintiffs had not shown that minority-owned small businesses enjoyed non-discriminatory access to and participation in highway contracts and, thus, had failed to carry their ultimate burden to prove that the DBE program did not meet a compelling governmental interest. *Id.*, citing *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1317 (Fed. Cir. 2001).[39]

## 2. Evidence Congress Considered Prior to Passing TEA-21

In this case, Federal Defendants offer the evidence considered by Congress prior to passage of TEA-21 to support their argument that Congress had a compelling interest in passing the Act. (Federal Defendants' Response to Plaintiff's First Set of Interrogatories to USDOT and Norman Y. Mineta, Ex. 8 to Pl.'s 56.1.) In asking this court to reach a conclusion other than that of the *Adarand VII* and *Sherbrooke Turf* courts, Plaintiff begins by noting generally that it is the duty of this court to examine the evidence proffered by Federal Defendants "fully and skeptically," citing several Supreme Court decisions "analyzing use of discriminatory programs employed by various public bodies." (Pl.'s Mem., at 6-7.) Plaintiff quotes Justice Powell's observation in *Regents of the Univ. of Cal. v. Bakke* that "[w]e have never approved a classification that aids persons perceived as members of relatively victimized groups at the expense of other innocent individuals in the

---

[39]     The court notes that, in a recent opinion, Judge Moran of this court cited with approval the *Sherbrooke Turf* court's conclusion that the Regulations pass constitutional muster. *See Builders Ass'n of Greater Chicago v. City of Chicago*, No. 96 C 1122, 2003 WL 23112668, at *13-14 (N.D. Ill. Dec. 29, 2003). Judge Moran noted that the DBE program's "modest" goals are "aspirational, not mandatory," a failure to achieve goals is not penalized, the program has duration limits and a relatively low net worth cutoff, the presumption regarding which firms qualify for DBE status is rebuttable, and recipient states are required to adopt race-neutral means to the extent feasible. *Id.*

absence of judicial, legislative, or administrative findings of constitutional or statutory violations." 438 U.S. 265, 307 (1978) (op. of Powell, J.). The Court in *Personnel Administrator of Massachusetts v. Feeney*, likewise observed that regardless of the reason for establishing a racial classification, the Court presumes such a classification is invalid and will require "extraordinary justification" before upholding it. 442 U.S. 256, 272 (1979).[40]

### a. Questions raised during floor debates

Plaintiff asserts that it is not possible for this court to determine from the legislative history of TEA-21 (1) whether Congress's goal in enacting § 1101(b) of the Act was to correct past

---

[40]    Plaintiff cites three additional Supreme Court opinions. In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Court held that the Religious Freedom Restoration Act of 1993 exceeded Congress's powers under § 5 of the Fourteenth Amendment. The Court noted that much of the legislative record consisted of anecdotal evidence of autopsies performed in violation of religious beliefs, as well as zoning regulations and historic preservation laws which had incidental adverse effects on churches and synagogues. *Id.* at 530-31. The court stated that it was unlikely these laws were enacted or enforced due to animus or hostility to religious practices or that they indicated "some widespread pattern of religious discrimination in this country." *Id.* at 531. The Court, however, found that the legislation was not remedial or preventative "[r]egardless of the state of the legislative record." *Id.* at 531-32. Thus, the Court did not base its holding on the lack of evidence in the legislative record.

In *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000), the court held that the Age Discrimination in Employment Act's ("ADEA") purported abrogation of the States' sovereign immunity was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment. The Court stated that Congress failed to identify any pattern of age discrimination by the States, in that the evidence consisted "almost entirely of isolated sentences clipped from floor debates and legislative reports." *Id.* at 91. The Court's review of the ADEA's legislative record revealed no "evidence of widespread and unconstitutional age discrimination by the States." Similarly, in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), the Court held that suits for money damages under Title I of the Americans with Disabilities Act ("ADA") against the States were barred by the Eleventh Amendment. As with the ADEA, the Court concluded that the legislative record of the ADA also did not establish the existence of "a pattern of discrimination by the States which violates the Fourteenth Amendment," and therefore subjecting the States to liability for damages under the ADA was not "congruent and proportional to the targeted violation." *Id.* at 374.

Plaintiff implies that this court can find TEA-21 and the Regulations constitutional only if it finds a "widespread pattern" of unconstitutional behavior by the States against minority and female-owned and controlled contractors in this country. As these cases all involve challenges to Congressional measures to remedy State discrimination pursuant to Congress's powers under § 5 of the Fourteenth Amendment, however, they are of questionable precedential value in dealing with Congress's efforts to ensure that federal funds are not used to perpetuate discrimination in the awarding of state highway contracts pursuant to § 1 of that Amendment.

discrimination or only to counter any lingering effects of past discrimination, or (2) whether Congress was attempting to remedy discrimination by public or by private entities. (Pl.'s Mem., at 9.) Therefore, Plaintiff contends that this court is able only to "speculate" as to what motivated Congress to act. (*Id.* at 9-10.) In Plaintiff's analysis, the legislative record shows that Congress lacked the evidence necessary to support its decision to use race-conscious measures before it passed TEA-21. (*Id.* at 10-12.) For example, Plaintiff cites statements made during floor debates concerning TEA-21, in which one Senator cautioned that the committee had not adequately considered the "real life" application of the preferences. 144 CONG. REC. S1395-01, S1398, S1400 (Mar. 5, 1998) (statement of Sen. Sessions). Another Senator submitted a Maryland political science professor's observations that the government had not evaluated the effectiveness of existing race-neutral programs and a California law professor's suggestions that the government form a lending service for business enterprises that had been passed over by other lenders. *Id.* at S1407 (statement of Sen. Ashcroft). Yet another Senator cited a letter from the Maryland political scientist criticizing the adequacy of the evidence Congress relied on in enacting the preferences. *Id.* at S1428 (statement of Sen. McConnell).

In addition, Plaintiff points to the "Additional Views" section of the House Report on the Building Efficient Surface Transportation and Equity Act of 1998, in which several members of the House Committee on Transportation and Infrastructure cautioned that

> [b]ased on existing case law, the DBE program raises significant constitutional questions. No evidence has been presented to this Committee that actual discrimination has occurred within the transportation construction industry. No evidence has been presented that race-neutral remedies were attempted and found deficient. No evidence has been presented justifying the use of the program on a nation-wide basis. No statistical evaluations have been presented justifying the use of the program in any given market. No evidence has been presented justifying the fact that the program does not include a procedure for individualized inquiries into whether a particular DBE has suffered from past discrimination.

H.R. REP. NO. 105-467(I), at 500 (Mar. 25, 1998).

From this evidence, Plaintiff concludes that "Congress *admitted* that it promulgated the federal DBE program without the necessary evidence before it of 'judicial, administrative or legislative findings of constitutional or statutory violations,'" (Pl.'s Mem., at 11, citing *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (op. of Powell, J.)), and that Congress failed to review the evidence necessary to support a compelling interest. (Pl.'s Mem., at 10; Pl.'s Resp. Mem., at 11.) Federal Defendants respond by pointing out that twenty-four members of Congress expressed contrary views. (*See* Ex. A to Federal Defendants' Response to Plaintiff's Motion for Summary Judgment.) In any event, the views of one or a few members of Congress who opposed a legislative measure can hardly be deemed an "admission" by the entire body, which passed it. *See, e.g., Dellums v. Bush*, 752 F. Supp. 1141, 1151 n.28 (D.D.C. 1990) ("[T]he statement of one Senator . . . is not constitutionally the equivalent of the views of Congress as an institution").

Plaintiff avers that the court in *Adarand VII* was "wrong to 'infer' discrimination" from the fact that minority business participation in a market drops sharply or disappears when race-conscious public contracting programs are discontinued, and that in any event it is "wrong to speculate" about the reasons for reduced minority participation. (Pl.'s Resp. Mem., at 17-18, citing 228 F.3d at 1174.) Again citing the testimony of Senators who were opposed to reauthorization of the federal DBE program, Plaintiff asserts that "[t]he Federal Government, in fact, *knew* in 1998 that these and other affirmative action programs were terminated *because discrimination was not shown to justify their continued use.*" (*Id.* at 18 (emphasis original).) Again, however, the views of a few members of Congress who opposed a legislative measure may not fairly be deemed an "admission" that Congress acted without a sufficient basis. *See Dellums*, 752 F. Supp. at 1151 n.28.

b. **DOJ report titled "The Compelling Interest"**

Plaintiff attacks the sufficiency of The Compelling Interest, (Pl.'s Resp. Mem., at 13-14), on which Congress relied in passing TEA-21. At least one district court has found that The Compelling

Interest details only five "possible allegations" of discrimination: two in Illinois, two in Massachusetts, and one in New York. *In re Sherbrooke Sodding Co.*, 17 F. Supp. 2d 1026, 1034 (D. Minn. 1998).[41] The *Sherbrooke Sodding* court ultimately concluded that the pre-Regulations DBE program, as applied in Minnesota, was not narrowly tailored to serve a compelling interest and enjoined the Minnesota Department of Transportation from soliciting bids for highway programs which incorporated DBE participation requirements. *Id.* at 1038. In reaching this conclusion, however, the court acknowledged that, despite a "paucity of specific findings of discrimination–which may well be difficult to document," Congress had authority to respond to the "the unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country." *Id.* at 1034, quoting *Adarand III*, 515 U.S. at 237.

Plaintiff further alleges that The Compelling Interest was created by "an *unsupervised paralegal, whose work was never checked.*" (Pl.'s Resp. Mem., at 13.) In a deposition, Mark Gross, whom Plaintiff characterizes as "[t]he Justice Department representative designated as most knowledgeable about the survey," (*id.*), testified that The Compelling Interest was "a summary or a list that others had done about a lot of studies and hearings and things that would go to support Congress's finding of a compelling interest"; that the report was written by a paralegal "on his own," subject to editing from higher-level individuals, in about a week; and that to his knowledge no one else in the Department reviewed the documents on which the report was based. (Deposition of Mark Gross, Ex. A to Affidavit of Thomas R. Olson in Support of Plaintiff's Memorandum in Response to Federal and State Defendants' Motions for Summary Judgment, at

---

[41]     Plaintiff also points out that the *Sherbrooke Sodding* court found that USDOT had offered no evidence that Congress considered alternatives to the DBE program promulgated under the predecessor to TEA-21. (Pl.'s Mem., at 18.) The court found that "USDOT offers only the fact that in 1978–20 years ago, and 4 years before Congress passed the first of these highway-funding Acts–a small business interest subsidy program was only minimally effective." 17 F. Supp. 2d at 1035. Plaintiff has not alleged that Federal Defendants relied on 20-year-old evidence in this case, however, and the court need not consider whether such evidence, without more, would be sufficient to meet Federal Defendants' burden here.

31-32, 35, 37, 39.)[42] The fact that a Justice Department paralegal wrote The Compelling Interest, however, does not call into question the reliability of the underlying studies on which it was based. In any event, Plaintiff's attack on The Compelling Interest will be effective only if Plaintiff can rebut the substance of that report, rather than simply taking shots at the author or the procedure by which the report was prepared.

Finally, Plaintiff asserts that one of the studies cited in The Compelling Interest does not support an inference of discrimination. (Pl.'s Resp. Mem., at 12.) The *Adarand VII* court referred to "the Urban Institute's analysis of thirty-nine disparity studies," cited in The Compelling Interest, 61 Fed.Reg. at 26,061-62, in which the Urban Institute concluded that "studies show underutilization by state and local governments of African American, Latino, Asian and Native American-owned businesses." 228 F.3d at 1172. Plaintiff notes that at least one study conducted by the Urban Institute found that "[c]onstruction subcontracting has the highest levels of minority-owned and women-owned business utilization of all industry categories." THE URBAN INSTITUTE, DO MINORITY-OWNED BUSINESSES GET A FAIR SHARE OF GOVERNMENT CONTRACTS? 15 (1997), *available at* http://www.urban.org/UploadedPDF/DMOBGFSGC.pdf. The relationship between this study and the "the Urban Institute's analysis of thirty-nine disparity studies" cited in *Adarand VII* is unclear. Even assuming that construction subcontracting does have the highest level of minority- and women-owned business participation of all industries, this fact alone does not show there is no discrimination against those groups–it may simply mean that discrimination is even worse in other industry categories.

---

[42] Because Plaintiff attaches only limited excerpts of Gross's deposition, it is not clear whether the deposition was taken pursuant to this case or in an earlier proceeding.

### 3.    Congressional Hearings and Reports Cited by Plaintiff

Plaintiff cites copious Congressional hearings and reports, none of which has been entered into the record,[43] to support its contentions that (1) the "most logical" explanations for reduced minority participation following the termination of DBE programs are price and competition, not discrimination, as competition is limited on set-aside programs to DBEs, and (2) minority businesses experience difficulty obtaining capital and bonding not because of discrimination, but because most are small and new, and "most small and new businesses suffer from lack of access to capital and bonding." (Pl.'s Resp. Mem., at 17-24.)

#### a.    Study of the construction industry

For example, Plaintiff cites a 1992 study of the construction industry that found that "[b]lack construction firms have grown faster than any other aspect of black businesses" and stated that the authors' analysis of 286 owners entering construction self-employment and using commercial bank financing to facilitate business entry and formation did not, "by itself," establish that black-owned businesses were victims of discrimination by lenders. (Grown & Bates, *Commercial Bank Lending Practices and the Development of Black Owned Construction Companies*, 14 J. Urban

---

[43]    The court will consider the few recent Congressional hearings and reports and other reports cited by Plaintiff that are available on the internet or via electronic database, or that Federal Defendants have submitted. The court will not consider hearings and reports that Plaintiff has not provided or are not readily available electronically.

Plaintiff submitted only one report, titled GENERAL ACCOUNTING OFFICE, DISADVANTAGED BUSINESS ENTERPRISES: CRITICAL INFORMATION IS NEEDED TO UNDERSTAND PROGRAM IMPACT (2001). (Pl.'s Mem., at 12-15; Ex. 13 to Pl.'s 56.1.) This report was issued after TEA-21 was enacted. As noted earlier, a governmental institution making a racial distinction must possess evidence that remedial action is necessary "*before* it embarks on an affirmative-action program." *Shaw v. Hunt*, 517 U.S. at 909-10. As this report was issued after TEA-21 was enacted, Congress could not have relied on it as evidence regarding the existence of discrimination in the federal-aid highway contracting industry. Thus, this report has no bearing on whether Congress had a compelling interest to promulgate TEA-21, and the court need not consider it in this litigation.

Similarly, Plaintiff cites a report issued after TEA-21 was enacted titled DEPARTMENT OF COMMERCE, SMALL DISADVANTAGED BUSINESS PROCUREMENT; REFORM OF AFFIRMATIVE ACTION IN FEDERAL PROCUREMENT, 63 Fed.Reg. 35,714 (1998). This report also is not relevant to the compelling interest inquiry.

Affairs 26, 39 (1992), Ex. 1 to Fed. Defs.' Reply Mem.) Plaintiff fails to recognize, however, that the study determined that, even after controlling for borrower risk, lending institutions are less likely to approve loans to blacks than to other business borrowers, and generally provide smaller loans to blacks when they do approve them. *Id.* at 25-26, 39. Plaintiff similarly ignores the study's finding that black-owned firms lagged behind nonminority businesses and that "[b]y limiting sales revenues and increasing the likelihood that firms will close down, financial constraints indeed thwart black business progress in construction. . . . Lender aversion to blacks may undermine some potentially viable black owned construction firms." *Id.* at 27, 40.

### b. Subcommittee hearing on 8(a) program

Plaintiff instead emphasizes a report titled *Problems Facing Minority and Woman-Owned Small Businesses, Including SBA Section 8(a) Firms, in Procuring U.S. Government Contracts: An Interim Report*, H.R. REP. NO. 103-870 (1994), 1994 WL 675005 (hereinafter, "Problems Facing M/WSBs"). (*See* Pl.'s Resp. Mem., at 15 n.5, 19, 23, 30, 31-32, 33, 40.) Congressman Bobby Rush, a member of the Commerce, Consumer, and Monetary Affairs Subcommittee of the House Committee on Government Operations, requested the hearing on which the report was based "because of serious concerns expressed to him by minority and women-owned small business firms, especially contractors, in the Chicago area." *Id.* at *1. Because Plaintiff cites only those portions of the report that support its arguments, a summary of the full report follows.

The subcommittee found that "[i]nability to obtain bonding is one of the top three reasons that new minority small business have difficulty procuring U.S. Government contracts." *Id.* at *14-15. The subcommittee also found that relatively new minority- and women-owned business enterprises have "great difficulty" obtaining surety bonds for several reasons, including lack of experience, inadequate capital, a lack of understanding of or history with the bonding process, and a lack of resources necessary to obtain audited financial statements and other necessary

documents. *Id.* at *15. In addition, the subcommittee observed, "there is underlying discrimination against new entrants into the construction field" because the surety industry is dominated by "bonding firms owned by several generations of the same families . . . and such firms tend to give performance and payment bonds to people they already know and not to the new business person, especially if the small business owner is a woman or of a racial or ethnic minority." *Id.*

The subcommittee concluded that federal agencies often set aside relatively few contracts for Small Business Administration ("SBA") "8(a) firms"–small businesses controlled by socially or economically disadvantaged individuals.[44] *Id.* at *17. The subcommittee recommended that SBA find, recruit, and expedite the eligibility process for firms whose products, services, or expertise are in demand by Federal procurement officials. *Id.* at *37. It also approved of SBA's plans to allow 8(a) firms to submit required business plans on their own forms and formats and to place a greater emphasis on training and providing technical and other assistance to 8(a) firms seeking contracts. *Id.*

Notably, the subcommittee focused particularly on circumstances in Chicago, recognizing that "many of the problems in [this] city occur elsewhere." *Id.* at *1-2. The subcommittee noted with approval a partnership between Amwest Surety Insurance Co. and the federally-funded Minority Enterprise Growth Assistance Center ("MegaCenter") in Chicago to assist minority contractors in obtaining bonding for construction projects in Illinois and the Midwest. (*Id.* at *17.) Amwest agreed to underwrite up to $50 million in surety bonds to qualified minority-owned construction companies which were also clients of the MegaCenter, offering these companies streamlined application procedures, special underwriting criteria, and local approval authority from its Chicago branch office. *Id.* Whenever possible, collateral requirements were met by SBA or Illinois Job Development Authority bond guarantees. *Id.* A surety access committee composed

---

[44]     For definitions of these terms, see note 10 *supra*.

of surety and insurance specialists[45] worked with Amwest to educate and advise contractors on bonding requirements and make presentations for the contractors to those surety companies most likely to approve the bonds. *Id.* Of 15 minority-owned construction companies of various sizes, which would otherwise have had no prequalifications for such bonds, the surety access committee successfully provided surety or credit commitments to 11 or 12, while the applications for the remainder were still in process at the time of the hearing. *Id.* The subcommittee concluded that "[t]his initiative could serve as an example for other locations and agencies around the country." *Id.*

Citing this single partnership initiative, Plaintiff asserts "that the remedies successfully implemented in Chicago can and should be successfully implemented elsewhere." (Pl.'s Resp. Mem., at 15 n.5.) The court is less certain. The Amwest initiative was obviously effective, but one venture initiated by a private corporation does not show that the federal government could have eliminated all discrimination and other problems DBEs face in accessing bonding by employing race-neutral means alone.

Plaintiff also cites the recommendations of witnesses at the hearing and of an individual member of the subcommittee. (Pl.'s Resp. Mem., at 19, 23, 33, 40.) For example, Plaintiff cites the testimony of Acting Regional Administrator of the Department of Housing and Urban Development's Chicago office, who stated that "[i]n several instances, prices under 8(a) contracts were significantly higher than prices obtained for similar services through full and open competition procurement procedures." Problems Facing M/WSBs, 1994 WL 675005, at *22. He related that a survey of HUD field offices in the Chicago region had disclosed other difficulties:

> Our offices expressed frustration with the unwillingness of 8(a) firms and SBA staff to understand and be responsive to our procurement needs. . . . In other cases, 8(a) firms expressed the attitude that they were unwilling to enter into substantive

---

[45]     The report did not identify what organization this committee was associated with, although the court assumes it was part of the MegaCenter.

discussions with our offices concerning contract pricing and provisions. Rather, the 8(a) firms expected to receive contracts based on their proposed prices irrespective of our historical pricing information. The above factors resulted in a general reluctance by our staff to view [the] SBA 8(a) program as a viable option for our procurement needs.

*Id.* In Plaintiff's view, this statement demonstrates that "the most logical explanation" for reduced minority participation absent set-aside programs is price and competition. (Pl.'s Resp. Mem., at 18.) Plaintiff has not, however, shown how the distortion of contract prices under the SBA 8(a) program or the uncooperative "attitudes" of 8(a) firms and SBA staff have any bearing on USDOT-aided highway construction contracting. Even assuming such a link exists, these facts alone do not tend to show that discrimination does not at least partly contribute to the sharp reduction in DBE participation that results when DBE programs are suspended.[46]

### 4. There Is a Compelling Interest in TEA-21

Like the two Courts of Appeals that have addressed this issue, this court finds that Congress had a "strong basis in evidence" to conclude that the DBE program was necessary to redress private discrimination in federally-assisted highway subcontracting. The *Adarand VII* court

---

[46] The court notes that Plaintiff makes several other arguments for which it offers no identifiable support. For example, Plaintiff challenges evidence on which the *Adarand VII* court relied for its conclusion that "subcontractors' unions . . . effectively block[] them from participation in a subcontracting market in which union membership is an important condition for success." 228 F.3d at 1168-69, citing MINORITY BUSINESS PARTICIPATION IN DEPARTMENT OF TRANSPORTATION PROJECT: HEARING BEFORE A SUBCOMM. OF THE HOUSE COMM. ON GOV'T OPERATIONS, 99th CONG. 203 (1985) (testimony of James Haughton, President, Fight Back); THE MEANING AND SIGNIFICANCE FOR MINORITY BUSINESS OF THE SUPREME COURT DECISION IN THE CITY OF RICHMOND V. J.A. CROSON: HEARING BEFORE THE LEGISLATIVE & NAT'L SEC. SUBCOMM. OF THE HOUSE COMM. ON GOV'T OPERATIONS, 100th CONG. 117-19 (1990); The Compelling Interest, 61 Fed. Reg. at 26,055-56 & nn.53 & 62. Plaintiff avers that this evidence "consisted of *unsubstantiated allegations of two men, made between 13-17 years ago,*" (Pl.'s Resp. Mem., at 12-13 (emphasis original)), but does not indicate which study it is referring to. Plaintiff also claims that the *Adarand VII* court "relied upon five documents for its claim that prime contractors were limiting minority participation." (Pl.'s Resp. Mem., at 14-16, citing 228 F.3d at 1168-69, 71.) Again, it is unclear what five documents Plaintiff is referring to. Plaintiff also claims that the *Adarand VII* court "found evidence of discrimination by suppliers based on [The Compelling Interest] and the *allegation of one individual.*" (Pl.'s Resp. Mem., at 16-17 (emphasis original), citing 228 F.3d at 1172.) This court is unmoved by Plaintiff's criticisms of The Compelling Interest, and Plaintiff offers no new evidence to challenge that study here. Nor is the court able to determine what "allegation of one individual" Plaintiff is referring to.

considered direct and circumstantial evidence, including post-enactment evidence and legislative history, in both government procurement contracts and the construction industry generally. *See id.* at 1166. The court also examined the government's evidence regarding barriers to minority business formation in construction contracting, consisting of numerous congressional investigations and hearings as well as outside studies of statistical and anecdotal evidence, including evidence that minority applicants in the construction industry were denied bank loans at a higher rate than "equally matched" non-minorities. *See Adarand VII,* 228 F.3d at 1168-1170. It also cited the government's evidence tending to show barriers to competition by existing minority enterprises. *Id.* at 1170-1172. This court agrees with the *Adarand VII* and *Sherbrooke Turf* courts that this evidence is sufficient to establish a compelling governmental interest. For the reasons stated above, the court also finds that, despite the voluminous "evidence" Plaintiff offers to nullify the data relied on by Congress and the *Adarand VII* court, Plaintiff has not met its burden "of introducing credible, particularized evidence to rebut the government's initial showing of the existence of a compelling interest in remedying the nationwide effects of past and present discrimination in the federal construction procurement subcontracting market." *Adarand VII,* 228 F.3d at 1175.

### B.   Narrow Tailoring

In addition to showing strong proof of a compelling interest, the government must "come forward with evidence that its affirmative action plan is narrowly tailored." *Majeske,* 218 F.3d at 820. The court must ascertain whether "the means chosen to accomplish the government's asserted purpose [are] specifically and narrowly framed to accomplish that purpose." *Grutter,* 123 S.Ct. at 2341 (internal quotation marks and citation omitted). Plaintiff bears the "ultimate burden" of establishing that the federal DBE program and the state implementation of the program are not narrowly tailored. *Sherbrooke Turf,* 345 F.3d at 971, citing *Wygant,* 476 U.S. at 293 (O'Connor, J., concurring). "An affirmative action plan is narrowly tailored if, as a practical matter, it

discriminates against whites as little as possible consistent with effective remediation." *Majeske*, 218 F.3d at 820 (internal quotation omitted). To determine whether an affirmative action plan is narrowly tailored, the court must determine "whether the racially preferenced measure is a plausible lower-bound estimate of a shortfall in minority representation that is caused by past discrimination." *Id.* at 823 (citation omitted).

Plaintiff's facial challenge to TEA-21 and the Regulations under the narrow tailoring rubric requires the court to determine whether the Regulations can be applied "under *any* set of factual circumstances." *Sherbrooke Turf*, 345 F.3d at 971, citing *United States v. Salerno*, 481 U.S. 739, 746 (1987) (emphasis original).[47] In making this determination, the court looks at several factors, such as the efficacy of alternative remedies, the flexibility and duration of the race-conscious remedies, including the availability of waiver provisions, the relationship between the numerical goals and the relevant labor market, the impact of the remedy on third parties, and whether the program is over- or under-inclusive. *Adarand III*, 515 U.S. at 237-38; *Croson*, 488 U.S. at 508 (plurality opinion); *United States v. Paradise*, 480 U.S. 149, 171, 187 (1987) (plurality and concurring opinions).

In urging that the federal DBE program is not narrowly tailored, Plaintiff first contends that the government could not properly consider whether race-neutral measures might adequately address discrimination before turning to race-conscious methods because the federal government lacked evidence regarding the existence or cause of discrimination affecting minority participation in highway contracting. (Pl.'s Mem., at 17-18.) Plaintiff notes that the *Croson* plurality found that the city had failed to consider the "whole array" of race-neutral measures at its disposal to increase the accessibility of government contracting opportunities to small entrepreneurs of all races, such

---

[47]     As discussed *infra*, the narrow tailoring analysis with regard to Plaintiff's as-applied challenge focuses on Illinois's implementation of the federal DBE program. *Cf. Sherbrooke Turf*, 345 F.3d at 970.

as "[s]implification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races." *Croson*, 488 U.S. at 508 (plurality opinion). Such measures, the plurality stated, "would open the public contracting market to all those who have suffered the effects of past societal discrimination or neglect." *Id.*

Plaintiff claims that, "[h]ad the Federal Government examined race-neutral remedies as constitutionally required, it would have found that the problem of too few minority subcontractors for [USDOT] government construction contracts could and should be remedied by purely race-neutral means." (Pl.'s Resp. Mem., at 29-34.) Specifically, Plaintiff claims the Federal Government "knew" that race-neutral alternatives were available to assist DBEs–namely, increasing access to capital and bonding and/or decreasing the need for such access. (*Id.* at 30.) To support this proposition, Plaintiff points to the analysis conducted by the Commerce, Consumer, and Monetary Affairs Subcommittee of the House Committee on Government Operations, discussed above, regarding a program under which the SBA guaranteed up to $1.250 million of a surety bond on a contract if a contractor had been previously rejected or would not qualify for a bond. Problems Facing M/WSBs, 1994 WL 675005, at *19. Such bonds were available for federal and local government contracts as well as private contracts. *Id.* From the time of the program's inception in 1971 through 1994, more than 208,000 bonds were guaranteed through the program for more than $20 billion. *Id.*

Federal Defendants respond by pointing to the fact that the federal DBE program does not mandate the use of race-conscious measures by Recipients, but in fact requires only that the goal reflect the Recipient's determination of the level of DBE participation it would expect absent the effects of discrimination. 49 C.F.R. § 26.45(b). They also emphasize that Recipients must meet the "maximum feasible portion" of the overall goal through race-neutral means before turning to race-conscious measures. 49 C.F.R. § 26.51.

The court notes that the *Adarand VII* court concluded that "[t]he long history of discrimination in, and affecting, the public construction procurement market–despite the efforts dating back at least to the enactment in 1958 of the [Small Business Act] to employ race-neutral measures–places a formidable burden on both existing and would-be minority participants and thus justifies race-conscious action." 228 F.3d at 1178. Still, as the *Sherbrooke Turf* court recognized, the Regulations place strong emphasis on "the use of race-neutral means to increase minority business participation in government contracting." 345 F.3d at 972, quoting *Adarand III*, 515 U.S. at 237-38. The court acknowledged that, although "narrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it does require "serious, good faith consideration of workable race-neutral alternatives." *Id.*, quoting *Grutter*, 123 S. Ct. at 2344-45. The Regulations, which prohibit the use of quotas and severely limit the use of set-asides, meet that requirement. *Id.*, citing *Croson*, 488 U.S. at 496 (plurality opinion). This court agrees with the *Adarand VII* and *Sherbrooke Turf* courts that the federal DBE program does require Recipients to make a "serious, good faith consideration of workable race-neutral alternatives" before turning to race-conscious measures.

Second, Plaintiff claims that the federal government cannot show that the DBE program is "appropriately limited" to last no longer than necessary, as "Congress did not express what discrimination the DBE program was designed to eliminate." (Pl.'s Mem., at 18-19; *see also* Pl.'s Resp. Mem., at 34-35.) A race-conscious program must be "appropriately limited such that it will not last longer than the discriminatory effects it is designed to eliminate." *Adarand III*, 515 U.S. at 238 (quotation omitted). As the *Adarand VII* court noted, it is clear that Congress designed the DBE program to prevent the disbursement of federal highway funds from perpetuating past discrimination and to remedy the effects of past discrimination in government highway contracting markets created by federal disbursements. 228 F.3d at 1165. As noted above, the present statutory provisions were scheduled to expire on February 29, 2004, unless reauthorized. The fact

that the legislation is subject to periodic congressional reauthorization underscores that departing from the norm of equal treatment for all racial groups is temporary. *Id.* at 1180, citing *Grutter*, 123 S. Ct. at 2346. This court notes, further, that Recipients must submit their fiscal year goals to USDOT for review and approval, 49 C.F.R. § 26.45(f)(1), and that a Recipient that has met its DBE participation by race-neutral means alone for two consecutive years is not required to project the amount of its goal it can meet using such means in the next year. 49 C.F.R. § 26.51(f)(3). Because the program is subject to periodic reauthorization and requires Recipients to review their programs annually, the court agrees with Federal Defendants that the federal DBE scheme is appropriately limited to last no longer than necessary.

Third, Plaintiff avers that the federal DBE program is inflexible, as Recipients must presume that women and minorities are socially disadvantaged. (Pl.'s Mem., at 19.) The court notes, however, that the presumption that women and minorities are socially disadvantaged is deemed rebutted if such individual's personal net worth exceeds $750,000, 49 C.F.R. § 26.67(b)(1), and a firm owned by an individual who is not presumptively disadvantaged may nevertheless qualify for such status if the firm can demonstrate that its owners are socially and economically disadvantaged. 49 C.F.R. § 26.67(d). Other aspects of the Regulations, as well, provide Recipients and prime contractors with ample flexibility: recipients may obtain waivers or exemptions from any requirement, 49 C.F.R. § 26.15(b), a provision which the *Adarand VII* court found had increased the flexibility of the current DBE program over previous iterations. 228 F.3d at 1181. Recipients are not required to set a contract goal on every USDOT-assisted contract. 49 C.F.R. § 26.51(e)(2). If a Recipient estimates that it can meet its entire overall goal for a given year through race-neutral means, it must implement the program without setting contract goals during that year. 49 C.F.R. § 26.51(f)(1). If, during the course of any year in which it is using contract goals, a Recipient determines that it will exceed its overall goal, it must adjust the use of race-conscious contract goals accordingly. 49 C.F.R. § 26.51(f)(2). Recipients administering a DBE

program in good faith cannot be penalized for failing to meet their DBE goals. 49 C.F.R. § 26.47 (a). A Recipient may terminate its DBE program if it meets its annual overall goal through race-neutral means for two consecutive years. C.F.R. § 26.51(f)(3). Further, a Recipient may award a contract to a bidder/offeror that does not meet the DBE participation goal so long as the bidder has made adequate good faith efforts to meet the goal. 49 C.F.R. § 26.53(a)(2). The Regulations also prohibit the use of quotas. 49 C.F.R. § 26.43.

Fourth, Plaintiff contends that the federal DBE program lacks numerical proportionality, i.e., that the goal-setting mechanism is not "reasonably tied to" the number of DBEs that are "qualified, willing, and able" to work. (Pl.'s Mem., at 19-20.) According to Plaintiff, Congress and the States lack sufficient statistical evidence regarding minority participation in the relevant construction markets to compare numerical goals to the relevant labor market in a meaningful way. (Id. at 19.) The *Sherbrooke Turf* court found, to the contrary, that USDOT has tied the goals for DBE participation to the relevant labor markets: the Regulations require Recipients to examine the likely number of minority contractors that would have received federally-assisted highway contracts but for the effects of past discrimination. 345 F.3d at 972. Though the underlying estimates may lack precision, the court stated, the exercise does require Recipients to establish realistic goals for DBE participation in the relevant labor markets, "in stark contrast to the program struck down in *Croson*, which 'rested upon the completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population.'" *Id.*, citing 488 U.S. at 507 (plurality opinion). This court concurs with the *Sherbrooke Turf* court's assessment that the federal DBE program requires Recipients to base DBE goals on the number of "ready, willing, and able" disadvantaged businesses in the local market.

Fifth, Plaintiff asserts that the DBE program imposes an unreasonable burden on third parties, including non-DBE subcontractors and taxpayers, because the federal government has no evidence that the burden is necessary to remedy any discrimination. (Id. at 20-22; Pl.'s Resp.

Mem., at 39-42.) Again, this objection has been addressed and overruled by each court to which it was presented. A plurality of the Court in *Wygant* stated, "As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy. When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." 476 U.S. at 280-81 (plurality opinion) (internal quotations omitted). Evaluating the pre-Regulations federal DBE program, the *Adarand VII* court found that, while at the margin, some DBEs might be hired over non-DBEs, "the possibility that innocent parties will share the burden of a remedial program is itself insufficient to warrant the conclusion that the program is not narrowly tailored." 228 F.3d at 1183. The *Sherbrooke Turf* court found that Congress and USDOT "have taken significant steps to minimize the race-based nature of the DBE program"–and thus the impact on third parties–by directing the program's benefits at all small businesses owned and controlled by socially and economically disadvantaged individuals. 345 F.3d at 972. The court found that, while relevant, race was not the dispositive factor, since the presumption that members of certain racial minorities are DBEs is rebuttable, wealthy owners and wealthy firms are excluded, and individuals who are not presumptively disadvantaged but can demonstrate actual social and economic disadvantage can be certified as DBEs. *Id.* at 972-73, citing *Gratz v. Bollinger*, 123 S. Ct. 2411, 2429 (2003); *Grutter*, 123 S. Ct. at 2345-46.

Federal Defendants contend that Plaintiff's burden under the federal DBE program is "negligible." (Fed. Defs.' Mem., at 19.) As discussed above, Plaintiff can only claim legitimate losses on the Backbone Road, Hennepin Bikeway, and Riley Creek Projects. Federal Defendants point out that, as described above, on the first such contract (Backbone Road), Plaintiff's lost profits were only $400. (Roesch Dep., at 153.) Regarding the second (Hennepin Bikeway), the owner of the prime contractor testified that the approximately $250 difference between Plaintiff's bid and that of the DBE was insignificant, that he had subcontracted with the DBE in the past and had been

very satisfied with its work, that the DBE's place of business was located closer to the project than Plaintiff's, and that there is a "strong possibility" that he would have selected the DBE even if the project had not contained a DBE goal. (Trovero Dep., at 45-49.)

With regard to the third contract (Riley Creek), a project manager for the prime contractor testified that he did not know whether IDOT requires a firm to subcontract to a DBE where, as here, the DBE submitted a bid that was 35 percent greater than the lowest bid. (Kuehne Dep., at 115.) In fact, there is some evidence that an award to a DBE bidder is not required where the bid is more than five percent higher than the lowest bid. (*See* Newbold Dep., at 22; Gower Dep., at 62; Velasco Dep., at 53-54; Ex. A to State Defendants' Reply in Support of Their Motion for Summary Judgment, at 2.) While the court does not agree that Plaintiff's burden is "negligible," it does find that the loss of this single profitable contract imposes only a minimal burden and, therefore, does not rebut Federal Defendants' evidence that the federal DBE program is narrowly tailored. *Majeske*, 218 F.3d at 820. Further, as the federal DBE program is "a limited and properly tailored remedy to cure the effects of prior discrimination," a "sharing of the burden" by parties such as Plaintiff "is not impermissible." *Wygant*, 476 U.S. at 280-81 (plurality opinion).

Finally, Plaintiff argues that the federal DBE program is over-inclusive, since, according to Plaintiff, the Regulations "require[] states to presume literally everyone in America is socially and economically disadvantaged except white males." (Pl.'s Mem., at 22, citing 49 C.F.R. § 26.61(c); *see also* Pl.'s Resp. Mem., at 42-45.) In *Croson*, the Supreme Court struck down an affirmative action program as not narrowly tailored in part because the government had not inquired into whether or not the particular minority business enterprises seeking a racial preference had suffered from the effects of past discrimination. 488 U.S. at 508 (plurality opinion).[48] Unlike the

---

[48]    In its TAC, Plaintiff also claimed that "[t]he relevant provisions of TEA-21 exceed Congress's legislative powers under the United States Constitution." (TAC ¶ 85.) Plaintiff did not, however, address this argument in its brief, and the court deems the argument waived.

impermissible program in *Croson*, however, the Regulations at issue here do not provide that every woman and member of a minority group is disadvantaged. As discussed earlier, preferences are limited to small businesses with average annual gross receipts in the preceding 3 fiscal years of $16.6 million or less, TEA-21 § 1101(b)(2)(A), and businesses whose owners' personal net worth exceeds $750,000 are excluded. 49 C.F.R. § 26.67(b)(1). A Recipient that has a "reasonable basis" to challenge a woman or minority individual's status as socially or economically disadvantaged may initiate a proceeding to review the matter, 49 C.F.R. § 26.67(b)(2), and any person may file with the Recipient a written complaint stating reasons that a DBE-certified firm should be found ineligible. 49 C.F.R. § 26.87(a). A firm owned by a white male may qualify as socially and economically disadvantaged nevertheless. 49 C.F.R. § 26.67(d).

TEA-21 and the Regulations are adequate, in the court's view, to ensure the program is narrowly tailored to help only those businesses whose owners are truly disadvantaged. The court, therefore, grants Federal Defendants' motion for summary judgment.

## IV.    Constitutionality of Illinois DBE Program

The *Sherbrooke Turf* court determined that a Recipient need not establish a distinct compelling interest before implementing the federal DBE program:

> Compelling government interest looks at a statute or government program on its face. When the program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation.

345 F.3d at 970. The court did conclude, however, that a Recipient's implementation of the federal DBE program must be narrowly tailored to serve the federal program's compelling interest. *Id.* at 971. To be narrowly tailored, the court continued, "a *national* program must be limited to those parts of the country where its race-based measures are demonstrably needed." *Id.* As the federal DBE program delegates this tailoring function to the States, the court deemed the States'

implementation "critically relevant" to the strict scrutiny analysis. *Id.* This court finds reasonable, and adopts, the Eighth Circuit's conclusion that a Recipient's implementation of the federal DBE program must be analyzed under the narrow tailoring analysis but not the compelling interest inquiry.

The court notes that, because Plaintiff is seeking only forward-looking relief, only IDOT's current DBE program is at issue in this case. The court is unable to determine with certainty whether, at the date of this decision, IDOT is operating under its FY 2003 or FY 2004 goal. As the parties have only briefed IDOT's FY 2003 goal, however, the court will presume, for purposes of this decision, that IDOT is operating pursuant to that goal.

The *Sherbrooke Turf* court concluded that both Minnesota's and Nebraska's implementation of the federal DBE program was narrowly tailored as applied. 345 F.3d at 973-74. Following promulgation of the Regulations, the Minnesota Department of Transportation ("MnDOT") commissioned a consulting firm to study the highway contracting market in Minnesota. *Id.* at 973. At the first step required by the Regulations, 49 C.F.R. § 26.45(c), the firm determined that DBEs made up 11.4 percent of the prime contractors and subcontractors in the highway construction market and that, of this number, 0.6 percent were minority-owned and 10.8 percent women-owned. *Id.* For the second step, 49 C.F.R. § 26.45(d), the firm estimated that the number of participating minority-owned businesses would be 34 percent higher in a race-neutral market. *Id.* Based on these figures, the firm adjusted its DBE availability figure very modestly, from 11.4 to 11.6 percent, a figure which MnDOT adopted as its overall DBE goal for FY 2001. *Id.*[49]

MnDOT forecast that it would need to meet nine percent of its overall goal through race- and gender-conscious means. *Id.* The department based this figure on the fact that DBE participation in state highway contracts had dropped from 10.25 percent in 1998 to 2.25 percent

---

[49]     The court notes that the firm's adjustment of the DBE availability figure from 11.4 to 11.6 percent is far smaller than a 34% increase.

in 1999, when MnDOT suspended its previous DBE program after a federal district judge invalidated the statutory ten percent set-aside of federal highway funds and USDOT's then-existing regulations "as applied to highway construction contracts in the State of Minnesota." *Id.*, citing *In re Sherbrooke Sodding*, 17 F. Supp. 2d at 1037-38. To meet its overall goal, MnDOT required each prime contractor bidding for federal-aid highway projects to make a good faith effort to subcontract a prescribed portion of the project to DBEs. *Id.* MnDOT determined this portion based on several individualized factors, including the availability of DBEs and the extent of subcontracting opportunities on the project. *Id.* USDOT approved MnDOT's FY 2001 program. *Id.*

The plaintiff presented evidence attacking the reliability of the data the consulting firm used in determining the recommended 11.6 percent overall goal, *id.,* but the court observed that plaintiff failed to identify better data or to demonstrate "that MnDOT was otherwise unreasonable in undertaking this thorough analysis and in relying on its results." *Id.* The court found that the "precipitous drop" in DBE participation in 1999, when no race-conscious methods were employed, supported MnDOT's determination that a substantial portion of its FY 2001 overall goal could not be met through race-neutral measures. *Id.* Further, the court could find no evidence that MnDOT failed to adjust its use of race-conscious and race-neutral methods as the year progressed, a requirement of the Regulations. *Id.* The court therefore held that the revised DBE program served a compelling government interest and was narrowly tailored, both facially and as applied in Minnesota. *Id.*

For similar reasons, the court upheld Nebraska's implementation of the DBE program. Like its Minnesota counterpart, the Nebraska Department of Roads ("NDOR") commissioned a consulting firm to conduct availability and capability studies of DBE firms in the Nebraska highway construction market. *Id.* at 974. The availability study found that between 1995 and 1999, under the then-mandatory ten percent set-aside scheme, 9.95 percent of all available and capable Nebraska firms were DBEs, and DBE firms received 12.67 percent of the contract dollars on

federally-assisted highway projects. *Id.*[50] The study recommended that NDOR set an overall goal of 9.95 percent DBE participation and predicted that 4.82 percent of this overall goal would have to be achieved by race- and gender-conscious means. *Id.* NDOR adopted these recommendations in its FY 2001 DBE goal submission to USDOT, which approved the program. *Id.* Like MnDOT, NDOR required that prime contractors make a good faith effort to allocate a set portion of each contract to DBE subcontractors. *Id.* The court concluded that plaintiff had failed to prove that the revised DBE program was not narrowly tailored as applied in Nebraska. *Id.*

In this litigation, Plaintiff argues that IDOT's DBE program is not narrowly tailored. First, IDOT acted in this case not only without any evidence of discrimination by State authorities, Plaintiff contends, but also without considering the efficacy of race-neutral measures. (Pl.'s Mem., at 40.) Plaintiff avers that the evidence showed in fact that "existing race-neutral measures are sufficient." (*Id.*) State Defendants respond by urging that Plaintiff does not challenge the methodology or data IDOT used to calculate the race-neutral portion of its goal. (State Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (hereinafter, "State Defs.' Opp. Mem."), at 20.) They claim Plaintiff did not challenge this calculation because "IDOT very precisely followed 49 C.F.R. [§] 26.51 and it has accurately projected the maximum feasible portion of its overall goal it can obtain through race neutral means." (*Id.* at 20-21.) State Defendants contend that IDOT implemented "extensive race-neutral measures," including assistance to minority contractors with bonding, insurance, seminars, technical services, training in filling out paperwork and other tasks that highway construction contractors frequently perform, and making general help available on its website. (State Defs.' Mem., at 19-20.) They urge that the testimony of IDOT Officials "establishes that the State Defendants had absolutely no evidence that [IDOT] could meet

---

[50]     The court did not comment on the fact that the mandatory set-asides had apparently overcompensated, resulting in awards to DBEs of more than their proportionate share of the contract work.

its goal entirely through race neutral means." (*Id.* at 20.) State Defendants also point to IDOT's zero-goal program as evidence that race-neutral criteria alone would not have permitted IDOT to achieve its DBE goals. (*Id.* at 19.)

The court notes that, although IDOT did in fact possess anecdotal evidence of discrimination, it apparently failed to quantify such data. The *Adarand VII* court stated that "[b]oth statistical and anecdotal evidence are appropriate in the strict scrutiny calculus, although anecdotal evidence by itself is not." *Adarand VII*, 228 F.3d at 1166. Similarly, in *Coral Construction Co. v. King County*, 941 F.2d 910, 919 (9th Cir. 1991), the court concluded that, "while anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination necessary for the adoption of an affirmative action plan." On the other hand, the *Contractors Association* court found that "anecdotal evidence alone may, in an exceptional case, be so dominant or pervasive that it passes muster under *Croson*." 6 F.3d at 1003.

Although our Court of Appeals has not indicated whether anecdotal evidence, standing alone, is ever sufficient to justify a racial preference program, in at least one instance it found that a "combination of persuasive statistical data and anecdotal evidence" adequately established both a compelling governmental interest that justified an affirmative action plan and provided "ample proof" that the program was narrowly tailored. *Majeske*, 218 F.3d at 822-23. In *Majeske*, 83 white police officers who worked for the Chicago Police Department ("CPD") sued the City of Chicago for reverse discrimination. *Id.* at 818. The officers asserted that the CPD's affirmative action plan violated their rights as it resulted in the Department promoting African-Americans and Hispanics instead of them. *Id.* After a jury made factual findings by answering 56 special interrogatories, the district court entered judgment in the City's favor and found the affirmative action plan constitutional; the Court of Appeals affirmed the district court's ruling. *Id.* The court found that, based on the evidence presented at trial and the jury's factual findings, there was "sufficient proof

of past discrimination by the City" to warrant the City's affirmative action plan. *Id.* at 822. The statistical proof, the court found, revealed that past discrimination had significantly lowered the number of African-Americans and Hispanics that were promoted to detective. *Id.* The court also noted that the jury heard extensive testimony from former minority members of the CPD about discriminatory practices the Department used to prevent blacks and Hispanics from (1) being hired into the Department and (2) advancing within the CPD. *Id.* This combination of statistical and anecdotal evidence was sufficient to establish a compelling governmental interest that justified the CPD's affirmative action plan and constituted "ample proof" that the program was narrowly tailored. *Id.* at 822-23.

In this case, some IDOT officials could not recall any allegations of discrimination by DBEs, while others claimed to have heard a large number of allegations by DBE subcontractors that they had experienced discrimination in obtaining subcontracts, financing, and bonding. IDOT apparently investigated only a handful of these complaints to determine the veracity of, or bases for, these claims. When it did investigate, IDOT often found nondiscriminatory explanations for the problems DBEs were experiencing, such as a DBE's failure to complete a loan package properly. On the other hand, there appear to have been situations in which a DBE had put together a loan package in the manner that was required by the lending institution, was initially denied financing, and after IDOT intervened on behalf of the DBE with virtually no change in the application, the loan was approved. Further, under the pre-Regulations DBE program, some DBE firms that exited the program "were no longer used," and some could not "sustain as viable DBEs."

The record contains reference to only one or two formal, written complaints to IDOT from DBE subcontractors alleging discrimination by a prime contractor. Gould testified that he was aware of only one formal complaint, and stated that IDOT determined that the DBE who filed the complaint had not in fact been a victim of discrimination. (Gould Dep., at 20-21.) Gower could recall only one formal complaint, from a southern Illinois DBE subcontractor or contractor who felt

that IDOT (rather than a prime contractor) was discriminating against his company in a claims process. IDOT had investigated the allegation, but Gower could not recall the result of the investigation. (Gower Dep., at 16-17.) On the other hand, five witnesses agreed that DBEs and other small businesses often do not file written complaints of discrimination for fear of being "black-balled" in the industry. (*See* Peters Dep., at 54-55, 58-60, 77-78; Newbold Dep., at 101-02; Vereen Dep., at 21-22, 25-26; Velasco Dep., at 104; Gould Dep., at 19.) Without a written complaint, witnesses observed, it was difficult for IDOT to investigate an allegation.

In addition to this anecdotal evidence, IDOT possessed limited statistical evidence of a shortfall in DBE participation when race-conscious goals are removed. As discussed above, State Defendants point to IDOT's zero-goal program as evidence that DBE participation drops in the absence of a DBE program. The parties agree that DBE participation dropped to about 1.5 percent on the projects that had no goals. As noted previously, however, the record does not provide the DBE subcontractor participation rate in the DBE program during this time period, nor does it provide the dates during which IDOT conducted this program. Further, Gower testified that no one examined whether discrimination motivated those prime contractors who did not select more DBE subcontractors in the zero-goal program. (Gower Dep., at 105.) The court concludes that, although this zero-goal program shows that DBE participation drops precipitously in the absence of race-conscious goals, it does not alone constitute "persuasive statistical data," which, combined with the anecdotal evidence discussed above, "adequately establishes a compelling governmental interest that justifies an affirmative action plan." *Majeske*, 218 F.3d at 822.

The court also notes that, in calculating the number of "ready, willing, and able" DBEs, IDOT used data on both prime contractor and subcontractor DBE availability and dollar volume of contracting business. As noted above, however, it is unclear whether IDOT sets goals for both prime contracts and subcontracts, or only the latter. Considering the importance of accurate data regarding availability and volume of work obtained by DBE subcontractors in IDOT's DBE

programs, the court finds there is a material issue of fact regarding both whether IDOT sets goals for prime contracts and, if not, whether data is available showing the number of ready, willing, and able DBE subcontractors.

More significantly, there is a genuine issue of material fact regarding whether IDOT has any quantifiable evidence that private parties have discriminated against DBE subcontractors in federal-aid IDOT contracting and whether that discrimination causes a lower level of DBE participation than would be expected in the absence of such discrimination. Without such data, IDOT could not credibly determine whether the DBE program "discriminates no more than is necessary to accomplish the remedial purpose," *Builders Ass'n*, 256 F.3d at 643-44, i.e., whether the race-conscious portion of the FY 2003 DBE goal was "a plausible lower-bound estimate of a shortfall in minority representation that is caused by past discrimination." *Majeske*, 218 F.3d at 823. If, in a future proceeding before this court, State Defendants do come forward with such data, Plaintiff will succeed in meeting its "ultimate burden" to show that the Illinois DBE program is not narrowly tailored only by presenting credible evidence to rebut State Defendants' proffered data. *Id.* at 820.[51]

Second, Plaintiff contends that the evidence available to IDOT did not indicate that discrimination is limiting DBE participation, therefore, Plaintiff asserts, any race-conscious programs are by definition lasting too long. (Pl.'s Mem., at 40.) State Defendants respond to this contention simply by claiming that Plaintiff has no evidence to support it. (State Defs.' Opp. Mem., at 21.) As discussed above, there is a genuine issue of material fact regarding whether IDOT

---

[51] The court recognizes that the *Sherbrooke Turf* court upheld Minnesota's and Nebraska's implementation of TEA-21 and the Regulations based on DBE participation data that was arguably similar to the information presented in this case, without discussing whether the record contained any statistical or anecdotal evidence of discrimination, or whether such evidence was required. *See* 345 F.3d at 973-74. As noted earlier, however, this court need not give the reasoning in *Sherbrooke Turf* "automatic deference." *Colby*, 811 F.2d at 1123.

possessed any statistical evidence that discrimination reduced DBE participation in federal-aid IDOT subcontracting.

Third, Plaintiff claims that IDOT's DBE program is inflexible because prime contractors are given no guidance regarding whether a DBE subcontractor's bid is "excessive or unreasonable." (Pl.'s Resp. Mem., at 35-36.) Since the phrase "excessive or unreasonable" is found in the Regulations, however, this argument more logically calls into question the federal DBE program. Moreover, the fact that the Regulations and IDOT employ the indefinite phrase "excessive or unreasonable" does not diminish the program's flexibility. On the contrary, such language enhances flexibility by permitting IDOT to waive the DBE requirement for prime contractors whenever it determines that a DBE bid is unreasonably high. Perhaps Plaintiff's real complaint is that the phrase "excessive or unreasonable" is vague. Such an argument, however, would find support only if there were evidence of circumstances in which IDOT refused to find that a high differential between a DBE and non-DBE bid was "excessive or unreasonable." Plaintiff has not presented any evidence of such an incident. The court, therefore, finds that IDOT's DBE program provides adequate flexibility.

Fourth, Plaintiff alleges that the "relationship between IDOT's goal and its labor market is skewed," and therefore that the plan lacks numerical proportionality. (Pl.'s Mem., at 40-41; Pl.'s Resp. Mem., at 37-38.) Plaintiff notes, correctly, that IDOT examined the availability of prime contractors and subcontractors together, rather than parsing out subcontractors separately, when establishing its annual DBE goals. (Pl.'s Mem., at 40-41; Gower Dep., at 37.) Plaintiff claims that "IDOT's race-conscious remedy is tied to the selection of subcontractors only." (Pl.'s Mem., at 41.) As noted earlier, Gould asserted that IDOT "by law" must award prime contracts to the lowest bidder, without regard to DBE status. (Gould Dep., at 35, 44, 74.) Further support for Plaintiff's position that the statistics on which IDOT relies are flawed is found in Newbold's and Gould's depositions, in which they testified that they thought IDOT "could have" determined the availability

of, and volume of business obtained by, non-DBE subcontractors separately from DBE subcontractors, and subcontractors separately from prime contractors, on awarded contracts for purposes of FY 2000 goal-setting. (Newbold Dep., at 51-52, 107-08; Gould Dep., at 39-41.)

Based on its assertion that IDOT's race-conscious remedy relates only to the selection of subcontractors, Plaintiff contends that IDOT should have based the race-conscious portion of its DBE goals only on data regarding subcontractor availability and volume of work, rather than on data that combined prime contractors and subcontractors. (Pl.'s Mem., at 41.) Had IDOT examined subcontractors separately, Plaintiff claims, it would have seen that its "own records revealed that DBE subcontractors were already *over utilized*." (*Id.* (emphasis original).) Although Plaintiff does not specifically cite to the record to support this contention, the court presumes it is referring to figures shown to Gould during his deposition that indicated that DBEs constituted between 21 and 22 percent of the subcontracting community during FY 1998, 1999, and 2000, but received approximately 31 percent of total subcontracting dollars during the periods July 1, 1998 through January 31, 1999, and July 1, 1999 through January 31, 2000. (Gould Dep., at 101-07, 126.) As noted earlier, some of these figures were handwritten, and Gould could not confirm the data represented "final numbers," since much of the material consisted of "quick compilations" that may have been based on incomplete reporting or resulted from duplications of subcontractors in multiple districts. (Gould Dep., at 101-107, 119, 126.) The court concludes there exists a material issue of fact regarding whether reliable data on DBE and non-DBE subcontractors is available.

Plaintiff also argues that both the federal and state program operate unconstitutionally because neither examines data on "*larger and successful*" non-DBE minority firms. (Pl.'s Resp. Mem., at 38 (emphasis original).) According to Plaintiff, such examination would "show a more favorable picture" of minority participation in federal-aid highway subcontracts. (*Id.*) The court notes that this position runs contrary to Plaintiff's position that the federal DBE program is over-inclusive since, according to Plaintiff, the Regulations "require[] states to presume literally everyone

in America is socially and economically disadvantaged except white males." (Pl.'s Mem., at 22; *see also* Pl.'s Resp. Mem., at 42-45.) Nevertheless, this argument lacks merit. The criteria for DBE status set forth in the Regulations specify that firms owned by an individual--including minorities and women--whose personal net worth exceeds $750,000 is not eligible for DBE status. 49 C.F.R. § 26.67(b)(1). Further, firms owned by white males may qualify for DBE status. 49 C.F.R. § 26.67 (d). The court finds that federal and state officials have no reason to account for the experience of minority firms that do not qualify for DBE status when calculating goals for participation of DBE firms.

Fifth, Plaintiff contends that it is "patently wrong" and "unacceptable" for IDOT to burden highway construction prime contractors, non-DBE subcontractors, and the general public to carry out its DBE goals because IDOT lacks any evidence that the construction industry is responsible for discrimination. (Pl.'s Mem., at 41; Pl.'s Resp. Mem., at 39-42.) As mentioned above, a "sharing of the burden" by innocent parties is permissible. *Wygant*, 476 U.S. at 280-81 (plurality opinion). State Defendants respond that Plaintiff bore minimal burden for essentially the same reasons cited by Federal Defendants above. (State Defs.' Mem., at 25-27; State Defs.' Opp. Mem., at 21.) If State Defendants come forward with persuasive evidence of discrimination, then it will likely be able to show that the burden on third parties from its DBE program is minimal.

Finally, according to Plaintiff, IDOT did not follow the Regulations in that it failed to "examine all of the evidence" to determine the expected level of DBE participation in an environment free of the effects of discrimination as 49 C.F.R. § 26.45(b)-(d) requires. (Pl.'s Mem., at 25-26, 36.) State Defendants respond that their FY 2003 DBE goal calculation closely followed the two-step process outlined in 49 C.F.R. § 26.45(c)-(d). (State Defs.' Opp. Mem., at 5-9.) As discussed above, the court finds that there are genuine issues of fact regarding whether IDOT possessed any information regarding the effects of discrimination in federal-aid IDOT subcontracting.

In cases such as this involving cross-motions for summary judgment, "the court must extend to each party the benefit of any factual doubt when considering the other's motion–a Janus-like perspective that sometimes forces the denial of both motions." *Buttitta v. City of Chicago*, 803 F. Supp. 213, 217 (N.D. Ill. 1992). The court finds that State Defendants have not establshed the absence of any dispute concerning whether IDOT's FY 2003 program is narrowly tailored. Specifically, State Defendants have not (1) explained whether IDOT employs race- and gender-conscious goals in awarding prime contracts, or provided any other reason for IDOT's apparent failure to calculate its FY 2003 DBE goal using only DBE subcontractor data, (2) shown that DBE participation dropped significantly in IDOT's zero-goal experimental program, or (3) produced persuasive statistical data showing that IDOT's DBE goal reflected a "plausible lower-bound estimate of a shortfall in minority representation that is caused by past discrimination." *Majeske*, 218 F.3d at 823. Plaintiff has not established the absence of disputes on these matters, either, however. For these reasons, the court denies summary judgment to both State Defendants and Plaintiff.

## V.     Motion to Strike Facts Referenced for First Time in Plaintiff's Reply Brief

State Defendants urge this court to strike facts regarding documents related to IDOT's zero-goal program that Plaintiff attaches and references for the first time in its Reply Brief. (State Defendants' Motion to Strike Improper Facts Referenced for the First Time in Plaintiff's Reply Brief, citing Plaintiff's Reply Memorandum in Support of its Motion for Summary Judgment (hereinafter, "Pl.'s Reply Mem."), at 6; Exs. S, T, U, W, X, Y, and Z to Pl.'s Reply Mem.)[52] State Defendants argue that these factual assertions violate Local Rule 56.1, which permits the party moving for

---

[52]     State Defendants also move to strike certain factual averments in Plaintiff's 56.1 statement of material facts. (State Defendants' Motion to Strike Improper Factual Averments in Plaintiff's Statement of Facts in Support of Summary Judgment.) Because State Defendants have had the opportunity to respond to these objected-to factual averments, and have done so, the court finds the contents of Plaintiff's 56.1 statement of facts do not prejudice State Defendants.

summary judgment to submit "a concise reply" to *additional* material facts submitted by the opposing party. Local Rule 56.1(a).

Plaintiff does not dispute that its factual assertions violate the Rule. Instead, Plaintiff claims that this court granted it permission to violate Local Rule 56.1 in this manner. It notes that it "moved for additional pages to address evidence and arguments contained in the Defendants' memoranda" during a hearing regarding Plaintiff's motion to file a 40-page response brief. (Plaintiff's Response to State Defendants' Motion to Strike Improper Facts Referenced for the First Time in Plaintiff's Reply Brief, at 2.) It claims this court "ruled that Plaintiff could address the Defendants' evidence in memorandum form rather than by a revised or supplemental Factual Statement" and that this court "granted Plaintiff's motion for all the additional pages requested on this basis." (Pl.'s Reply Mem., at 2-3.) In the court's view, a ruling "that Plaintiff could address the Defendants' evidence in memorandum form" is not equivalent to permitting Plaintiff to offer new evidence. Specifically, using "additional pages to address evidence and arguments" means just that–*addressing* the evidence, not supplementing it with additional evidence.

State Defendants object most strenuously to Plaintiff's attempt to introduce facts alleging that participation in the zero-goal program did not drop to approximately 1.5 percent. Despite the fact that Plaintiff obtained all relevant documents relating to the zero-goal program during discovery, (*id.* at 2), it did not dispute the 1.5 percent figure in response to State Defendants' 56.1 statement, (*See* Pl.'s Resp. to State Defs.' 56.1 ¶ 77), and only raises that issue in its reply brief. (Pl.'s Reply Mem., at 6.) State Defendants did not make any new factual assertions in their response brief or attach any new documents to which Plaintiff previously did not have access. Plaintiff concedes that it assumed that State Defendants had "accurately tallied" DBE subcontractor participation in the zero-goal program, and only discovered this assumption was "incorrect" when it read State Defendants' response brief. (*Id.*) Plaintiff's failure independently to evaluate all of the evidence available to it does not justify circumvention of the Local Rules. Were the court to

evaluate these facts and the supporting exhibits based solely on Plaintiff's interpretation, State Defendants would be unfairly denied the opportunity to respond, as the reply brief constitutes the final stage in the parties' "battle of the briefs." This court, therefore, will grant State Defendants' motion to strike those facts improperly referenced for the first time in Plaintiff's reply brief, and will not consider such facts or any exhibits to Plaintiff's reply brief. As the court finds there is a material issue of fact regarding the results of the zero-goal program, however, the parties will have an opportunity to revisit this issue.

## CONCLUSION

Federal Defendants have identified a compelling governmental interest for implementing the federal DBE program, i.e., not perpetuating the effects of racial discrimination in the distribution of federal highway funds and remediating the effects of past discrimination in the governmental highway contracting market created by federal disbursements. The court, further, finds that the federal DBE program is narrowly tailored to further that interest. Therefore, the court grants Federal Defendants' motion for summary judgment (Doc. 88-1).

The court finds, however, that there exist material issues of fact regarding whether the Illinois DBE program is narrowly tailored to achieve the federal government's compelling interest. Specifically, the parties have failed to proffer sufficient evidence—or to establish the absence of evidence—regarding (1) whether IDOT employs race- and gender-conscious goals in awarding prime contracts, (2) IDOT's zero-goal experimental program—specifically, the relative number and dollar amount of subcontracts awarded to DBEs in the program compared to the relative number and dollar amount of subcontracts awarded to DBEs outside of the program during the same period, (3) the relative number and dollar amounts of federal-aid IDOT subcontracts awarded to DBEs in FY 2003, and (4) the number, type, investigation, and resolution of all oral allegations and written complaints of discrimination without limitation. The court, therefore, denies Plaintiff's motion for summary judgment (Doc. 82-1), and denies State Defendants' motion for summary judgment (Doc. 87-1).

Additionally, the court denies State Defendants' motion to strike improper factual averments in Plaintiff's statement of facts in support of summary judgment (Doc. 98-1) and grants State Defendants' motion to strike improper facts referenced for the first time in Plaintiff's reply brief (Doc. 121-1).

ENTER:

Dated: March 3, 2004

REBECCA R. PALLMEYER
United States District Judge