

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NORTHERN CONTRACTING, INC.,　　）
an Illinois Corporation,　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　Plaintiff,　　　　　　　　）
　　　　　　　　　　　　　　　　　　）
　　　　　　v.　　　　　　　　　　　　）　　　No. 00 C 4515
　　　　　　　　　　　　　　　　　　）
THE STATE OF ILLINOIS,　　　　　　 ）　　　Judge Rebecca R. Pallmeyer
ILLINOIS DEPARTMENT OF　　　　　 ）
TRANSPORTATION, KIRK　　　　　　 ）
BROWN, in his capacity as the　　　　 ）
Illinois Secretary of Transportation,　　 ）
and GORDON SMITH, in his capacity　）
as the Bureau Chief of the Bureau　　　）
of Small Business Enterprises,　　　　 ）
　　　　　　　　　　　　　　　　　　）
　　　　　　Defendants.　　　　　　　）

## MEMORANDUM OPINION AND ORDER

Plaintiff, Northern Contracting, Inc. ("Northern"), an Illinois highway contractor, challenges the constitutionality of state law provisions designed to guarantee the award of a portion of highway subcontracts to disadvantaged business enterprises ("DBEs"). Northern brought this action against the State of Illinois, the Illinois Department of Transportation ("IDOT"), the United States Department of Transportation ("USDOT"), and federal and state officials, seeking a declaration that the federal statutory provisions, federal implementing regulations, and state statute authorizing the Illinois DBE program, as well as the Illinois DBE program itself, are unlawful and unconstitutional. In an earlier order, the court granted summary judgment in favor of the Federal Defendants, but found that there was a material issue of fact regarding whether the Illinois DBE program is narrowly tailored to achieve the federal government's compelling interest. Following the issuance of the court's opinion, IDOT issued its fiscal year 2005 DBE program, which differed substantially from its

earlier DBE programs. The court subsequently presided over a two-week bench trial in October 2004, focusing on this 2005 program. For the reasons set forth below, the court finds in favor of Defendants.

## FACTUAL BACKGROUND

### I.    Parties

Defendant IDOT is the Illinois state agency responsible for planning, construction, and maintenance of Illinois's transportation network, including highways and bridges, airports, public transit, rail freight, and rail passenger systems. With an annual budget of approximately $5 billion, IDOT administers all state-funded and federal-aid highway construction projects in the State of Illinois, subject to USDOT Regulations and the state's own Business Enterprise for Minorities, Females and Persons with Disabilities Act, 30 ILCS 575/1, *et seq.* (West 1996) (hereinafter, the "Business Act").

The individual Defendants include Kirk Brown, the Illinois Secretary of Transportation until December 2002; Timothy Martin, the current Secretary; Gordon Smith, Chief of the Bureau of Small Business Enterprises and the Liaison Officer for the IDOT DBE program from June 16, 2002 until April 30, 2003; and Carol Lyle, who holds that position today and is therefore responsible for developing and implementing all aspects of IDOT's DBE program and for promoting the utilization of women and minorities consistent with federal regulations. Plaintiff Northern Contracting, Inc. is a highway contractor specializing in guardrail and fencing work. Northern bids on both state and local government work, as well as commercial work, generally as a subcontractor. On average, Northern bids as a subcontractor on approximately 200 to 250 IDOT and county projects each year. In doing so, it competes against a number of minority contractors, though, as discussed in this court's

summary judgment opinion, Plaintiff has presented little evidence that is has suffered anything more than minimal revenue losses due to the program. *See Northern Contracting, Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, *24 (N.D. Ill. Mar. 3, 2004).

## II.     Relevant Statutes

### A.     TEA-21 and Federal Implementing Regulations

Since 1982, federal highway statutes have required that ten percent of federal highway construction funds be paid to small businesses owned and controlled by "socially and economically disadvantaged individuals," as that term is defined in the Small Business Act. *See* Surface Transportation Assistance Act of 1982, Pub.L. No. 97-424 § 105(f), 96 Stat. 2097, 2100. In 1998, Congress passed the Transportation Equity Act for the 21st Century ("TEA-21"), which authorized USDOT to expend funds for federal surface transportation programs during fiscal years 1998-2003. Pub.L. No. 105-178, § 1101(b)(1), 112 Stat. 107, 113. Prior to the expiration of TEA-21, the President signed into law the Surface Transportation Extension Act of 2003, Pub.L. No. 108-88, 117 Stat. 1110, which extended the provisions of TEA-21 for an additional five months, through February 29, 2004. Two years later, Congress further extended the Act through passage of the Surface Transportation Extension Act of 2005, Pub.L. No. 109-14, 119 Stat. 324 (May 31, 2005).

Pursuant to these statutes, USDOT issued implementing regulations entitled "Participation by Disadvantaged Business Enterprises in Department of Transportation Financial Assistance Programs." 64 Fed. Reg. 5096 (Feb. 2, 1999) (codified in 49 C.F.R. Pt. 26) (the "Regulations"). The Regulations apply to all "Recipients" of federal highway funds, defined as "any entity, public or private, to which DOT financial assistance is extended, whether directly or through another Recipient, through the programs of the FAA, FHWA, or FTA, or who has applied for such

assistance." 49 C.F.R. § 26.5. The parties agree that the State of Illinois and IDOT are Recipients within this definition. As a condition of receiving federal highway funds, Recipients must establish a DBE program to increase the participation of disadvantaged business enterprises in the construction industry, and must set an overall goal for DBE participation in USDOT-assisted contracts. 49 C.F.R. §§ 26.21; 26.45(a). The Regulations direct that at least ten percent of federal highway construction funds be paid to DBEs, though this provision represents "an aspirational goal at the national level." 49 C.F.R. § 26.41(b). This goal "does not authorize or require Recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent." 49 C.F.R. § 26.41(c). Moreover, USDOT may grant an exemption or waiver from nearly all aspects of the program, including any provision related to administrative requirements, overall goals, contract goals, or good faith efforts. 49 C.F.R. § 26.15(b).

### 1. The Goal-Setting Process

The Regulations outline the process for setting the Recipient's overall DBE participation goal. Under the Regulations, the goal "must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all business ready, willing and able to participate" on its USDOT-assisted contracts (hereinafter, the "relative availability of DBEs"). 49 C.F.R. § 26.45(b). The goal must also reflect the Recipient's determination of the level of DBE participation it "would expect absent the effects of discrimination." *Id.* This determination is the result of a two-step process set forth in the Regulations. The first step directs the Recipient to determine "a base figure for the relative availability of DBEs." 49 C.F.R. § 26.45(c). The Regulations present a number of examples of approaches a Recipient may employ in determining a base figure, including: (1) use of

4

DBE directories and census data; (2) use of a bidders list; (3) use of data from a disparity study; (4) use of the goal of another Recipient in the same, or a substantially similar, market, adjusted for differences in the Recipient's market and contracting program, as a base figure of the Recipient's goal; or (5) other methods to determine a base figure, as long as such methods are based on demonstrable evidence of local market conditions and are designed ultimately to attain a goal that is rationally related to the relative availability of DBEs in the relevant market. *Id.*

Once the Recipient has identified its base figure, the second step of the goal-setting process requires the Recipient to examine all available evidence in the jurisdiction and adjust the base figure accordingly to arrive at the overall goal. 49 C.F.R. § 26.45(d). The Regulations mandate that "many types of evidence" be considered, including: (1) the current capacity of DBEs to perform work in the Recipient's contracting program, as measured by the volume of work performed in recent years, and (2) evidence from disparity studies within the jurisdiction, to the extent such evidence is not already accounted for in the base figure. *Id.* In addition, if available, the Recipient must consider evidence from related fields that affect the opportunities for DBEs to form, grow, and compete, including (1) statistical disparities in the ability of DBEs to obtain the financing, bonding, and insurance required to perform the work in the program, and (2) data on employment, self-employment, education, training, and union apprenticeship programs, to the extent they relate to the opportunities for DBEs to participate in the Recipient's programs. *Id.* If the Recipient attempts to make an adjustment to the base figure "to account for the continuing effects of past discrimination (often called the 'but for factor') or the effects of an ongoing DBE program, the adjustment must be based on demonstrable evidence that is logically and directly related to the effect for which the adjustment is sought." *Id.* In setting the overall goal, the Recipient must provide for public

5

participation, including consultation with minority, women's, and general contractor groups and community organizations which "could be expected to have information concerning the availability of disadvantaged and non-disadvantaged businesses, the effects of discrimination on opportunities for DBEs, and [the Recipient's] efforts to establish a level playing field for the participation of DBEs." 49 C.F.R. § 26.45(g)(1). If a Recipient does not have an approved DBE program or overall goal, or if it fails to implement its program in good faith, it is "in noncompliance with" the Regulations. 49 C.F.R. § 26.47(b). A Recipient cannot, however, be penalized, or treated by USDOT as being in noncompliance with the Regulations, merely because its DBE participation falls short of its overall goal, unless it has failed to administer its program in good faith. 49 C.F.R. § 26.47(a).

When submitting its DBE goal to USDOT, a Recipient must include a description of the methodology used to establish the goal, including the base figure and the evidence with which it was calculated, as well as the adjustments made to the base figure and the evidence relied on for such adjustments. 49 C.F.R. § 26.45(f)(3). The Regulations also recommend the inclusion of a summary listing of the relevant available evidence in the jurisdiction and, where applicable, an explanation of why the Recipient did not use that evidence to adjust the base figure. *Id.* Further, the Recipient must include its projection of the portions of the overall goal it expects to meet through race-neutral and race-conscious measures. 49 C.F.R. §§ 26.45(f)(3); 26.51(c).

## 2. Preferences for Race-Neutral Measures

Under the Regulations, a recipient must meet the "maximum feasible portion" of its overall goal through race-neutral means.[1] 49 C.F.R. § 26.51(a). Race-neutral means include providing

---

[1] The terms "race-neutral" and "race-conscious" are to be interpreted as referring as (continued...)

assistance in overcoming limitations such as inability to obtain bonding or financing by simplifying the bonding process, reducing bonding requirements, eliminating the impact of surety costs from bids, and providing services to help DBEs and other small businesses obtain bonding and financing. 49 C.F.R. § 26.51(b).

If a Recipient projects it will not be able to meet its overall goal through solely race-neutral means, it must establish contract goals to the extent necessary to achieve the overall goal. 49 C.F.R. § 26.51(d). Contract goals may be used only on those USDOT-assisted contracts that have subcontracting possibilities. 49 C.F.R. § 26.51(e)(1). Further, a Recipient must adjust its use of race-neutral and/or race-conscious measures if it determines during the course of the year that it will exceed or fall short of its overall goal. 49 C.F.R. § 26.51(f)(2). If a Recipient has succeeded in meeting or exceeding its overall goals through solely race-neutral means for two consecutive years, it need not make a projection of the amount of its goal it can meet using race-neutral means in the next year. 49 C.F.R. § 26.51(f)(3). If the Recipient obtains DBE participation that exceeds its overall goal in two consecutive years through the use of contract goals, it must reduce its use of contract goals proportionately in the following year. 49 C.F.R. § 26.51(f)(4). The Regulations provide, further, that a Recipient may not use quotas for DBEs on USDOT-assisted contracts and may not set aside contracts for DBEs on USDOT-assisted contracts except in limited circumstances "when no other method could be reasonably expected to redress egregious instances of discrimination." 49 C.F.R. § 26.43.

---

[1](...continued)
well to gender-neutrality and gender-consciousness for purposes of 49 C.F.R. § 26.51. 64 FED. REG. at 5112.

Once a DBE goal has been set, a Recipient may only award a prime contract to a bidder/offeror that documents that it has either (1) obtained enough DBE participation to meet the goal, or (2) made adequate good faith efforts to meet that goal, even if it did not succeed in obtaining enough DBE participation to do so. 49 C.F.R. § 26.53(a). Examples of the types of actions a Recipient should consider as part of the bidder's good faith efforts to obtain DBE participation include soliciting interest of DBEs at pre-bid meetings; advertising and/or written notices; breaking out contract work items into economically feasible units to facilitate DBE participation, even where the prime contractor might otherwise prefer to perform these work items with its own forces; providing interested DBEs with adequate information about the plans, specifications, and requirements of the contract; negotiating in good faith with interested DBEs; declining to reject DBEs as unqualified without sound reasons based on a thorough investigation of their capabilities; making efforts to assist interested DBEs in obtaining bonding, lines of credit, or insurance as required by the Recipient or contractor; making efforts to assist interested DBEs in obtaining necessary equipment, supplies, materials, or related assistance or services; and effectively using the services of available minority/women community organizations, contractors' groups, and government business assistance offices. 49 C.F.R. pt. 26, Appendix A § IV. A higher bid from a DBE than from a non-DBE is not a sufficient reason for a prime contractor's failure to meet the DBE goal on a contract, unless the difference is "excessive or unreasonable." 49 C.F.R. pt. 26, Appendix A § IV(D)(2). DBEs who make bids on prime contracts are also bound by these requirements. 49 C.F.R. § 26.53(g). In determining whether a prime contractor has met a contract goal, the Recipient is directed to "count the work the DBE has committed to performing with its own forces [that is, the

8

amount of work that the prime contractor is not subcontracting out to other firms] as well as the work that it has committed to be performed by DBE subcontractor and DBE suppliers." *Id.*

### 3. Qualifications for DBE Status

To qualify as a DBE, a contractor must be independently owned and operated, not dominant in its field of operation, and at least 51 percent owned and controlled by one or more socially and economically disadvantaged individuals. TEA-21 § 1101(b)(2); 15 U.S.C. §§ 632(a)(1); 637(a)(6)(A); 637(d). "Socially disadvantaged individuals" are "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). "Economically disadvantaged individuals" are "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capacity and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). Recipients "must rebuttably presume" that women and members of certain racial minority groups are socially and economically disadvantaged individuals and must require each presumptively disadvantaged business owner to submit a signed, notarized certification that he or she is, in fact, socially and economically disadvantaged. 49 C.F.R. § 26.67(a)(1). A firm does not qualify for DBE status, however, if its average annual gross receipts over the preceding three fiscal years exceed $16.6 million, as adjusted by USDOT for inflation. TEA-21 § 1101(b)(2)(A). Further, any individual whose personal net worth exceeds $750,000 is not economically disadvantaged. 49 C.F.R. § 26.67(b)(1). Nevertheless, a firm owned by an individual who is not presumptively disadvantaged may qualify as a DBE if it can demonstrate that "the individuals who own and control" the firm are in fact socially and economically disadvantaged. 49 C.F.R. § 26.67(d).

9

Recipients have the responsibility to ensure that DBEs attest to the accuracy of the information provided to the Recipient and continue to meet the requirements for that status. 49 C.F.R. § 26.83(c)(7)(ii). Recipients must require each individual owner of a firm applying to participate as a DBE to certify that he or she has a personal net worth that does not exceed $750,000. 49 C.F.R. § 26.67(a)(2). Any person may file with the Recipient a written complaint alleging that a DBE-certified firm is ineligible for specific reasons. 49 C.F.R. § 26.87(a). When such a complaint is made, the Recipient must review all available information concerning the firm and, if it determines that there is reasonable cause to believe the firm is ineligible, provide written notice to that firm setting forth the reasons for the proposed determination and give the firm an opportunity for an informal hearing on the matter. 49 C.F.R. § 26.87(a), (d)-(k).

## B.    Illinois DBE Program

Pursuant to these Regulations, IDOT is, as a recipient of federal highway funds, required to file an annual DBE goal and methodology with the Federal Highway Administration. The court's memorandum order and opinion on the parties' cross motions for summary judgment examined IDOT's DBE plans for fiscal years 2000, 2002, and 2003.[2] Since the issuance of that opinion on March 3, 2004, IDOT has completed and issued its fiscal year 2005 DBE plan. In light of the fact that Plaintiff is seeking prospective relief, and not specific damages for, say, loss of a contract in 2002, the court will focus on IDOT's fiscal year 2005 plan and consider whether there is a compelling need for such a program going forward, and whether the plan is a narrowly-tailored remedy for

---

[2]    With the approval of USDOT, IDOT did not submit a proposed DBE goal for fiscal year 2001 but continued to use the fiscal year 2000 goal and race-neutral component in fiscal year 2001. *Northern Contracting*, 2004 WL 422704, *19.

discrimination. *See Builders Ass'n of Greater Chicago v. City of Chicago*, 298 F. Supp. 2d 725, 732 (N.D. Ill. 2003) (where plaintiff association sought to enjoin City's minority set-aside program, court focused on "whether there is sufficient evidence [at present] of a continuing need, and of narrow-tailoring, so as to cause the program to pass constitutional muster.").

### 1. Fiscal Year 2005 DBE Plan

In June 2004, IDOT retained Colette Holt as a consultant to assist with the formulation of its fiscal year 2005 DBE plan ("FY2005 Plan"). (Trial Transcript, hereinafter "T.T.," at 26.) Ms. Holt served as the principal drafter of IDOT's FY2005 Plan, and outlined the drafting process in her testimony before the court.[3] (*Id.* at 27.) In setting its overall goal for the FY2005 Plan, IDOT followed the two-step process set forth in 39 C.F.R. pt. 26: (1) calculation of a base figure for the relative availability of DBEs and (2) consideration of a possible adjustment to the base figure to reflect the effects of the DBE program and the level of participation that would be expected but for the effects of past and present discrimination. (IDOT's FY2005 Overall DBE Goal Submission, Defendant's Trial Ex. 28, hereinafter "FY2005 Submission," at 1; 49 C.F.R. § 26.45.)

### a. Step 1: Calculation of Base Figure

In order to calculate the overall availability of DBEs for the FY2005 Plan, Holt and IDOT retained National Economic Research Associates, Inc. ("NERA"), a Chicago-based consulting firm. (T.T. at 37.) As explained above, 49 C.F.R. § 26.45(c), a Recipient may calculate its base estimate of DBE availability using one of five methods. In prior plans, IDOT had utilized a bidders list to calculate the relative availability of DBEs, pursuant to 49 C.F.R. § 26.45(c)(2). Under that

---

[3]     In addition to Ms. Holt, Carol Lyle, the Bureau Chief of Small Businesses at IDOT, also testified regarding the development of the FY2005 Plan. (*See* T.T. at 425.)

approach, which IDOT believed to be the best available at the time, IDOT determined the relative availability of DBEs by reference to its existing list of pre-qualified and pre-registered[4] construction and professional consulting firms.[5] When determining the relative availability of DBEs for the FY2005 Plan, however, IDOT commissioned NERA to conduct a custom census to determine whether a more accurate means of determining the relative availability of DBEs might be available. Dr. Jon Wainwright, the economist who conducted the NERA study, testified that he did not believe that the "bidders list" approach was appropriate for measuring the availability of DBEs "because it imports potential bias on the part of recipients directly into the measure." (T.T. at 732.) Thus, if the recipient agency itself had discriminated against DBEs, their availability, as reflected in the bidders list, may be lower than their actual availability in the marketplace. (Id.)

In developing its own methodology, NERA relied on 49 C.F.R. § 26.45(c)(5), which authorizes a Recipient to utilize alternative methods (beyond those specifically identified in the Regulations) to determined the relative availability of DBEs, so long as the alternative methodology is "based on demonstrable evidence of local market conditions and . . . designed to ultimately attain a goal that is rationally related to the relative availability of DBEs in [the Recipient's] market." 49 C.F.R. § 26.45(c)(5). Pursuant to these instructions, NERA conducted a "custom census," in which it employed a six-step analysis to determine the baseline level of DBE availability. (T.T. at 731.) In

---

[4]     Under Illinois law, only firms registered and pre-qualified are eligible to participate in IDOT contracts, whether as a prime or subcontractor. 44 ILL. ADMIN. CODE tit. 44, §§ 650.10; 625.40. In order to become pre-qualified, a firm must submit an application including a "Statement of Experience and Financial Condition," detailing the firm's work history and financial status. Id. §§ 650.40.

[5]     For an overview of IDOT's pre-2005 DBE plans, see Northern Contracting v. State of Illinois, No. 00 C 4515, 2004 WL 422704, **8-11.

the first step, NERA identified the appropriate and relevant geographic market for IDOT's contracting activity and its prime contractors as the State of Illinois. (T.T. at 731, 737-38; NERA Disadvantaged Business Enterprise Availability Study, Defendant's Ex. 27, hereinafter "NERA Study," at 8.) Second, NERA identified the relevant product markets in which IDOT and its prime contractors contract (i.e., concrete work or transportation). In so doing, NERA identified the specific industries from which IDOT draws its contractors – highway, engineering consulting, and aviation – as well as the relative amount of money spent in each of these industries. (T.T. at 739-40.) To do this, NERA worked with IDOT officials to assign one or more Standard Industrial Classification System Codes ("SIC Codes") to every contractor and subcontractor that had successfully completed work for IDOT or its prime contractors in the previous five years. (Id. at 741.) SIC Codes are the government's means of categorizing firms by their specific industry. (Id.)[6] NERA then estimated the relative amount of dollars flowing into each industry category. (Id. at 740.) NERA also worked with IDOT officials to assign SIC Codes to specific pay items within all IDOT contracts over the five years leading up to the study. (Id. at 741.) NERA used these figures to determine the relative amount of contracting dollars spent in each industry, and thus the relative weight/importance of each industry in which IDOT contracts. (Id. at 738-40.)

In step three, NERA sought to identify all available contractors and subcontractors in the relevant industries within the State of Illinois using Dun & Bradstreet's *Marketplace*, which Mr. Wainwright described as "one of, if not the most comprehensive microbusiness establishment lists

---

[6]     Some relevant example codes include: SIC 1442 (construction sand and gravel); SIC 1794 (excavation); SIC 1731 (electrical contractors). (NERA Report, at 10 n.15.)

available."[7]  (T.T. at 747-48.)  The *Marketplace* list identified minority- and women-owned businesses. (*Id.* at 751-52.)  These businesses were classified according to the SIC Codes, as listed above. (*Id.*)  Using this information, NERA determined the total number of businesses operating in the relevant geographic and product markets. (NERA Study, at 16.)  NERA then identified the number of DBE businesses within the relevant geographic and product markets. In doing so, NERA felt it necessary to go beyond a mere reliance on DBE businesses listed in *Marketplace* because, in NERA's experience, the *Marketplace* "does not adequately identify businesses owned by minorities or women." (NERA Study, at 21.)  NERA therefore also collected lists of DBEs from IDOT as well as approximately twenty other public and private agencies in and around Illinois, including the Indiana, Wisconsin, Iowa, and Missouri Departments of Transportation, as well as a number of other state and local agencies. (*Id.*; T.T. at 751-52.)  From these sources, NERA compiled a list of Illinois-based DBEs, classified based on SIC Codes. (NERA Study, at 22-25.)

In the final two steps, NERA attempted to correct for what it considered to be two common biases in DBE lists: (1) the possibility that certain businesses listed as DBEs no longer qualify for that status, due to ownership change, recording errors, or misrepresentation, or, on the other hand, that certain businesses are not listed as DBEs, but qualify as such under the federal Regulations, and (2) the possibility that not all DBE businesses are listed in the various directories. (NERA Study, at 30; T.T. at 754-55.)  To correct for these biases, NERA employed standard statistical sampling procedures. (NERA Study, at 30.)  With regard to the possibility that a business is incorrectly

---

[7]      *Marketplace* contains not only the name, address, and telephone number of relevant contractors, but also executive names and titles and their primary and secondary areas of business, reflected by SIC Codes. (T.T. at 747-48.)  This information is updated quarterly. (*Id.* at 748.)

14

classified as a DBE or non-DBE, NERA surveyed a large random sample of relevant businesses to measure how often they were misclassified. (*Id.*) Overall, NERA found that 22.8 percent of listed DBE businesses were actually owned by white males. (*Id.* at 31.) Finally, NERA attempted to determine the ownership of unclassified firms (those not listed in any of the consulted directories) by polling a random sample of such businesses. (*Id.* at 37.) The result of this random sample revealed that the vast majority – 85 percent – were owned by white men. (*Id.* at 39.) Separate DBE availability calculations (on a percentage basis) were then made by SIC Code grouping and by race and gender. (*Id.* at 41.)

Combining the information and weighted averages obtained in each of these six steps, NERA estimated an overall weighted average DBE availability of 22.7 percent. (T.T. at 762; NERA Study, at 45.) This weighted average adjusted the DBE availability for the relative amount of IDOT funds spent in each industry and each county. (T.T. at 766-67.) Thus, the average DBE availability figure gave proportionately higher weight to those industries and counties where IDOT spends a higher proportion of its total contract dollars and proportionately lower weight to those industries and counties where IDOT spends fewer dollars. (*Id.* at 767.)

### b. Step Two: Adjustment Based on Past Discrimination

Once it had identified an overall weighted average of DBE availability, IDOT next turned to the second step in the goal-setting process under 49 C.F.R. § 26.45: examining all available evidence within the jurisdiction to determine what adjustment, if any, is needed to the base figure to meet the overall goal. (FY2005 Submission, at 1; T.T. at 42-43.) Under this prong, the Regulations required IDOT, as a Recipient, to determine whether the DBE availability figures are artificially low due to the effects of past discrimination, or, in other words, whether DBE availability

would be higher "but for" past discrimination. (T.T. at 43.) In determining whether DBE availability would be higher in a discrimination-free marketplace, IDOT relied on a number of sources, including the second portion of the NERA Study, as well as prior studies completed in conjunction with other legal cases. (T.T. at 44-46.)

The first study examined by Ms. Holt (on behalf of IDOT) was the second half of the NERA Study, which considered whether the DBE level should be adjusted to reflected the approximate availability level "but for" past discrimination. (T.T. at 768; NERA Study, at 46.) In other words, the study considered whether DBE availability figures are artificially low due to the effects of past discrimination; for example, discrimination may have rendered minorities and women less likely to start businesses or make such businesses less profitable and hence more likely to fail. (NERA Study, at 46.) To discern such effects, the study examined disparities in the earnings of minority and female business owners compared to their similarly-situated white male counterparts. (T.T. at 769.) In addition, NERA looked at differences in the business formation rates between women and minorities and similarly-situated white males. (Id.) Running a regression analysis on this data, NERA concluded that in a discrimination-free marketplace, DBE availability would be approximately 20.8 percent higher, resulting in an overall corrected weighted average DBE availability of 27.51. (NERA Study, at 63-64; T.T. at 768-70.)

In addition to this NERA estimate, IDOT also considered a separate NERA DBE study commissioned by the Northeast Illinois Regional Commuter Railroad Corporation, better known as Metra.[8] (T.T. at 55; DBE Availability Study, March 28, 2000, Defendant's Ex. 19, hereinafter

_____

[8]   The Metra Study was commissioned by Metra in order to fulfill its responsibilities
(continued...)

"Metra Study.")  The Metra Study included a 1999 survey in which 50.6 percent of minority- or women-owned construction firms reported that firms that use or solicit their services on contracts with race or gender participation goals rarely or never solicit or subcontract with their firm on non-goals projects.  (T.T. at 59; Metra Study, at 21.)  Similarly, 54.1 percent of minority- or women-owned professional service firms[9] reported that they were seldom or never solicited to bid for non-goals projects.  (T.T. at 62-63; Metra Study, at 28.)  IDOT concluded that race-neutral methods are unlikely to achieve IDOT's baseline estimate of 22.77 percent DBE availability if DBEs are often not solicited in the absence of goals.  (T.T. at 59-60.)  In addition, the Metra Study found that DBEs suffered discrimination in capital markets.  Specifically, the Study found that, controlling for creditworthiness, DBEs were more likely to have loan applications denied, and, when such loans are approved, more likely to pay higher rates of interest.  (T.T. at 63-64; Metra Study, at 73-74.)  Finally, the Metra Study found disparities in the earnings and business formation rates of minorities and women similar to those found in the study conducted on behalf of IDOT.  (T.T. at 67-68; *supra* at 16.)

In addition, IDOT considered reports prepared by three expert witnesses retained by the City of Chicago in a lawsuit challenging its minority set-aside program.  *See Builders Ass'n of Greater Chicago v. City of Chicago*, 298 F. Supp. 2d 725 (N.D. Ill. 2003).  Dr. Elisabeth Landes, a consultant who holds a Ph.D in economics from Columbia University, completed the first of these

---

[8](...continued)
under 49 C.F.R. § 26.45 as a recipient of federal highway funds.  (T.T. at 56.)  The Study was conducted within IDOT's jurisdiction.  (T.T. at 66.)

[9]      In the Study, professional service firms included architects, engineers, surveyors, and other professionally licensed fields within the construction industry.  (T.T. at 61-62.)

reports, which examined whether minority- and women-owned firms in the Chicago-area are underutilized relative to their availability, i.e. whether such firms attract less business and earn lower revenues than similarly situated white male-owned businesses. (T.T. at 72; Report of Dr. Elisabeth M. Landes, Defendant's Ex. 31, hereinafter "Landes Report," at 2.)[10] After having analyzed a number of statistical studies, Dr. Landes concluded that minority- and women-owned businesses in the Chicago area are underutilized relative to their capacity, and that this underutilization was a result of discrimination. (Landes Report, at 11-12.) Moreover, Dr. Landes concluded that this underutilization had the effect of substantially diminishing the overall earning capacity of minority- and women-owned businesses. (Id.)

The second report was completed by Dr. David Branchflower, a professor of economics at Dartmouth University on April 28, 2004. (T.T. at 73.) Dr. Branchflower examined and compared the rates of business formation for minorities and women with those of white males within the City of Chicago. (Id. at 75; Report of Dr. David Branchflower, Defendant's Exhibit 18, hereinafter "Branchflower Report," at 5.) Using 2000 data, Dr. Branchflower concluded that, after controlling for relevant variables such as credit worthiness,[11] minorities and women are less likely to form businesses, and that when they do form businesses, those businesses achieve lower earnings than did businesses owned by white males. (T.T. at 76; Branchflower Report, at 14-15, 18.)

---

[10]     Dr. Landes's report is undated, however, it appears to have been completed in either 2001 or 2002.

[11]     Dr. Branchflower's Report does not identify all relevant variables for which he controlled in his analysis, instead stating that he had held constant "a whole array of characteristics, including creditworthiness." (Branchflower Report, at 12.)

Dr. Timothy Bates, a professor of economics at Wayne State University, completed the third study, dated April 20, 2004. Dr. Bates's study, again controlling for relevant variables,[12] concluded that minority- and female-owned businesses formation rates are lower than those of their white male counterparts. (T.T. at 78.) Dr. Bates's study found, further, that such businesses engage in a disproportionate amount of government work and contracts as a result of their inability to obtain private sector work. (Id. at 78-79.)

In addition to this material, IDOT also conducted a series of public hearings during June and July 2004 in an effort to obtain further information regarding discrimination in the construction industry. These hearings were conducted pursuant to 49 C.F.R. § 26.45(g), which requires a Recipient to provide for public participation in the goal-setting process. (T.T. at 83; 49 C.F.R. § 26.45(g).) IDOT invited participating firms as well as the general public to participate in the meetings, which were held in Peoria, East St. Louis, and Chicago. (T.T. at 83; FY2005 Submission, at 2.) In total, 187 people attended the three meetings, 57 witnesses testified, and an additional 10 people submitted written statements. (FY2005 Submission, at 2.) During these hearings, a large number of DBE owners testified that they were rarely, if ever, solicited to bid on projects not subject to disadvantaged-firm hiring goals ("non-goals projects"). (T.T. at 85.)[13] A number of the DBE witnesses identified prime contractors who rarely or never solicited bids on non-goals projects, despite the fact that, in some instances, the witness' own firms had satisfactorily completed work for the contractors on goals projects. (T.T. at 8-87.) In total, twenty such prime contractors were identified

---

[12]     Specifically, Dr. Bates's study controlled for education, age, marital status, industry, and wealth. (Report of Dr. Timothy Bates, Defendant's Ex. 17, at 38.)

[13]     Defendant's Exhibit 20 contains a transcript of these proceedings.

in IDOT District 1 alone.[14] Further research revealed that IDOT had entered into contacts totaling $772,315,498.98 with those twenty firms from July 2, 2000 through June 30, 2004. (T.T. at 89-91; Defendant's Ex. 38.) This total represents more than 34 percent of IDOT expenditures within District 1 during the four-year period. (T.T. at 93-95; Defendant's Ex. 38.) On August 13, 2004, Frank McNeil of IDOT wrote letters to the twenty firms, requesting documents concerning their use and solicitation of DBEs on non-goal projects. (Defendant's Ex. 23.) Not one of the firms responded to the letters. (T.T. at 96-97.) IDOT took no action to pursue the matter, but concluded from the firms' silence that the witnesses' allegations had merit. (T.T. at 971-73.)

The final consideration in IDOT's "step two" discrimination analysis consisted of a review of "unremediated market data." Unremediated market data consists of DBE participation rates in markets that do not have race- or gender- conscious subcontracting goals in place to remedy discrimination. (T.T. at 120.) IDOT considered such data as evidence of what IDOT market conditions would look like in the absence of DBE goals.[15] (Id. at 120-21.) Specifically, IDOT examined data from four unremediated markets: the Illinois State Toll Highway Authority, the Missouri Department of Transportation, Cook County road construction activities, and a "non-goals" experiment conducted by IDOT itself from 2001 to 2002. The Illinois State Toll Highway Authority (the "Tollway") is involved in road construction in the northern part of Illinois, including Chicago

---

[14]     IDOT divides the state into nine districts. (T.T. at 92; Defendant's Ex. 2 at 1.) District 1, an area encompassing Cook, Lake, McHenry, Kane, Dupage and Will Counties (as well as the City of Chicago), is the largest of the nine districts in terms of volume of expenditures. (T.T. at 94-95.)

[15]     IDOT considered this data pursuant to 49 C.F.R. § 26.45(d)(1)(ii), which directs Recipients to consider "[e]vidence from disparity studies conducted anywhere within [their] jurisdiction."

and the surrounding region. (T.T. at 122-23.) Although involved in the same type of construction as IDOT, the Tollway does not received federal funding and thus is not bound by the Regulations at issue in this case. (Id.) The Tollway has adopted a voluntary 15 percent DBE subcontracting goal, though it does not conduct any monitoring of contractors' efforts to reach the goal nor impose any sanctions upon those that fail to do so. (Id.) An analysis of DBE utilization rates on Tollway subcontracts revealed that DBE utilization in fiscal year 2002 on Tollway projects was just 1.3 percent. (Id. at 130; Illinois State Tollway Highway Authority 2002 Contracts, Defendant's Ex. 8, at 6.) Further analysis revealed the DBE utilization rate in fiscal year 2003 to be 0.9 percent. (T.T. at 131; Illinois State Tollway Highway Authority 2003 Contracts, Defendant's Ex. 10, at 6.) A cross-check (by Ms. Holt) of Tollway's DBE designations against a larger DBE directory revealed that Tollway had understated DBE utilization; after adjusting for this, IDOT found that the Tollway's DBE utilization was still only 1.5 and 1.7 percent for fiscal years 2002 and 2003. (T.T. at 133-34.)

The second unremediated market examined by IDOT was the Missouri Department of Transportation ("MoDOT"), which has a goals program in place on its federally funded projects, but not on its state-funded highway projects. (T.T. at 135.) Although MoDOT's contracting is outside of IDOT's jurisdiction, IDOT believed MoDOT's DBE utilization rates are relevant because many firms seek work from both IDOT and MoDOT. (Id. at 134-36.) An analysis of the MoDOT data revealed that DBEs received 9.04 percent of contracting dollars on federally-assisted projects with goals, but only 3.36 percent of contract dollars on state-funded projects, which did not have goals. (T.T. at 138.)

IDOT also examined Cook County's public contracting program. In 2000, Cook County's goals program was enjoined by a federal court due to the County's failure to establish a compelling

interest furthered by the race- and gender-conscious aspects of the program. *See Builders Ass'n of Greater Chicago v. County of Cook*, 123 F. Supp. 2d 1087 (N.D. Ill. 2000), *aff'd* 256 F.3d 642 (7th Cir. 2001). Data obtained from the County revealed that during the period December 1, 2002 through December 1, 2003, approximately 5 percent of contracting dollars in the construction context were awarded to DBEs. (T.T. at 145-46; Memorandum from Betty Perry, Defendant's Ex. 22.) This figure was substantially less than the overall availability of the marketplace at the time; in its fiscal year 2002 plan, IDOT estimated DBE availability as 12.29 percent of the marketplace.[16] (T.T. at 146; *Northern Contracting*, 2004 WL 422704, **10-11.)

In addition, IDOT considered its own "Zero Goals" experiment. During 2001 and 2002, IDOT reserved a portion of its highway construction contracts without race- or gender-conscious goals. (Stipulation ¶ 3(a); Am. Stipulation ¶ 7(a).) During this period, DBEs received approximately 1.5 percent of the total dollar value of all those contracts, as compared with approximately 17 percent of the total dollar value of all subcontracts awarded. (*Id.*)

Finally, as directed by 49 C.F.R. § 26.45(d), IDOT considered evidence of past utilization of DBEs on IDOT projects.[17] (T.T. at 151.) IDOT records revealed that during fiscal years 2001

---

[16]     Ms. Holt, the author of IDOT's FY2005 plan, also testified that IDOT considered data collected by the Minnesota Department of Transportation ("MnDOT") during a two-year period in which it operated without a DBE goals program following a federal court's injunction barring enforcement of that state's DBE program in 1998. *In re Sherbrooke Sodding Co.*, 17 F. Supp. 2d 1026 (D. Minn. 1998). The report itself was not entered into evidence, however, and the court will not consider it.

[17]     The Regulations require Recipients to consider the "current capacity of DBEs to perform work in [the Recipient's] DOT-assisted contracting program, as measured by the volume of work DBEs have performed in recent years," when considering adjustments to the base figure under step two. 49 C.F.R. § 26.45(d)(1)(i).

22

through 2003, IDOT's utilization of DBEs, as a percentage of total contract dollar awards, was 12.4 percent. (T.T. at 152-53; FY2005 Submission, at 3.) Between April 2003 and March 2004, DBEs received 17.54 percent of the total contract dollars awarded by IDOT. (*Id.*) These figures measure the utilization of all DBE contractors, not merely subcontractors. (T.T. at 152-53.) During her testimony, Ms. Holt explained that the study included all DBE contractors, and not merely subcontractors, in accordance with the Regulations, which do not limit the inquiry to the utilization of subcontractors alone. (*Id.* at 153.) The disparity between these overall utilization rates, and the previously measured DBE availability rate of 22.77 percent during the period from April 2003 through March 2004, was consistent, in Ms. Holt's view, with the anecdotal evidence of discrimination against DBEs in the highway construction industry. (*Id.* at 153-54.)

After analyzing the above data sources as part of the "step two" analysis under the Regulations, NERA concluded that DBE availability would be 27.51 percent absent the effects of discrimination on the market. (T.T. at 154-55; NERA Study, at 63-64.) NERA thus recommended that IDOT upwardly adjust its DBE goal from 22.77 percent to 27.51 percent. Nevertheless, IDOT wished to adopt as its 2005 goal a "plausible lower bound estimate" of DBE availability, and thus chose to set its goal at 22.77 percent, rather than accepting NERA's proposed upward adjustment. (T.T. at 155; FY2005 Submission, at 7.)

## 2. Administration of the DBE Program

Ms. Holt testified that IDOT administers its DBE program on a contract-by-contract basis; that is, it examines each contract individually to decide whether a goal is appropriate on that particular project. (T.T. at 156-57.) In doing so, IDOT considers factors such as the size of the project, the anticipated amount of subcontracting, the location of the project, and the availability

of DBEs to perform the specific type of work involved. (*Id.*) This approach was adopted to comport with the requirements of 49 C.F.R. § 26.51(e), which states that a Recipient need not set a DBE goal on each contract, but rather that the goal on an individual contract, if any, should be narrowly tailored to the specifics of the contract, provided that over the period covered by the overall goal, the contract goals are set "so that they will cumulatively result in meeting any portion of your overall goal you do not project being able to meet through the use of race-neutral means." (T.T. at 156-57; 49 C.F.R. § 26.51(d)(2).) Ms. Holt testified that this provision ensures that IDOT retains flexibility on each project and that contractors are not burdened with unrealistic goals on, for example, projects where DBE availability is low. (T.T. at 157-58.) In any event, DBE goals have no effect on the award of prime contracts; pursuant to § 26.43(b), IDOT awards such contracts exclusively to the "lowest responsible bidder."[18] (*Id.* at 159-60.)

### a. Waivers

In order to retain flexibility in the program and avoid imposing unreasonable burdens on contractors, IDOT also allows contractors to petition for waiver of individual contract goals in certain situations, such as where the contractor has been unable to meet the goal despite having made reasonable good faith efforts to do so.[19] (*Id.* at 160-61.) Between January 2001 and August 2004, IDOT received waiver requests on just 8.53 percent of contracts and granted almost 3 out of

---

[18]    49 C.F.R. § 26.43(b) provides: "[A Recipient] may not set-aside contracts for DBEs on DOT-assisted contracts subject to [TEA-21], except that, in limited and extreme circumstances, you may use set-asides when no other method could be reasonably expected to redress egregious instances of discrimination."

[19]    This standard is derived from the federal regulations, which state: "When you have established a DBE contract goal, you must award the contract only to a bidder/offeror who makes good faith efforts to meet it." 49 C.F.R. § 26.53.

every 4 of these requests. (T.T. at 161, 440; Report on Pre-Award Modifications and Waivers, Defendant's Ex. 4.) Moreover, when a waiver request is denied, the contractor may appeal that decision to a reconsideration officer.[20] (T.T. at 442.)

## b.    Race- and Gender-Neutral Measures

IDOT's fiscal year 2005 plan contains a number of race- and gender-neutral measures designed to achieve the maximum feasible portion of its overall DBE utilization goal without resort to race- or gender-conscious measures. (T.T. at 163; FY2005 Submission, at 7-8.) These race- and gender-neutral encourage participation in IDOT-contracted work on the part of small businesses, whether or not they qualify as DBEs. (T.T. at 163-64.) IDOT has, for example, a "prompt payment" provision in its contracts, requiring that subcontractors be paid promptly after they complete their work, and prohibiting prime contractors from delaying such payments. (FY2005 Submission, at 8; T.T. at 170.) In addition, IDOT has implemented an extensive outreach program seeking to attract and assist DBE and other small firms enter and achieve success in the industry. (FY2005 Submission, at 8.) In support of this goal, IDOT retains a network of consultants to provide management, technical, and financial assistance to small businesses. (Id.) Similarly, IDOT sponsors networking sessions throughout the state to acquaint small firms with larger contractors and to encourage the involvement of small firms in major construction projects. (Id.)

In addition to these continuing initiatives, IDOT has also instituted a number of race- and gender-neutral initiatives in response to this court's earlier summary judgment order. Since that time, IDOT has, for example, developed a number of initiatives to increase opportunities for new and

---

[20]    According to Ms. Holt, such appeals are brought "not very often." (T.T. at 442.)

smaller firms, and reduce barriers to participation of emerging contractors as prime contractors. (FY2005 Submission, at 7.) These initiatives include: reviewing the criteria for prequalification to reduce any unnecessary burdens; "unbundling" large contracts – that is, breaking a large project into smaller, discrete work assignments which can more easily be performed by smaller firms; and allocating some contracts for bidding only by firms meeting the Small Business Administration's definition of small businesses. (*Id.*) In addition, IDOT is in the process of adopting bonding and financing initiatives to assist emerging contractors obtain bonding and lines of credit. (*Id.*) These programs would provide graduates with guaranteed bonding and lines of credit, thereby addressing one of the major hurdles facing emerging firms in the construction industry. (*Id.*) Finally, IDOT is also in the process of developing an effective mentor-protégé program, through which established contractors would teach smaller firms about management skills, business development, banking and bonding relationships, and other relevant aspects of the industry. (FY2005 Submission, at 7; T.T. at 166.)

c. **Estimate of Race- and Gender-neutral and Race- and Gender-conscious Portions of Overall Goal**

In accordance with the Regulations, IDOT sought to achieve the maximum feasible portion of its overall DBE goal through race- and gender-neutral measures. (FY2005 Submission, at 9; 49 C.F.R. § 26.51(a).) Under § 26.51(a), race- and gender-neutral participation includes situations in which: (1) a DBE wins a prime contract through the competitive bidding process; (2) a DBE is awarded a subcontract on a non-goals project; or (3) a DBE is awarded a subcontract on a goals project where the contractor did not consider its DBE status in awarding the contract. 49 C.F.R. § 26.51(a). IDOT determined that race- and gender-neutral means resulted in a DBE utilization rate

of 6.43 percent in fiscal year 2003. (FY2005 Submission, at 9.) According to Ms. Holt, this rate was a historic high for IDOT; prior to 2003, race- and gender-neutral measures had been responsible for a DBE utilization rate of approximately 2 or 2.5 percent. (T.T. at 176-77.) Nevertheless, IDOT believes it can maintain a DBE participation rate of 6.43 percent on the basis of race- and gender-neutral measures alone due to the implementation of the initiatives discussed above. (T.T. at 177.) As a result, IDOT projects the need to achieve the remaining 16.34 percent of its overall goal through race- and gender-conscious contract goals. (FY2005 Submission, at 9; T.T. at 177.) Thus, approximately 84 percent of IDOT expenditures are unaffected by race- or gender-conscious contracting goals. (T.T. at 178.) Of the firms competing in this market, 77 percent constitute non-DBEs. (T.T. at 179.)

### d.    Testimony of DBE Owners

In support of IDOT's DBE program, a number of DBE owners testified regarding the difficulties they face and described instances in which they believed they were discriminated against based on their race or gender.[21] The DBE witnesses testified regarding their struggle to obtain work in the private sector, which operates without DBE goals. The witnesses unanimously reported that they were rarely invited to bid on such contracts. They explained, further, their reluctance to submit unsolicited bids, due to the expense involved as well as the fact that such bids are rarely successful.

---

[21]    The following witnesses testified on behalf of IDOT: (1) Ernest Wong, president and owner of Site Design Group, Ltd., a landscape architectural firm; (2) Elizabeth Perino, President, CEO, and owner of Perdel Contracting, a general contracting firm specializing in carpentry and concrete work, and Accurate Steel Installers, a subcontractor specializing in the installation of concrete reinforcing bars; (3) Harendra Mangrola, Vice President and Controller of Summit Construction Company, a general contractor engaged in concrete, sewer, bridge, and road repair work; (4) William Clark, owner of Clark Trucking; and (5) Deborah Sawyer, President and CEO of Environmental Design International, a civil engineering firm.

A number of DBE witnesses identified specific firms for which they had successfully completed subcontracting work on goals projects, but who nevertheless rarely solicited their firms to submit bids for subcontracts on non-goals projects. Ernest Wong, for example, identified seven firms that regularly solicited proposals from his firms on projects with DBE goals, but rarely, or never, solicited proposals on non-goals projects. (T.T. at 477-80.) According to Mr. Wong, these failures to solicit his firm for non-goals work continued even after he expressly asked these firms to contact his firm regarding such projects. (Id. at 477-78.)

A number of IDOT's witnesses also discussed incidents of direct discrimination in the industry. Elizabeth Perino, for example, related incidents in which contractors or engineers in the field had asked if they could speak with a man when problems arose on a job site. (T.T. at 509-10.) Ms. Perino also testified that she had attended bid openings and been asked "whose secretary are you?" (Id. at 509.) More significantly, Ms. Perino discussed an occasion in which her firm had been the low bidder at a public bid opening. Despite the fact that she met all the qualifications and requirements for bidding the contract as a prime contractor, the architect later informed her that the owner wanted to rebid the job. (Id. at 509-10.) Ms. Perino's firm, Perdel Contracting, rebid the job at the same price (which had been publicly announced at the first bid opening), only to be underbid by $1000 (on a $30,000 contract) by a local contractor who had not submitted a bid initially. (Id.) William Clark, who owns and operates a trucking and excavation firm, testified more generally that, in his experience, DBEs are often assigned the "hardest" work, which causes the most wear and tear on their equipment. (Id. at 663.)

IDOT's witnesses also discussed discrimination in the financing and insurance markets. According to Ms. Perino, her applications for a line of credit were turned down by countless banks,

many of which requested that a man co-sign the loan application. (T.T. at 508.) Other banks required her to post "'three-for-one' collateral" in order to establish a line of credit.[22] (Id.) Deborah Sawyer, similarly, reported being asked for a male co-signor on her loan applications. (Id. at 682.) A number of witnesses also testified that they had experienced difficulties in obtaining insurance, and that their rates were ultimately higher than those of similarly-situated non-DBEs. Mr. Clark, for example, testified that insurance rates tend to be higher for DBEs in the trucking industry, regardless of their record of accidents and violations.[23] (Id. at 632.) Similarly, Ms. Sawyer testified that insurance rates are very high and burdensome in the industry; the Chicago Public Schools, for example, has a $10 million insurance requirement. (Id. at 684-85.) Ms. Sawyer acknowledged that these insurance requirements are burdensome for all firms, but she believes they are especially so for DBEs, which frequently are forced to pay higher insurance rates due to racial and gender discrimination.[24] (Id. at 680-81, 684-85.)

Finally, the DBE witnesses reported that they encountered difficulties in obtaining prompt payment for their work, leading to serious cash-flow problems and jeopardizing their business success. According to Harendra Mangrola, his firm has had problems obtaining prompt payments on approximately 50 percent of its projects historically. (T.T. at 576.) Such delays hamper the growth

---

[22]     Ms. Perino did not define her meaning by "three-for-one" collateral; the court presumes that this means that the bank required her to post collateral of three times the value of the line of credit.

[23]     It appears to the court that the source for Mr. Clark's testimony that DBEs pay higher insurance premiums than non-DBEs could only be hearsay. Nevertheless, in the absence of an objection by Plaintiff, the information was admitted.

[24]     Again, this testimony was admitted in the absence of a hearsay objection.

of his firm and compromise his firm's ability to bid on new and larger projects. (*Id.*) Noting that it is public agencies that are most likely to delay payment, Mr. Wong expressed his desire for more non-goals work in the private sector, where he can expect prompt payment for those services. (*Id.* at 480-81.)

>   e.      **Testimony of non-DBE Owners**

In response to the testimony of DBE owners, Plaintiff called a number of non-DBE business owners as witnesses.[25] These witnesses were unanimous in declaring that they solicit DBEs and non-DBEs equally on non-goals jobs. Generally, such solicitations are made from a subcontractor list compiled and maintained by each firm, according to the type of work being solicited. Most witnesses reported that their lists contain all known subcontractors in a given field, and that any firm may ask to be added to their list. Upon receiving bids, the witnesses reported that they award subcontracts based on three factors: (1) price; (2) the ability of the subcontractor to complete the work; and (3) whether the project has a DBE goal. As to this final consideration, a number of witnesses explained that their firms will occasionally solicit bids from subcontractors for certain work on goals projects that the firm would otherwise have completed itself in the absence of goals, solely in order to meet the specified DBE goal. In addition, a number of witnesses testified that their firms occasionally

---

[25]     The following business owners/representatives testified on behalf of Plaintiff: (1) Bob Fulton, Vice President of Gunther Construction Company; (2) Eugene Keeley, President of Keeley & Sons Construction Company; (3) James Brunner, President and CEO of United Contractors Midwest; (4) Art Baker, President of Peter Baker & Sons Co.;(5) Donald Schultz, President of Herlihy Mid-Continent Construction; (6) Richard Weber, Chief Estimator for Plate Construction, Inc.; Charles Gallagher, President of Gallagher Asphalt Corp.; (7) Alex Apes, estimator and project manager for Greco Construction; (8) Kenneth Aldridge, CEO of Aldridge Electric; (9) Dennis DeVitto, Vice President of K-Five Construction Corp; (10) David Lorig, President of Lorig Construction; and (11) Diane Forbus, Chief Estimator at Central Blacktop.

award work to a DBE that was not the low bidder in order to avoid scrutiny from IDOT, though other witnesses reported that their firms have no such policy.

Representatives from a number of firms accused of failing to solicit DBEs on non-goals projects testified. Responding to allegations that his firm solicited Perdel Contracting (Elizabeth Perino's firm) only on non-goals projects, Richard Weber, the chief estimator for Plate Construction, identified a number of non-goals projects on which his firm had in fact solicited bids from Perdel. (T.T. at 1121-22.) He explained that his firm maintains an automated subcontractor list, from which bid solicitations are faxed out automatically to qualified subcontractors. (*Id.* at 1020-22.) Similarly, Alex Apes, an estimator and project manager for Greco Construction, denied allegations that his firm solicits Summit Construction (Harendra Mangrola's firm) only on goals projects. (*Id.* at 1228-29.) To the contrary, Mr. Apes explained that his firm has a close relationship with Summit, even leasing Summit space on Greco's property. (*Id.*) He testified, further, that the only time his firm does not solicit Summit's service on relevant subcontracts is on those projects where Summit is also bidding as a prime contractor. (*Id.*)

Kenneth Aldridge, CEO of Aldridge Electric, also responded to Summit's allegations against his firm. Mr. Aldridge described a bad experience his firm had with Summit, in which Summit refused to honor its bid, leading to a lawsuit. (*Id.* at 1241-42.) Given this history, Aldridge stated that the did not believe his firm should continue to do business with Summit. (*Id.*) He denied, however, that this refusal was in any way related to Summit's status as a DBE. To the contrary, Mr. Adridge testified that his firm goes out of its way to mentor minority and other new small businesses by, for example, giving them smaller projects and introducing them to his bonding insurance agents

31

and bankers. (*Id.* at 1239-40.) According to Mr. Aldridge, such mentoring is in his own firm's best interest, by helping it create long-term relationships with reputable subcontractors. (*Id.*)

## DISCUSSION

Plaintiff argues that the IDOT DBE program violates the Equal Protection Clause of the Fourteenth Amendment which provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. The use of racial preferences is a "highly suspect tool," subject to strict judicial scrutiny. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion). Thus, racial classifications created or imposed by federal, state, or local law must serve a compelling governmental interest and must be narrowly tailored to serve that interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) ("*Adarand III*"); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) (plurality opinion). The Supreme Court has observed that although strict scrutiny is rigorous, it is not always "fatal in fact." *Adarand III*, 515 U.S. at 237.

To the extent that IDOT's DBE program is rooted in gender-conscious classifications,[26] the program is subject to intermediate scrutiny. In general, a government entity must set forth an "exceedingly persuasive justification" for gender classifications. *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d 642, 644 (7th Cir. 2001), *citing United States v. Virginia*, 518 U.S. 515, 533 (1996). The Supreme Court has not, however, developed a framework for analyzing equal protection challenges to gender-based remedial measures, nor have the courts resolved the issue of whether

---

[26] As discussed, the federal Regulations upon which IDOT's DBE program is rooted contains a rebuttable presumption that women (and members of certain racial minority groups) are socially and economically disadvantaged individuals. 49 C.F.R. § 26.67(a)(1).

gender preferences are entitled to a different, more permissive, standard than those based on race. *Builders Ass'n*, 256 F.3d at 644, *citing Milwaukee County Pavers Ass'n v. Fiedler*, 922 F.2d 419, 422 (7th Cir. 1991). In any event, since IDOT has not argued for application of a different standard for the race and gender aspects of the DBE program, the court will apply strict scrutiny to the program as a whole, and will not attempt to carve out and apply a more permissive standard to the gender-based aspects of the program.

## I. Strict Scrutiny Review

In order to survive strict scrutiny, the government must first articulate a compelling government interest served by the legislative enactment. To do so, the government must make two showings:

> First, the discrimination must be "identified discrimination." "While the states and their subdivisions may take remedial action when they possess evidence" of past or present discrimination, "they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." A generalized assertion of past discrimination in a particular industry or region is not adequate because it "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." Accordingly, an effort to alleviate the effects of societal discrimination is not a compelling interest. Second, the institution that makes the racial distinction must have had "a strong basis in evidence" to conclude that remedial action was necessary, *before* it embarks on an affirmative action program.

*Shaw v. Hunt*, 517 U.S. 899, 909-10 (1996) (emphasis in original) (internal citations omitted); *cf. Croson*, 488 U.S. at 500 ("Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice.") (citation omitted); *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000) ("[T]he government must show real evidence of past discrimination and cannot rely on conjecture."). If the government makes such a showing, the party challenging the

affirmative action plan bears the "ultimate burden" of demonstrating that unconstitutionality of the program. *Wygant*, 476 U.S. at 277-78.

## II.   Compelling Interest

In its earlier opinion, this court granted summary judgment in favor of the federal Defendants, holding that the federal DBE statute (TEA-21) was narrowly tailored to further a compelling government interest. *Northern Contracting, Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, *39-40 (N.D.Ill. Mar. 3, 2004). Specifically, the court held that the federal DBE program was narrowly tailored to further the government's compelling interest in redressing private discrimination in federally-assisted highway subcontracting. *Id.* at *34. In enacting its own DBE program, IDOT was complying with federal law, specifically TEA-21. Therefore, the court, citing a similar Eighth Circuit case, held that IDOT need not establish a distinct compelling interest before implementing the federal DBE program, *Northern Contracting, Inc.*, 2004 WL 422704, *40, *citing Sherbrooke Turf, Inc. v. Minnesota Dept. of Transp.*, 345 F.3d 964, 970 (8th Cir. 2003), *cert. denied*, 541 U.S. 1041 (2004). IDOT is, however, required to demonstrate that its implementation of the federal DBE program is narrowly tailored to serve the federal program's compelling interest. *Sherbrooke Turf*, 345 F.3d at 971. Specifically, to be narrowly tailored, "a *national* program must be limited to those parts of the country where its race-based measures are demonstrably needed." *Id.* The federal DBE program delegates this tailoring function to the state; thus, IDOT must demonstrate, as part of the narrowly tailored prong, that there is a demonstrable need for the implementation of the federal DBE program within its jurisdiction.

## III. Narrowly Tailored

Once a government entity has identified and established that a race-conscious program serves a compelling government interest, it must next show the program is narrowly tailored to serve that interest. *Adarand III*, 515 U.S. at 235. This analysis considers several factors, "including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *United States v. Paradise*, 480 U.S. 149, 171 (1987) (plurality). An affirmative action plan is narrowly tailored if "it discriminates against whites as little as possible consistent with effective remediation." *Majeske*, 218 F.3d at 820, *quoting McNamara v. City of Chicago*, 138 F.3d 1219, 1222 (7th Cir. 1998). Thus, courts look to "whether the racially preferenced measure is 'a plausible lower-bound estimate of a shortfall in minority representation' that is caused by past discrimination." *Majeske*, 218 F.3d at 823, *quoting McNamara*, 138 F.3d at 1224.

Once the government entity has both demonstrated a compelling interest in remedying past discrimination and shown that its plan is narrowly tailored to achieve that goal, the party challenging that program bears the "ultimate burden" of proving that the plan is unconstitutional. *Majeske*, 218 F.3d at 820, *citing Aiken v. City of Memphis*, 37 F.3d 1155, 1162 (6th Cir. 1994); *Concrete Works of Colo., Inc. v. City and County of Denver*, 36 F.3d 1513, 1521 (10th Cir. 1994); *see also Wygant*, 476 U.S. at 277-78 ("The ultimate burden remains with the [plaintiff] to demonstrate the unconstitutionality of an affirmative-action program."). This burden can be met only by presenting credible evidence to rebut the government's proffered data.

## A.    Is IDOT's FY2005 DBE Goal a "Plausible Lower-bound Estimate"?

The court need not conduct a step-by-step analysis of the statistical data underlying IDOT's

FY2005 DBE plan.  IDOT has presented an abundance of such data documenting usage disparities

between DBEs and non-DBEs in the construction industry.  The methodology employed in the

NERA Report has been upheld on a number of other occasions, *see Sherbrooke Turf*, 345 F.3d 964

(8th Cir. 2003); *Concrete Works of Colo., Inc. v. City and County of Denver*, 321 F.3d 950 (10th Cir.

2003), *cert. denied*, 540 U.S. 1027 (2003), and this court agrees that the methodology utilized here

is generally consistent with the dictates of the federal Regulations.  Nevertheless, Plaintiff has raised

a couple of specific issues regarding the methodology of the NERA Study that the court must

address.  First, Plaintiff argues that the custom census methodology was erroneous because it failed

to limit its DBE availability figures to those firms that are registered and pre-qualified with IDOT,

as required by state law.  Plaintiff also maintains that the NERA study erred in its calculations of the

DBE utilization rate because it considered data relating to IDOT subcontracts as well as prime

contracts, despite the fact that the latter are awarded, as a matter of law, to the lowest bidder.

According to Plaintiff, limiting the analysis of DBE utilization to IDOT subcontracts alone reveals

such firms are actually overutilized.  As a result of these errors, Plaintiff argues that IDOT's fiscal year

2005 DBE goal does not represent a "plausible lower-bound estimate" of DBE participation in the

absence of discrimination.  The court will address these contentions in turn.

### 1.    Calculation of DBE Availability

Under 49 C.F.R. § 26.45(c), a Recipient may calculate its base estimate of DBE availability

under one of five methods: (1) use of DBE directories and Census Bureau data; (2) use of a previous

year's bidders list; (3) use of data from a disparity study; (4) use of a goal of another DOT recipient

in the same, or substantially similar, market; or (5) use of alternative methods "based on demonstrable evidence of local market conditions." 49 C.F.R. § 26.45(c)(1)-(5). Prior to fiscal year 2005, IDOT calculated its DBE availability figures based on its existing list of pre-qualified and pre-registered DBE firms. In developing its fiscal year 2005 plan, however, IDOT commissioned NERA to conduct a "custom census" to provide a more accurate estimate of DBE availability, pursuant to § 26.45(c)(5). As part of this custom census, NERA identified all available DBE contractors and subcontractors in the relevant industries within the State of Illinois using Dun & Bradstreet's *Martketplace* directory, as well as approximately twenty additional DBE lists from various public and private entities within Illinois and the surrounding states.[27] This resulted in the calculation of a higher DBE availability figure than would have been reached by focusing solely on the list of registered and pre-qualified bidders lists. Specifically, use of the bidders list would have resulted in a DBE availability figure of 13.34 percent,[28] as opposed to the 22.77 percent availability figure found in the NERA Study.

Plaintiff argues that IDOT is required to calculate DBE availability based solely on the bidders list of registered and pre-qualified subcontracts. Under Illinois law, only firms registered and pre-qualified are eligible to participate in IDOT contracts, whether as a prime or subcontractor. 44 ILL. ADMIN. CODE tit. 44, §§ 650.380; 625.40. Plaintiff argues that including DBEs that are not

---

[27] As discussed above, NERA cross-checked these lists to eliminate duplicates and randomly sampled the firms to verify DBE status. The Study also attempted to weight firms, and various industries, based on their relative amount of IDOT contracting dollars. *See supra* at 15.

[28] This 13.34 percent figure is based on the following figures: 794 pre-qualified prime contractors, of which 57 are DBEs; 1381 registered subcontractors, of which 197 are DBEs; and 381 pre-qualified consultants, of which 87 are DBEs. (Am. Stipulation, ¶ 5; Ex. A.)

registered and pre-qualified violates § 26.45(b), which requires that a Recipient's overall goal to be "based on demonstrable evidence of the availability of *ready, willing and able* DBEs relative to all business ready, willing and able to participate on your DOT-assisted contracts." 49 C.F.R. § 26.45(b) (emphasis added). Unregistered firms are not "ready, willing and able" to participate in IDOT contracts, Plaintiff urges, and thus IDOT's inclusion of such firms within its DBE availability calculation contravenes the federal Regulations. Plaintiff also cites language in prior IDOT DBE plans reflecting IDOTs reliance prior to 2005 on the bidders list as the most accurate estimate of DBE availability. (Plaintiff's Post-Trial Memorandum, at 13-14.)

In response, IDOT notes that NERA's custom census approach has been employed, without successful challenge, by the Minnesota Department of Transportation, Chicago's Metra commuter railway agency, and the Maryland Department of Transportation. (Defendant's Post-Trial Memorandum, at 5, citing T.T. at 361-62.) The Eight Circuit recently upheld the Minnesota Department of Transportation's use of a custom census conducted by NERA. *Sherbrooke Turf*, 345 F.3d at 973-74. Significantly, *Sherbrooke Turf* involved an agency that, like IDOT, requires firms to be pre-qualified before being placed on a bidder's list of eligible firms. (T.T. at 370-73.) Despite this requirement, the Eighth Circuit (albeit without expressly addressing the matter) upheld the use of a custom census that looked beyond the list of pre-qualified firms when measuring DBE availability.

In addition to these precedents, IDOT urges that more general policy concerns support the use of the custom census measure. Specifically, IDOT suggests, and the court agrees, that the remedial nature of the federal statute counsels for the casting of a broader net when measuring DBE availability. IDOT cites, for example, language from a website run by the US DOT's Office of Small

and Disadvantaged Business Utilization, which explicitly encourages Recipients to consider sources

beyond certified DBE lists when calculating DBE availability:

> [I]f you have data about the number of minority and women-owned businesses (regardless of whether they are certified as DBEs) in your market area, or DBEs in your market area that are in other recipients' Directories but not yours, you can supplement your Directory data with this information. Doing so may provide a more complete picture of availability of firms to work on your contracts than the data in your Directory alone.

(Def.'s Post-Trial Brief, at 5-6, citing http://osdbu.dot.gov/business/dbe/hottips.cfm.) Moreover, the

author of the NERA Study, Dr. Wainwright, discussed during his testimony his concern that a

registration list such as the one maintained by IDOT may reflect lower levels of DBE availability due

to the indirect effects of discrimination. (T.T. at 732-34.) Dr. Wainwright explained, for example,

that discrimination in the credit and bonding markets may artificially reduce the number of

registered and pre-qualified DBEs, relative to the number of such firms within the marketplace as a

whole. (Id.) As discussed below, IDOT presented uncontradicted evidence that DBEs face

significantly higher burdens within the credit and bonding markets than non-DBE small firms. In

light of the established use of the custom census approach, as well as the legitimate policy

considerations in favor of a broader and more flexible inquiry into DBE availability, the court

overrules Plaintiff's objections to the custom census.[29]

---

[29]    As for Plaintiff's suggestion that IDOT is bound by its prior statements indicating its belief that the bidder's list produced the most accurate estimate of DBE availability, the court finds nothing in the Regulations indicating that a Recipient is required to utilize the same approach in each of its annual DBE plans. To the contrary, the Regulations invite Recipients to use whichever of the five alternative approaches they deem likely to produce the most accurate estimate of DBE availability. Indeed, the Regulations provide not only that the five examples "are not intended to be an exhaustive list," but explain that "[a]ny percentage figure derived from one of these examples should be considered a basis from which you begin when examining all evidence available in your
(continued...)

2.      **Calculation of DBE Utilization**

Plaintiff urges that the DBE utilization rate presented in the NERA study is erroneous because it considered data relating to IDOT subcontracts as well as prime contracts, despite the fact that the latter are awarded, as a matter of law, to the lowest bidder. According to Plaintiff, calculation of DBE utilization rate based on percentage of subcontracting dollars alone would have revealed that DBEs are actually overutilized on both goals and non-goals projects. As shown in the chart below, DBE utilization on subcontracts has exceeded availability each year for which data is available since 2001, on both goals and non-goals projects:

| Year | Methodology Used | Baseline DBE availability | DBE % of Total $ value of non-goals Ks | DBE % of total $ value of non-goals sub-Ks | DBE % of total $ value of goals contracts | DBE % of total $ value of goals subcontracts |
|------|------------------|---------------------------|-----------------------------------------|---------------------------------------------|---------------------------------------------|----------------------------------------------|
| 2001 | Bidders list 26.45(c)(2) | 14.76% | 1.5% | 17% | Not available | Not available |
| 2002 | 26.45(c)(2) | 11.74% | 1.5% | 17% | Not available | Not available |
| 2003 | 26.45(c)(2) | 11.01% | 2% | 19% | 15.19% | 47.72% |
| 2004 | 26.45(c)(2) | 13.79% | 2% | 17% | 18.05% | 49.85% |
| 2005 (Jan. - Apr. 2004) | Custom Census 26.45(c)(5) | 22.77% | 2% | 17% | N/A | N/A |

---

[29](...continued)
jurisdiction." 49 C.F.R. § 26.45(c)(1). In the face of such regulatory flexibility, any assertion that a Recipient is bound to employ the same method of estimating DBE availability in each of its annual DBE plans is frivolous.

(Adapted from Exs. A, B, and C to Am. Stipulation.) In 2004, for example, IDOT calculated DBE availability, using its bidders list of registered and pre-qualified firms, to be 13.79 percent of the total marketplace. During that year, DBEs received 17 percent of the total value of the subcontracted portion of non-goals contracts and 48.85 percent of the total value of the subcontracted portion of contracts with goals, both totals significantly in excess of DBE availability. Plaintiff argues that since DBE utilization on the subcontracted portion of both goals and non-goals contracts exceeded their overall availability in the marketplace, DBEs are not only fully utilized, but overutilized as compared with their utilization in a race-neutral market. (Pl.'s Post-Trial Brief, at 5.) In light of this full utilization of DBEs, Plaintiff contends, IDOT has no basis on which to employ any race-conscious requirement in the selection of subcontractors. (Id.)

IDOT responds that if one considers DBE utilization in terms of the total value of all IDOT contracts, as the Regulations require, DBE usage plummets to 2 percent of the total value of non-goals contracts and 18.05 percent of the total value of goals contracts. IDOT urges that this 2 percent figure represents a more accurate estimation of likely DBE utilization in a market without any race-conscious goals. Moreover, IDOT contends that the Regulations require Recipients to consider DBE participation rates in terms of the total value of all federally funded contracts, not merely the portion of those contracts awarded to subcontractors. Under the Regulations, a Recipient must set an overall goal for DBE participation in your DOT-assisted contracts." 49 C.F.R. § 26.45(a)(1). At no point do the Regulations limit the application of DBE goals to the subcontracted portion of contracts. To the contrary, the Regulations expressly provide that the goals requirements are imposed on prime contractors:

You must apply the requirements of this section to DBE bidders/offerors for prime contracts. In determining whether a DBE bidder/offeror for a prime contract has met a contract goal, you count the work the DBE has committed to performing with its own forces as well as the work that it has committed to be performed by DBE subcontractors and DBE suppliers.

49 C.F.R. § 26.53(g).

This requirement that goals be applied to the value of the entire contract, not merely the subcontracted portion(s), is not altered by the fact that prime contracts are, by law, awarded to the lowest bidder. While it is true that prime contracts are awarded in a race- and gender-neutral manner, the Regulations nevertheless mandate application of goals based on the value of the entire contract. Strong policy reasons support this approach. Although laws mandating award of prime contracts to the lowest bidder remove concerns regarding direct discrimination at the level of prime contracts,[30] the indirect effects of discrimination may linger. The ability of DBEs to compete successfully for prime contracts may be indirectly affected by discrimination in the subcontracting market, or in the bonding and financing markets. Such discrimination is particularly burdensome in the construction industry, a highly competitive industry with tight profit margins, considerable hazards, and strict bonding and insurance requirements. *See Builders Ass'n of Greater Chicago*, 298 F. Supp. 2d at 730-31 (discussing the hurdles facing small firms in the construction industry). Due to these requirements, smaller firms are generally unable to bid on large, prime contracts, and indeed often focus on subcontracts in a particular trade. *Id.* at 731 ("Smaller firms are not, therefore, bidders on large prime contracts and generally focus on subcontracts in a particular trade.").

---

[30]     In light of laws requiring the award of prime contracts on the basis of low bid, any direct racial or gender discrimination at this level could presumably occur only in the form of overt bid-rigging.

42

IDOT presented an array of statistical studies concluding that DBEs face disproportionate hurdles in the credit, insurance, and bonding markets. A study conducted by NERA on behalf of Metra, for example, found that black-owned firms are twenty percent more likely to have a loan application denied than white-owned firms, even after controlling for differences in creditworthiness. (Def.'s Ex. 19, at 75.) The study also found that black-owned firms pay, on average, a one percent higher rate of interest than comparable white-owned firms. (Id. at 76.) In addition, IDOT cited studies concluding that minorities and women form businesses at a lower rate, and that such business, when formed, are less successful than businesses owned by white males. (Branchflower Report, at 14-15, 18.)

The results of these studies were consistent with the testimony of DBE owners. These witnesses discussed their difficulties obtaining financing, lines of credit, and insurance, as well as their beliefs that their experiences were linked to their race or gender. Disappointingly, the two female witnesses, both successful business owners, separately reported that they had been asked to present a male co-signor when applying for lines of credit.[31] The DBE witnesses testified, further, that when they are able to obtain credit and insurance, their rates are higher than those applied to non-DBEs.[32]

_____

[31]    IDOT's DBE witnesses also discussed their belief that many prime contractors only solicited their services on projects with DBE goals. Some of this testimony, however, was effectively rebutted by the testimony of the prime contractors called to testify on behalf of Plaintiff. Plaintiff's witnesses were unanimous in maintaining that they solicit DBEs and non-DBEs equally, and in explaining that their firms look to price and ability, not race or gender, in awarding subcontracts. There was no evidence of even a single instance in which a prime contractor failed to award a job to a DBE that offered the low bid. This testimony is supported by the statistical data discussed above, which shows that at least at the level of subcontracting, DBEs are generally utilized at a rate in line with their ability.

[32]    Regrettably, IDOT did not verify the specific allegations made by these witnesses nor
(continued...)

43

These accounts were not impeached during cross examination, nor did Plaintiff otherwise refute their testimony through its own witnesses (i.e. representatives from the credit or insurance industries) or statistical studies.

That such discrimination indirectly affects the ability of DBEs to compete for prime contracts, despite the fact that they are awarded solely on the basis of low bid, cannot be doubted: "[E]xperience and size are not race- and gender-neutral variables . . . [DBE] construction firms are generally smaller and less experienced *because* of industry discrimination. The lending discrimination and business formation studies both strongly support [the recipient's] argument that [DBEs] are smaller and less experienced because of marketplace and industry discrimination." *Concrete Works*, 321 F.3d at 981.

Nevertheless, Plaintiff urges that, regardless of the method of calculation, the data indicates that there is no underutilization of DBEs in IDOT contracts and, thus, data on the utilization of DBEs provides no support for race- or gender-based remedial measures. The parties have stipulated that DBE utilization on goals projects exceeded their overall availability in both fiscal years 2003 and 2004, even if utilization is measured as a percentage of total IDOT contract dollars. In fiscal year

---

[32](...continued)
test these experiences against those of new businesses established by white males. At least one Court of Appeals has nevertheless honored such testimony:

> There is no merit to [plaintiff's] argument that the witnesses' accounts [of discrimination] must be verified to provide support for [the government's] burden. Anecdotal evidence is nothing more than a witness' narrative of an incident told from the witness' perspective and including the witness' perceptions. . . . [The government] was not required to present corroborating evidence and [plaintiff] was free to present its own witnesses to either refute the incidents described by [the government's] witnesses or to relate their own perceptions on discrimination in the . . . construction industry.

*Concrete Works*, 321 F.3d at 989.

2003, in which IDOT calculated DBE availability at 11.01 percent of the marketplace, DBEs were awarded 15.19 percent of the total dollar value of all IDOT goals contracts and 47.72 percent of the subcontracted dollars. (Ex. B to Am. Stipulation.) Likewise in fiscal year 2004, when DBE availability was estimated to be 13.79 percent, DBEs were awarded 18.05 percent of the total value of all IDOT goals contracts and 49.65 percent of the total value of the subcontracted portions of all goals contracts. (Ex. C to Am. Stipulation.)

IDOT contends that the high utilization of DBEs on goals contracts was a product of the successful DBE program and not the absence of discrimination. It points to the sharp decline in DBE utilization on IDOT contracts without DBE goals over the same period. In fiscal year 2003, in which DBE availability was estimated to consist of 11.01 percent of the total marketplace, DBEs received 2 percent of the total dollar value of IDOT contracts without goals and 19 percent of the total value of the subcontracted portions of those contracts. (Ex. A to Am. Stipulation.) Similarly, in fiscal year 2004, when IDOT estimated DBE availability at 13.79 percent of the total market, DBEs received only 2 percent of the total dollar value of non-goals contracts but 17 percent of the total value of subcontracts awarded. (Id.) In addition, IDOT presented evidence regarding DBE utilization in other unremediated markets (without DBE goals), all of which showed DBE utilization to decline significantly in the absence of goals.

In light of this data, the court is convinced that the relatively high (or appropriately high) level of DBE participation on goals contracts has resulted not from a lack of discrimination, but from the success of IDOT's DBE program. The stark disparity in DBE participation rates on goals and non-goals contracts, when combined with the statistical and anecdotal evidence of discrimination in the relevant marketplaces, indicates that IDOT's 2005 DBE goal represents a "plausible lower-

45

bound estimate" of DBE participation in the absence of discrimination. *Majeske*, 218 F.3d at 82; *McNamara*, 138 F.3d at 1224. Now that IDOT has met this burden, Plaintiff can succeed in meeting its "ultimate burden" to show that IDOT's DBE program is not narrowly tailored only by presenting credible evidence to rebut IDOT's proffered data. *Majeske*, 218 F.3d at 820. Such "rebuttal evidence may consist of a neutral explanation for the statistical disparities" or presentation of Plaintiff's own statistical data. *Concrete Works*, 321 F.3d at 959, *quoting Coral Const. Co. v. King County*, 941 F.2d 910, 921 (9th Cir. 1991). Plaintiff presented no persuasive evidence contravening the conclusions of IDOT's studies, or explaining the disparate usage of DBEs on goals and non-goals contracts.

In the absence of its own statistical evidence, Plaintiff argues that the marketplace data presented by IDOT, even if accepted at face value, cannot justify the use of race- or gender-based remedies because IDOT has not identified direct discrimination against DBEs by prime contractors. (Pl.'s Post-Trial Brief, at 22-23.) It cites language from the Seventh Circuit suggesting that in the absence of such evidence, IDOT could not constitutionally create race-conscious remedies:

> [I]f prime contractors on County projects were discriminating against minorities and this was known to the County, whose funding of the contracts thus knowingly perpetuated the discrimination, the County might be deemed sufficiently complicit (a kind of joint tortfeasor, coconspirator, or aider and abettor) to be entitled to take remedial action. But of that there is no evidence either.

*Builders Ass'n of Greater Chicago*, 256 F.3d at 645 (citations omitted). Plaintiff urges that IDOT is barred from employing race-conscious remedies because it has not demonstrated, statistically or otherwise, any direct discrimination by prime contractors.

At bottom, this argument amounts to the contention that IDOT failed to identify a compelling government interest underlying its DBE program by failing to "identify [past or present]

discrimination, public or private, with some specificity." *Shaw*, 517 U.S. at 909-910. The argument fails for two reasons. First, IDOT's proffered evidence of discrimination against DBEs was not limited to alleged discrimination by prime contractors in the award of subcontracts. IDOT also presented evidence that discrimination in the bonding, insurance, and financing markets erected barriers to DBE formation and prosperity. Such discrimination inhibits the ability of DBEs to bid on prime contracts, thus allowing the discrimination to indirectly seep into the award of prime contracts, which are otherwise awarded on a race- and gender-neutral basis. This indirect discrimination is sufficient to establish a compelling governmental interest in a DBE program:

> [E]vidence of discriminatory barriers to the formation of businesses by minorities and women and fair competition between [DBEs] and majority-owned construction firms shows a "strong link" between a government's "disbursements of public funds for construction contracts and the channeling of those funds due to private discrimination." Evidence that private discrimination results in barriers to business formation is relevant because it demonstrates that [DBEs] are precluded *at the outset* from competing for public construction contracts.

*Concrete Works*, 321 F.3d at 977 (internal citations omitted).[33] Having established the existence of such discrimination, a governmental entity "has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *Croson*, 488 U.S. at 492 (O'Connor, J., joined by Rehnquist, C.J. and White, J.).

More importantly, Plaintiff fails to acknowledge that, in enacting its DBE program, IDOT acted not to remedy its own prior discriminatory practices, but pursuant to federal law, which both authorized and required IDOT to remediate the effects of *private* discrimination on federally funded

---

[33]     As in this case, the defendants in *Concrete Works* presented statistical studies showing that private discrimination in the lending and credit markets was responsible for lower minority business formation rates. *Id.* at 963-66.

highway contracts. This is a fundamental distinction.[34] As noted above, a state or local government need not independently identify a compelling interest when its actions come in the course of enforcing a federal statute, citing

> Compelling government interest looks at a statute or government program on its face. When the program is federal, the inquiry is (at least usually) national in scope. If Congress or the federal agency acted for a proper purpose and with a strong basis in the evidence, the program has the requisite compelling government interest nationwide, even if the evidence did not come from or apply to every State or locale in the Nation. Thus, we reject appellants' contention that their facial challenges to the DBE program must be upheld unless the record before Congress included strong evidence of race discrimination in construction contracting in [a given state].

*Sherbrooke Turf*, 345 F.3d at 970; *see also Milwuakee County Pavers Ass'n v. Fielder*, 922 F.2d 419, 423 (7th Cir. 1991) ("If the state does exactly what the statute expects it to do, and the statute is conceded for purposes of the litigation to be constitutional, we do not see how the state can be thought to have violated the Constitution.").

---

[34]    For this reason, *Builders Association of Greater Chicago v. County of Cook*, 123 F. Supp. 2d 1087 (N.D. Ill. 2000) *aff'd* 256 F.3d 642 (7th Cir. 2001), is not directly relevant to the present case. In that case, the court held that Cook County had failed to establish a compelling interest supporting its contract set-aside program. In support of its program, the County had presented anecdotal evidence that prime contractors failed to solicit minority- and women-owned subcontractors at the same rate as similarly-situated firms owned by white males. *Id.* at 1113. In addition, the County had presented statistical data demonstrating that a number of firms rarely or never solicit minority- or women-owned firms for subcontract work. The court, however, held that the County had failed to show evidence of a systematic refusal to solicit such firms for subcontract work, noting that the County's statistical data was based on the practice of a mere thirteen general contractors. *Id.* The Seventh Circuit subsequently upheld this decision, adding that the program also failed the narrowly tailored prong insofar as the County failed to link its set-aside levels (30 percent to minorities and 10 percent to women) to evidence of their availability in the marketplace. *Builders Ass'n of Greater Chicago v. County of Cook*, 256 F.3d at 647.

## A. Race-Neutral Aspects of IDOT's DBE Program

As a part of the narrow tailoring inquiry, courts examine whether there was "'any consideration of the use of race-neutral means to increase minority business participation' in government contracting." *Adarand III*, 515 U.S. at 237-38, *quoting Croson*, 488 U.S. at 507. Such measures are important to ensure that a plan "'discriminates against whites as little as possible consistent with effective remediation.'" *Majeske*, 218 F.3d at 820, *quoting McNamara*, 138 F.3d at 1222. Though "[n]arrow tailoring does not require exhaustion of every conceivable race-neutral alternative," it does require "serious, good-faith consideration" of race-neutral measures. *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003) (citations omitted). This court is satisfied that IDOT has done its best to maximize the portion of its DBE goal met through methods unrelated to contracting goals.

Those measures fall into two broad categories: anti-discrimination enforcement and small business initiatives. As part of its anti-discrimination efforts, IDOT has developed an internet website where a DBE can file an administrative complaint if it believes a prime contractor is discriminating on the basis of race or gender in the award of subcontracts. (FY2005 Plan, at 8; T.T. at 1335.) Once such a complaint has been filed, IDOT will conduct a full-scale inquiry into the allegations, and, if discrimination is found, impose penalties on individual contractors. (T.T. at 1335-37.) In addition, IDOT requires contractors seeking pre-qualification to maintain and produce solicitation records on all projects, both public and private, with and without goals, as well as records of the bids received and accepted. (FY2005 Plan, at 8; T.T. at 1335-38.) Such evidence will assist IDOT in investigating and evaluating discrimination complaints. Through these measures, IDOT is able to limit its reliance on race- and gender-conscious remedies, by attempting to stem discrimination at its source.

In addition to these anti-discrimination measures, IDOT has also implemented a number of small business initiatives designed to increase DBE participation without the use of race- or gender-conscious goals. The agency has, for example, taken a number of steps to reduce barriers to participation facing new and small firms, including the "unbundling" of large contracts into smaller pieces, and the allocation of some contracts for bidding only by firms meeting the Small Business Administration's definition for small businesses. (FY2005 Plan, at 7.) IDOT is also in the process of adopting a bonding and financing assistance initiative, which will assist emerging contractors in meeting IDOT's pre-qualification requirements and increasing their capacity to handle larger projects. (*Id.*) Towards this end, IDOT has adopted "prompt pay" rules, designed to ensure prompt payment of subcontractors and to improve the cash flow of small businesses. (*Id.* at 8.) IDOT has continued to sponsor networking and informational sessions, as well as a mentor-protégé program encouraging partnerships between established firms and DBEs, and other small businesses. (*Id.*) In addition, IDOT maintains a network of consultants available to provide management, technical and financial training to DBEs and other small businesses. (*Id.*)

Significantly, Plaintiff did not question the efficacy or sincerity of these race- and gender-neutral measures. For good reason. There is no basis to dispute IDOT's commitment to achieving the maximum portion of its DBE goals through race- and gender-neutral means.[35] The court takes

---

[35] This is in sharp contrast to the program in *Builders Association of Greater Chicago v. City of Chicago*, where the court found that a contractual set-aside program was not narrowly tailored to remedy past and present discrimination and thus violated equal protection. 298 F. Supp. 2d at 741. In that case, the court found, initially, that evidence that business formation rates among women and minorities were depressed by discrimination in the credit market established a compelling governmental interest for the City's set-aside program. *Id.* at 739. The court held, however, that the City's program was not narrowly tailored to this interest. Specifically, the court noted that the
(continued...)

special notice of the efforts to increase the ability of DBEs and other small businesses to grow in size and compete for prime contracts. These efforts are significant in light of the statistical data showing that DBE participation is especially low in the prime contracting arena. Because this data is not the result of direct discrimination, race- and gender-neutral measures are likely to be vital in increasing the ability of DBEs and other small businesses to compete for prime contracts.

## B.    Flexibility and Waivers

IDOT's DBE program also retains significant flexibility through the use of contract-by-contract goal setting and a provision for individual contract waiver. In the case of the former, IDOT individually tailors the DBE goal on an individual contract basis – in other words, IDOT does not apply a fixed DBE goal to each individual contract. (T.T. at 156-57.) Instead, IDOT sets individual contract goals only after considering the nature of the work involved, the geographic area, and the availability of DBEs in that area. (*Id.* at 157.) In addition, IDOT's DBE plan allows prime contractors to petition for waiver of individual contract goals in certain situations. (*Id.* at 160.) A contractor is entitled to a waiver when it cannot meet a goal despite having made reasonable efforts to do so. (*Id.* at 160-61.) Significantly, IDOT approves over 70 percent of waiver requests (though they are only requested on 8 percent of contracts). *Compare Builders Ass'n of Greater Chicago*, 298

---

[35](...continued)
program had no termination rate, and contained a very high "graduation" revenue amount of $27,500,000. *Id.* at 739-40. Thus, a minority- or women-owned business was treated as disadvantaged unless or until it achieved annual revenues of over $27,500,000. Furthermore, the court noted that the City "rarely or never granted" waivers on construction constructs. *Id.* at 740. Finally, the court found that the City had failed to attack direct discrimination by prime contractors and had otherwise failed to implement race-neutral measures designed to assist minority- or women-owned businesses without resort to race- or gender-conscious set-asides. *Id.* at 741.

F. Supp. 2d at 740 (finding DBE plan not to be narrowly tailored where waivers were "rarely or never granted").

The individualized goal setting and waiver provisions are important aspects of IDOT's DBE program. A number of courts have stressed the importance of the flexibility in the context of narrow tailoring:

> Regarding flexibility, "the availability of waiver" is of particular importance. As for numerical proportionality, *Croson* admonishes us to beware of the "completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." In that context, a "rigid numerical quota" particularly disserves the cause of narrow tailoring.

*Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1177 (10th Cir. 2000) ("*Adarand VII*") (internal citations omitted) (opinion on remand from *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000)). IDOT's DBE plan accounts for both these factors. Its plan contains a great deal of flexibility, through the employment of individualized DBE goals on a contract-by-contract basis, and through the maintenance of a waiver provision to account for those situations in which achievement of the set DBE goals is not reasonably possible.

## CONCLUSION

The court finds IDOT's plan narrowly tailored to the goal of remedying the effects of racial and gender discrimination within the construction industry. Judgment is entered in favor of Defendants.

ENTER:

Dated: September 8, 2005

REBECCA R. PALLMEYER
United States District Judge